IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Criminal No. 2:19-cr-00241 |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| SRIRAMLOO KESARI, M.D. ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT SRIRAMLOO KESARI, M.D.'S MOTION IN LIMINE TO ADMIT
EXPERT EVIDENCE OF COGNITIVE IMPAIRMENT TO REBUT SPECIFIC INTENT**

Pursuant to 18 U.S.C. § 4241 and Federal Rule of Criminal Procedure 12.2(b), Defendant Sriramloo Kesari, M.D. ("Dr. Kesari"), through counsel, moves this Court to find Dr. Kesari competent to stand trial and to admit expert evidence relating to Dr. Kesari's diagnosed cognitive impairment at trial. Dr. Kesari's impairment is not severe enough to preclude him from understanding the nature and consequences of the proceedings against him or from assisting properly in his defense. However, because his diminished capacity impacted his ability to formulate the specific intent to participate in a conspiracy or unlawfully distribute a controlled substance, expert testimony regarding his impairment is admissible and highly relevant to rebut a necessary element of the government's case. In support of this Motion, Dr. Kesari states as follows:

**I.      Introduction and Factual Background**

Based on our own observations and the recommendation of an expert psychiatrist retained in a different capacity, the undersigned counsel acted in an abundance of caution to arrange for Dr. Kesari to be evaluated by Dr. Daniel Franc, MD, PhD, a board-certified neurologist, and Dr. Judith Friedman, MEd, PsyD, a board-certified geriatric clinical neuropsychologist. Dr. Franc's CV and a summary report of his diagnostic findings are respectively attached to this motion as **Exhibits A**

1

and **B**; and Dr. Friedman's CV and two summary reports of her findings are attached to this motion as **Exhibits C**, **D-1**, and **D-2**. Both Dr. Friedman and Dr. Franc independently diagnosed Dr. Kesari with moderate cognitive impairment/mild dementia, which results in problems with memory, language, thinking, and judgment. Based on the results of Dr. Franc's and Dr. Friedman's evaluations and MRIs performed on or about July 8, 2018 and January 5, 2020, Dr. Kesari's impairment was present in its current form during the operative dates of the alleged conspiracy.

### A.  Based on a Full Neurological Evaluation, Dr. Kesari Suffers from Moderate Cognitive Impairment.

Dr. Franc evaluated Dr. Kesari on January 14, 2020.  After various neurological testing, Dr. Franc concluded that Dr. Kesari suffers from moderate cognitive impairment and microvascular neurodegenerative brain disease. **Exhibit B** at 3-4. Specifically, Dr. Kesari scored 20/30 on the Montréal cognitive assessment and scored 0.7 on the Clinical Dementia Rating ("CDR") Scale. *Id*. Both scores indicate cognitive impairment beyond normal aging, including trouble with concentration and memory. *Id*. To put Dr. Kesari's scores in perspective, the general consensus is that scores of 23 or less in the Montréal cognitive assessment indicate mild stage dementia, and scores over 0.5 on the CDR scale indicate cognitive impairment. *Id*. at 4. "Dr. Kesari was given a CDR of 0.7, indicating more significant impairment." *Id*.

Dr. Franc did not see signs of Alzheimer's disease, but rather saw indications of vascular dementia in Dr. Kesari's 2018 and 2020 MRI results. *Id*. Dr. Franc identified several risk factors that made Dr. Kesari predisposed to vascular dementia, and believes his observed impairments in executive functioning, memory, and visuospatial functioning are consistent with vascular dementia.  *Id*. Vascular dementia is a progressive condition which eventually results in dementia. *Id*. The cognitive impairment for patients showing signs of vascular dementia is approximately 10-12% per year.  *Id*.

Dr. Franc noted that Dr. Kesari has experienced approximately ten years of cognitive decline. *Id*. at 3. Dr. Kesari first started forgetting patient names; this progressed to forgetting appointments, forgetting to pay bills, forgetting to take medications or taking incorrect doses, and more recently repeating conversations and questions. *Id*. at 1-2. Dr. Kesari reported an increase in his memory loss within the past one to two years. *Id*. at 1. These facts, combined with Dr. Kesari's neurological test results, and his 2018 and 2020 MRI results led Dr. Franc to his current diagnosis. *Id*. at 1-4. Dr. Franc stated "with medical certainty that the same underlying disease process of vascular dementia was in place during [2018], and I anticipate similar mild to moderate cognitive dysfunction as a result." *Id*. at 4. Dr. Kesari not only suffers from moderate cognitive impairment now, but has for some time, including during the relevant time period of these charges. *Id*.

**B.     Based on a Full Neuropsychological Evaluation, Dr. Kesari Suffers from Mild Dementia.**

Dr. Friedman evaluated Dr. Kesari on January 7, 2020. **Exhibit D-1** at 1. After reviewing Dr. Kesari's medical history and conducting an evaluation which included the administration of a battery of psychological tests, Dr. Friedman concluded that Dr. Kesari suffers from a "Vascular dementia without behavioral disturbance." *Id*. at 5-7. In particular, Dr. Friedman found that Dr. Kesari's cognitive impairment is likely the result of several etiological factors working in combination. *Id*. at 7. The test results revealed executive dysfunction, auditory and visual memory difficulties, and difficulties with language, visual perception, and attention, coupled with a decline in instrumental activities of daily living (such as declines in financial management, medication management, etc.). *Id*. Dr. Friedman concluded that the pattern of scattered cognitive decline was likely related to Dr. Kesari's history of vascular changes in the brain, as documented in MRI impressions dated July 8, 2018 and January 5, 2020. *Id*.

Dr. Friedman noted that Dr. Kesari's memory difficulties began approximately 10 years ago and have become more pronounced in the last two years. *Id.* at 1-2. Dr. Kesari forgets events, conversations, and names, repeats himself and requires repetitive reminding to perform tasks, often relying on his family to remember to do things. *Id.* Dr. Kesari has word finding difficulties, difficulty with expressive and receptive language in both English and his native language, Telugu, and general difficulty in expressing his thoughts in an organized way. *Id.* Finally, Dr. Friedman noted that Dr. Kesari is highly distractible, prone to lose his train of thought, and has problems concentrating. *Id.*

The tests administered by Dr. Friedman revealed that Dr. Kesari performed well-below expectation on a number of executive functioning tasks designed to gauge a patient's ability to plan, organize, sequence, and manage information. *Id.* at 7. Dr. Kesari performed in the impaired range on a test (the Delis-Kaplan Executive Function System – Color-Word (Inhibition/Switching) test) requiring inhibition of competing overlearned responses and could complete only two out of six categories on a test (the Wisconsin Card Sorting Test-64 Card Version) of complex problem-solving abilities. *Id.* The tests also included an effort component designed to detect any attempt to intentionally skew test results. *Id.* at 6. Dr. Kesari's responses to this component were within normal limits and Dr. Friedman concluded that overall results of her examination "are thought to portray a valid representation of [Dr. Kesari's] current neuropsychological functioning." *Id.* Based on the totality of her review, Dr. Friedman concluded that "Dr. Kesari meets diagnostic criteria for mild dementia, according to the Global Deterioration Scale criteria and demonstrates deficits across multiple cognitive domains." *Id.* at 7.

### C. Dr. Kesari's Cognitive Impairment Does Not Render Him Incompetent to Stand Trial, But Does Present an Important Issue of Fact for the Jury.

The relevancy of Dr. Kesari's condition to this matter is two-fold. First, Dr. Kesari's condition presents certain challenges, but does not rise to the level of rendering him unable to appreciate the nature of these proceedings or meaningfully participate in his defense pursuant to 18 U.S.C. § 4241. *See* **Exhibit D-2**. Dr. Friedman and Dr. Franc both found Dr. Kesari able to articulate the nature and seriousness of the government's allegations and Dr. Friedman expressly concluded within a reasonable degree of neuropsychological certainty that "Dr. Kesari is currently competent to stand trial and has the ability to assist counsel." *Id.* at 3. In light of Dr. Kesari's cognitive difficulties, Dr. Friedman recommended certain measures be taken to assist Dr. Kesari in processing complex information, including breaking information down into smaller units and otherwise communicating in a slow, clear, and repetitive manner. *Id.* Dr. Kesari is represented by experienced and capable counsel who have to date and will continue in the future to communicate with Dr. Kesari in a manner to ensure that he is able to process information and make informed decisions in support of his defense. For these reasons, the undersigned counsel will recommend that this Court find Dr. Kesari competent to stand trial at the hearing set for January 30, 2020.

As a separate and distinct issue, both Dr. Friedman and Dr. Franc unequivocally found that Dr. Kesari's high-level reasoning was impaired during the period of the alleged conspiracy and that this condition affected Dr. Kesari's ability to communicate—both in understanding others and in articulating his own thoughts in an understandable and organized manner—and to execute complicated intellectual tasks, all of which are directly relevant to rebut the government's assertion that Dr. Kesari knowingly and intentionally decided to convert his medically assisted addiction treatment practice into a criminal enterprise.

Evidence of intent is the central issue in this proceeding—to make a determination of guilt or innocence, the jury must infer Dr. Kesari's intent from all of the surrounding circumstances. The government charged Dr. Kesari with distributing a controlled substance and conspiring to do so based on allegations that he prescribed medication to treat opioid addiction ("opioid use disorder") outside the usual course of professional practice and for no legitimate medical purpose in violation of 21 U.S.C. §§ 841 and 846. Because both are specific intent crimes, throughout its filings with this Court, the government has repeatedly articulated what it must prove: that Dr. Kesari "was not running his medical practice for the legitimate purpose of treating patients, as instead he was remotely operating a lucrative prescription-script mill. . ." *See* ECF No. 32, at 3; *see also United States v. McIver*, 470 F.3d 550, 560-61 (4th Cir. 2006) (explaining that to support a conclusion that a physician was acting outside the usual course of professional practice, the government must introduce sufficient evidence "to support an inference" that the defendant was "acting as a dealer of drugs rather than a provider of care"). If, however, Dr. Kesari acted in good faith—regardless of any technical violations of regulations—the jury must find him not guilty on all charges.

The question of Dr. Kesari's intent is unquestionably impacted by his mental capacity. To ensure a fair trial, Dr. Kesari seeks to admit expert testimony regarding his moderate cognitive impairment/mild dementia as evidence against his specific intent to commit violations of 21 U.S.C. §§ 841(a)(1) and 846. Specifically, evidence of impairment is a critical component of the totality of the circumstances the jury must consider in determining whether Dr. Kesari specifically intended to enter into a criminal conspiracy or to prescribe buprenorphine other than as a good faith effort to treat opioid use disorder. Dr. Kesari's diminished abilities to communicate and process information directly impact the inferences that can reasonably be drawn from any alleged

6

technical defects in the care he rendered to his patients. These alleged technical defects are at the heart of the government's case and highly relevant to the jury's determination of whether Dr. Kesari was acting in good faith or, instead, as the leader of a drug dealing conspiracy.

## II. Argument

### A. The Government Must Prove Specific Intent.

21 U.S.C. § 841(a)(1) makes it unlawful for "any person [to] knowingly or intentionally... manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 846, in turn, holds anyone "who attempts or conspires to commit" a § 841(a)(1) violation to the same penalties as the alleged § 841(a)(1) violation. The two charges remain separate. *See United States v. Hackley*, 662 F.3d 671, 681 (4th Cir. 2011).

21 U.S.C. §§ 841(a)(1) and 846 are specific intent crimes. Under Fourth Circuit law, "the *mens rea* of § 846 is derived from that of the underlying offense, in this case § 841(a)." *United States v. Ali*, 735 F.3d 176, 186 (4th Cir. 2013) (citing *United States v. Deffenbaugh*, 709 F.3d 266, 272 (4th Cir. 2013)). The court in *Ali* explained that "[t]he *mens rea* of § 841(a) is articulated explicitly in the statute," which criminalizes "knowingly or intentionally. . .distribut[ing]. . .a controlled substance." *Id.* (characterizing § 841(a)(1) as a "specific intent" crime). As the Fourth Circuit has also explained, physicians "who are 'registered' by the Attorney General are authorized to write prescriptions for or to otherwise dispense controlled substances, so long as they comply with the requirements of their registration. *United States v. Hurwitz*, 459 F.3d 463, 475 (4th Cir. 2006) (citing 21 U.S.C. § 822(b)). The implementing regulations provide that "a prescription for a controlled substance is effective only if it is 'issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.'" *Id.* Accordingly, courts have imposed an additional element in prosecutions of physicians under § 841(a)(1) that

requires the government to prove that the prescriptions were issued other than in good faith and outside the usual course of professional practice. *See United States v. Moore*, 423 U.S. 122, 124, 139-43 (1975); *United States v. Singh*, 54 F.3d 1182, 1187 (4th Cir. 1995).

On this critical element, the Fourth Circuit has summarized the government's burden as requiring proof that the defendant used his authority to prescribe controlled substances other than in good faith for treatment of a patient, "for the purpose of assisting another in the maintenance of a drug habit or some other illegitimate purposes, such as his own personal profit." *United States v. McIver*, 470 F.3d 550, 559-60 (4th Cir. 2006) (internal citations omitted); *see also United States v. Alerre*, 430 F.3d 681, 687 (4th Cir. 2005) (summarizing jury instructions that, to convict, "the jury was obliged to find beyond a reasonable doubt that the defendants were selling drugs, or conspiring to do so, and not practicing medicine"); *United States v. Tran Trong Cuong*, 18 F.3d 1132, 1138 (4th Cir. 1994) (jury was properly instructed that "[g]ood faith in this context means good intentions in the honest exercise of best professional judgment as to a patient's need. . .[and] the doctor acted in accordance with what he believed to be proper medical practice."). The purpose of this element is to differentiate between the civil malpractice standard, which requires only proof that the "doctor departed from the recognized and generally accepted standards, practices, and procedures," and the criminal standard, which requires proof "that the physician was not practicing medicine, but was instead cloaking drug deals under the guise of a professional medical practice." *United States v. Alerre*, 430 F.3d 681, 690-91 (4th Cir. 2005) (citing the South Carolina standard for malpractice); *see also McIver*, 470 F.3d at 560 (approving an instruction that admonished the jury that "[Malpractice or negligence] is not what we're talking about"). Accordingly, if Dr. Kesari acted in good faith—meaning with "good intentions, [] honest exercise of professional judgment as to the patent's needs[,]" and in an effort to act "in accordance with what he reasonably believed

to be proper medical practice"—then he is not guilty. *See McIver*, 470 F.3d at 556 n.9 (recounting the district court's good faith instruction); *id.* at 560 (explaining that a "good faith" instruction is "a plainspoken method of explaining to the jury a critical difference between" the civil and criminal standards). In making that determination, courts have repeatedly instructed juries to consider "the totality of [the physician's] actions and the circumstances surrounding them." *United States v. McIver*, 470 F.3d 550, 556 n.9 (4th Cir. 2006) (recounting the district court's instructions); *id.* at 560 ("find[ing] no error with the district court's instructions").

Under this standard, the government is required to prove that Dr. Kesari knowingly and intentionally distributed a controlled substance outside of his legitimate medical practice and that he knowingly and willfully joined a conspiracy to achieve that unlawful object. The government undoubtedly intends to rely on evidence such as the recordings of an undercover agent, poorly managed or scrambled medical records, or inconsistencies in patient charts, in an effort to demonstrate Dr. Kesari's specific intent. Dr. Kesari must be allowed to present relevant evidence, including evidence of his moderate cognitive impairment/mild dementia, to rebut the same. In other words, Dr. Kesari should be able to offer evidence of a reasonable alternative explanation for any alleged defect from which the government will ask the jury to infer specific intent.

### B.     Non-Insanity Psychiatric Evidence is Admissible to Negate Specific Intent.

Non-insanity psychiatric evidence is admissible to show a defendant lacked the requisite specific intent. *See, e.g., United States v. Worrell*, 313 F.3d. 867, 874 (4th Cir. 2002). The Fourth Circuit has held that the Insanity Defense Reform Act[1] ("IDRA") of 1984 "does not prohibit psychiatric evidence of a mental condition short of insanity when such evidence is offered purely

---

[1] The IDRA codified the federal standard for an insanity defense. 18 U.S.C. § 17. While the IDRA bars introduction of evidence relating to mental conditions unless the defendant pursues a formal insanity defense, it does not bar psychiatric evidence used to negate an element of the government's case. *See e.g., Worrell,* 313 F.3d at 872.

9

to rebut the government's evidence of specific intent." *Worrell*, 313 F.3d at 874.[2] It is appropriate for courts to allow psychiatric testimony at trial.[3] The court in *Worrell* went on to cite *United States v. Staggs*,[4] as an example of the appropriate use of non-insanity psychiatric evidence. *Id.* at 873–74. In *Staggs*, the Seventh Circuit reversed the district court's exclusion of psychiatric evidence intended to show that Staggs's mental condition made it highly unlikely he would commit the crime. 553 F.2d 1073 (7th Cir. 1977). The Seventh Circuit found that "[the doctor's] testimony that the defendant was a person more likely to want to harm himself than to think about directing his aggressions toward others made more probable the truth of defendant's assertion that he harbored no criminal intent during his encounter with [a federal agent]." *Id.* at 1076.

Both the Third and Eleventh Circuits also cite *Staggs* as an example of the appropriate use of psychiatric evidence to negate specific intent. *See United States v. Cameron*, 907 F.2d 1051, 1067 (11th Cir. 1990); *United States v. Pohlot*, 827 F.2d 889, 897 (3rd Cir. 1987). The court in *Worrell* reasoned that the evidence in *Staggs* was appropriate because he "was offering the psychiatric evidence *to show he did not do it*, not that he could not help it." 313 F.3d. at 874 (emphasis added). The court in *Cameron* adds, "[t]he evidence instead shed a light on whether Staggs possessed a specific state of mind that would make him guilty of a more serious crime than his conduct alone would support." *Cameron,* 907 F.2d at 1067.

---

[2] The Fourth Circuit is not alone; this interpretation of the IDRA is widely held among the circuits. *See, e.g.*, *United States v. Dupre*, 462 F.3d 131, 137 & n.8 (2d Cir. 2006); *United States v. Brown*, 326 F.3d 1143, 1147 (10th Cir. 2003); *United States v. Schneider*, 111 F.3d 197, 201 (1st Cir. 1997); *United States v. Bartlett*, 856 F.2d 1071, 1081-82 (8th Cir. 1988); *United States v. Twine*, 853 F.2d 676, 679 (9th Cir. 1988); *United States v. Pohlot*, 827 F.2d 889, 890 (3d Cir. 1987); *United States v. Cameron*, 907 F.2d 1051, 1067 (11th Cir. 1990); *United States v. Leandre*, 132 F.3d 796, 802, 328 U.S. App. D.C. 95 (D.C. Cir. 1998).

[3] *See, e.g.*, *United States v. Santos-Bueno*, 2006 U.S. Dist. LEXIS 6275 at *3 (D.C. Mass. Jan. 5, 2006) (denying government's motion in limine to exclude expert testimony, allowing neuropsychologist to testify to defendant's limited cognitive abilities); *United States v. Marenghi*, 893 F. Supp. 85, 91 (D.C. Maine June 26, 1995) (denying government's motion in limine to exclude expert testimony, ordering written proffer of the testimony of experts).

[4] *Staggs* was overruled on unrelated grounds. *See United States v. Ricketts*, 146 F.3d 492, 497 (7th Cir. 1998) (finding its conclusion in *Staggs,* that 18 U.S.C.. § 111 is a general intent crime, was incorrect).

District courts have admitted psychiatric evidence, and appellate courts have held that excluding such evidence constitutes reversible error.[5] For example, in *United States v. Milan*, an elderly doctor was charged with the same crimes Dr. Kesari is charged with here—violations of 21 U.S.C. §§ 841(a) and 846. 2014 U.S. Dist. LEXIS 163776 at *2 (N.D. W. Va., Nov. 24, 2014). Moving the court for authorization to expend funds for a neurological evaluation to determine whether or not she suffered from dementia or a related disease, the doctor argued that such an evaluation was necessary to rebut "the government's evidence of specific intent and as a complete defense to the charge of conspiracy." *Id.* at *4 (quoting Dkt. No. 270 at 2). The district court overruled the magistrate judge's decision to deny the doctor funds and authorized her counsel to obtain a forensic neurological evaluation. The district court reasoned that Milan would be permitted to use a possible diagnosis to negate the specific intent element to the government's case, and therefore should be provided funds to obtain the neurological evaluation.

Finally, expert testimony is governed by Federal Rules of Evidence 702 and 704. Under the federal rules, district courts have "broad discretion to admit or exclude expert testimony, based upon whether it is helpful to the trier of fact." *United States v. Dorsey*, 45 F.3d 809, 814 (4th Cir. 1995).[6] While 704(b) prevents an expert from opining on "whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense," an expert may opine on "the effect of some mental condition on the defendant's ability to form the requisite criminal intent." *See United States v. Tsoa,* 592 Fed. Appx 153, 155 (4th Cir. 2014) (citing

---

[5] *See, e.g.*, *United States v. McBride*, 786 F.2d 45, 50 (2d Cir. 1986) (overruling district court's decision to exclude psychiatric testimony relevant to the defendant's state of mind at the time of the crime); *United States v. Dwyer*, 539 F.2d 924, 928 (2d Cir. 1976) (finding exclusion of psychiatric testimony "so critical to Dwyer's defense, constituted an abuse of discretion.").

[6] *See also*, *United States v. Sublett*, 2007 U.S. Dist. LEXIS 5916 at *10 (W.D.K.Y. Jan. 26, 2007) (finding the probative value of psychiatric evidence outweighed prejudice or confusion of the issues and therefore admissible).

*United States v. Schneider*, 111 F.3d 197, 202–03 (1st Cir. 1997)). Dr. Friedman's and Dr. Franc's testimony will stay within the bounds prescribed by Federal Rules of Evidence 704(b).[7]

### C. Dr. Kesari's Cognitive Impairment Is Highly Relevant to His Intent.

Dr. Kesari's mental state is dispositive of his guilt or innocence. If a jury finds that he acted with "good intentions" and "in accordance with what he reasonably believed to be proper medical practice," then it must find him not guilty. *See United States v. McIver*, 470 F.3d 550, 556 n.9 (4th Cir. 2006) (recounting the district court's good faith instruction). Conversely, the jury may convict on any given charge only if it finds that the government has proven beyond a reasonable doubt that Dr. Kesari acted other than in good faith and with the precise mental state required. *See id. at 559-60*.

A jury cannot assess Dr. Kesari's mental state without considering his mental condition. There is a difference between confusion and criminality, and Dr. Kesari's cognitive impairment is central to whether he reasonably believed he was prescribing buprenorphine for a legitimate medical purpose or instead acting as a drug dealer. Even if a jury determines that Dr. Kesari failed to "adher[e] to the standards required of telemedicine . . . , failed to keep proper medical records, [and] failed to exercise supervision over his untrained staff,"[8] it may still find him not guilty. The outcome turns on intent: Was Dr. Kesari's alleged departure from telemedicine standards the result of his greed or his confusion? Were his allegedly scattered medical records the product of a

---

[7] Moreover, if this motion is granted, Dr. Kesari intends to propose that the Court provide the jury with a limiting instruction to make clear that expert testimony regarding Dr. Kesari's diminished capacity was offered for the limited purpose of the jury's consideration of whether Dr. Kesari possessed the precise mental state to commit the crimes charged in the indictment and admonishing the jury that it may not consider the expert testimony for any other purpose. Jury instructions are presumed to be effective and an instruction in this case would be sufficient to balance any government concern of undue prejudice. *See*, *generally*, *United States v. Runyon*, 707 F.3d 475, 496-97 (4th Cir. 2013), citing *Richardson v. Marsh*, 481 U.S. 200, 206, 107 (1987).

[8] United States' Motion *in Limine* to Exclude Irrelevant Testimony regarding the Medical Condition of Defendant Sriramloo Kesari, M.D.'s Wife ("U.S. MIL"), ECF No. 32 at 2.

criminal mastermind or a disoriented seventy-eight-year-old man experiencing difficulty with both familiar and complex tasks? Was he operating a "lucrative prescription-script mill,"[9] or treating his patients with an indicated medication for the legitimately present condition of opioid use disorder and allegedly falling short on some of the attendant technical requirements?

A key example of the impact of Dr. Kesari's moderate cognitive impairment/mild dementia is provided by his surreptitiously recorded behavior and actions during the in-person patient encounter on March 21, 2019 between Dr. Kesari, his assistant, Ms. Truxhall, and an undercover agent ("UCA") posing as an opioid-addicted patient. A disc containing the recorded interaction is attached to this filing as **Exhibit E**.[10] In the recording, Dr. Kesari was presented with essentially the same information twice regarding the UCA's alleged aberrant conduct. When first told that the UCA sold the Suboxone Dr. Kesari prescribed to him, Dr. Kesari plainly did not understand and seemed to believe that the UCA did not have enough money to fill the prescription he received. Moments later, Dr. Kesari received the same information again, processed the UCA's action as illegal, and immediately terminated the patient from his care. Dr. Kesari's action to terminate the UCA as a patient and therefore remove the patient as a revenue stream is, in and of itself, exculpatory because it is materially incompatible with the government's theory that a desire to profit trumped efforts to lawfully treat addiction. Moreover, the delay in Dr. Kesari's ability to process information and chart an appropriate course in response is a reflection of the executive dysfunction difficulties with language brought about by his moderate cognitive impairment/mild dementia. Specifically, the following passage, which begins approximately 12 minutes and 30

---

[9] U.S. MIL, ECF No. 32 at 3.

[10] The recording was artificially divided into three segments in the government's discovery production made to Dr. Kesari on or about November 4, 2019. **Exhibit E** to this filing is therefore subdivided into three portions with file names **Exhibit E – Part 1**, **Exhibit E – Part 2**, and **Exhibit E – Part 3**.

seconds into **Exhibit E – Part 2**, demonstrates Dr. Kesari's diminished ability to effectively communicate and process information, and his indirect, but ultimately decisive path to a legally and medically appropriate outcome:

> **UCA**: Yeah, so, I got all the ones [Suboxone film strip wrappers] that I took. But I didn't get paid and I ain't even gonna sit here and try to bullshit you. I sold the rest of them because I didn't get a paycheck so my apologies if it doesn't show up right.
>
> **Truxhall**: What's that?
>
> **UCA**: Oh I just put them [used Suboxone wrappers] in the envelope.
>
> **Truxhall**: Oh, ok.
>
> **Truxhall** [to Kesari]: He is testing negative for Suboxone.
>
> **Kesari**: Testing negative for Suboxone?
>
> **Truxhall**: He said he's not able to do it.
>
> **Kesari**: Why not?
>
> **Truxhall**: He said that he didn't get paid. That's what he just explained to us.
>
> **UCA**: I didn't get paid at work so a buddy of mine, he takes them, but he don't have a script for them so he asked if he could buy them and well I need the money.
>
> **Kesari**: That is not acceptable.
>
> **UCA**: Well I understand but I had to do what I had to do though.
>
> **Kesari**: Right, but that is not acceptable. Because that is like a… I am helping you to sell… when the law comes and tells me that when you are doing the dirty things and giving me and it is not showing up in your urine, you might be selling and you are also accomplice in that.
>
> **UCA**: Oh I know what I did was wrong but I mean I gotta eat too so it's uh… my boss didn't get paid I didn't get paid so…
>
> **Kesari**: Ok. I understand the excuse but if it doesn't show up [Suboxone must be present in future urine screens] I'm not going to continue the treatment.
>
> **UCA**: Ok.
>
> **Kesari**: It is immaterial whether you got paid or not I don't know how to continue this kind of situation.
>
> **Truxhall**: Right. I have not had any issues at [sic] him [UCA], this is the first time. So that's why I uh…
>
> **Kesari**: That's fine, but uh, with this legal situation can we shoot somebody an email and ask these questions that can help the department and see the patients all coming like this so what do they want me to do?
>
> **Truxhall**: Yeah.

14

**Kesari**: So let us know.

**Truxhall**: If it was a common issue, but it's the first time it's happened since I've been here, to me.

**Kesari**: Yeah but there are so many issues coming out like this. This is not the only one I'm sure. Some people, say that lady keeps showing up and everything and then she says I did not take it.

**Truxhall**: Yeah.

**Kesari**: So that kind of a thing. And then she shows up and she says "Well, I did not take them."

**Truxhall**: What, which, I don't know which one you're taking about. About one of the patients?

**Kesari**: Right.

**Truxhall**: I can't picture which one, I don't know. Oh! Yeah I know which one you're talking about she's so [unintelligible].

**UCA**: I tried to keep a straight face but when you spout something like that.

**Kesari**: Make a note, make a note in the chart of what happened exactly and we gave him a warning and continued so if next time if he doesn't, if anytime we don't find it [Suboxone in the patient's urine screen], I have to let him go.

**Truxhall**: Ok.

**UCA**: I understand.

**Kesari**: Ok.

**UCA**: I understand.

**UCA**: I bet it's gonna be high [UCA's blood pressure] today.

**Kesari**: That is [unintelligible].

**Kesari**: Another thing to remember, if anything happened here like this I could bring you back every week, ok [bring the patient in for weekly examinations]? Then it will be a pain for you. You pay more, you pay more [for weekly, rather than monthly examinations] and you come in … are you working?

**UCA**: I am. Well, I've worked for the same guy, it wasn't that I'm not working. It was that we got shorted, we just got laid off for a few days because we didn't have any work to do. So I didn't get the paycheck that I normally get so that's when I said, well, a guy said I'd give you some money for your script and I said well.

**Kesari**: You should have taken it.

**UCA**: What's that?

**Kesari**: You should have taken it and buy or bought the strips [Suboxone film strips].

**UCA**: No, no I needed the money. I, I, I had my strips.

**Kesari**: I'm not, I don't understand.

15

**Truxhall**: Yeah, he said he didn't have any money so…

**Kesari**: He did not buy the script.

**Truxhall**: He did not buy it, he sold it.

**Kesari**: He, he sold [Suboxone]?

**Truxhall**: Yeah.

**Kesari**: To who?

**UCA**: One of the guys I work with.

**Kesari**: No…that is not. You cannot –

**UCA**: Well I know I'm not supposed to do this.

**Kesari**: No….Nope. I misunderstood you.

**Truxhall**: Ok.

**Kesari**: Give him the one month supply, terminate him. Ok?

**Truxhall**: Ok.

**UCA**: Ok.

**Kesari**: That's it, that's all I can do.

**UCA**: Ok.

**Kesari**: Make him detail who he sold the script to. Somebody he…See, that is my problem. You have to explain to me. I don't understand.

**Truxhall**: I didn't, I thought you understood. I didn't –

**Kesari**: No, I did not.

**Truxhall**: Now that you misunderstood.

**Kesari**: Right. So…what went in my brain that he bought from, he bought them from somebody else so, he sold…then he asks me if he cannot, he sold it then he don't need it.

**UCA**: Well what am I supposed to do, then?

**Kesari**: I'm giving you one month's supply, you go on and see any other doctor.

**UCA**: Well, it ain't like I meant, I had, I wanted to sell them because I didn't have any money.

**Kesari**: Look it's, look it's against the law.

**UCA**: There's a lot of things that are against the law.

**Kesari**: Right, but I can't. That's why I was going to give you when it did not show up the chance, second chance, but…

**Exhibit E – Part 2** (12:30 to 17:45).

The jury should be entitled to hear from Dr. Friedman and Dr. Franc how a patient with a diminished ability to communicate may struggle to process statements made by others and to clearly articulate his own thoughts. In this example, the jury should be permitted to consider how and why Dr. Kesari only responded to the information that the UCA allegedly sold Suboxone when it was relayed to him a second time. Similarly, the jury should consider whether and how Dr. Kesari's diminished capacity affected his decision-making to first attempt to give the patient a second chance, only to later recognize that the patient had crossed a redline for which termination of care was the appropriate remedy. That Dr. Kesari plainly made a real-time reference to his own confusion, when he had no idea that his words were being recorded or that the UCA was a law enforcement officer, only serves to highlight the relevancy of expert testimony and the need for the jury to understand the medical bases for the confusion as a reasonable alternative to criminal intent.

Unquestionably, Dr. Kesari's mental condition is highly probative of the critical issue of whether he possessed the precise required mental state of knowingly and intentionally conspiring and distributing a controlled substance other than in good faith. Dr. Franc's testimony that Dr. Kesari was afflicted with moderate cognitive impairment throughout the entirety of the alleged conspiracy and Dr. Friedman's testimony that Dr. Kesari's mild dementia resulted in "executive dysfunction, auditory and visual memory difficulties, and difficulties with language, visual perception, and attention, coupled with a decline in instrumental activities of daily living" are all relevant and admissible. **Exhibit D-1** at 7. This testimony will aid the jury's determination of whether Dr. Kesari knowingly and intentionally decided not to "run[] his medical practice for the legitimate purpose of treating patients . . . [and] instead [] was remotely operating a lucrative

17

prescription-script mill that provided no checks against the abuse and diversion of opioids and other controlled substances." U.S. MIL, ECF No. 32 at 3.

## IV. Conclusion

For the foregoing reasons, Dr. Kesari respectfully requests that the Court grant his motion *in limine* and admit the testimony of Dr. Franc and Dr. Friedman.

**Respectfully Submitted,**

**SRIRAMLOO KESARI, M.D.**

**By Counsel**

/s/ Raymond L. Harrell, Jr.
Raymond L. Harrell, Jr. (WV State Bar #12995)
Dinsmore & Shohl LLP
P.O. Box 11887
707 Virginia Street, East, Suite 1300
Charleston, WV 25339-11887
Telephone: (304) 357-0900
Facsimile: (304) 357-0919
raymond.harrell@dinsmore.com

Michael J. Ferrara (*pro hac vice*)
Dinsmore & Shohl LLP
191 West Nationwide Boulevard
Suite 300
Columbus, OH 43215
Telephone: (614) 628-6975
Facsimile: (614) 628-6890
michael.ferrara@dinsmore.com

Joseph William Harper (*pro hac vice*)
Dinsmore & Shohl LLP
255 East Fifth Street
Suite 1900
Cincinnati, OH 45202
Telephone: (513) 977-8693
Facsimile: (513) 977-8141
joe.harper@dinsmore.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
### CHARLESTON DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | **Criminal No. 2:19-cr-00241** |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **SRIRAMLOO KESARI, M.D.** ) | |
| ) | |
| **Defendant.** | |

## **CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that on the 24th day of January, 2020, *Defendant Sriramloo Kesari, M.D.'s Motion in Limine to Admit Expert Evidence of Cognitive Impairment to Rebut Specific Intent,* was filed with the court through the ECF system, and copies of the above will be provided to all parties of record at the addresses indicated below by sending electronically to the registered participants as identified on the notice of electronic filing (NEF), or by sending paper copies to those indicated as non-registered participants.

Kilby MacFadden
United States Department of Justice
Suite 500
307 Grandview Drive
Ft. Mitchell, KY 41017
kilby.macfadden@usdoj.gov
*Counsel for the United States of America*

Andrew B. Barras
United States Department of Justice
Suite 400
207 Grandview Drive
Ft. Mitchell, KY 41017
andrew.barras@usdoj.gov

Andrew J. Tessman
United States Attorney's Office
P. O. Box 1713
Charleston, WV 25326-1713
andrew.tessman@usdoj.gov
*Counsel for the United States of America*

/s/ Raymond L. Harrell, Jr.
Raymond L. Harrell, Jr. (WV State Bar #12995)