**IN THE UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

UNITED STATES OF AMERICA

v.

SRIRAMLOO KESARI, M.D. and
KRISTINA TRUXHALL

CRIMINAL ACTION NO. 5:19-00241

Judge John T. Copenhaver.

**UNITED STATES' TRIAL MEMORANDUM**

LISA G. JOHNSTON
Acting United States Attorney

Maryam Adeyola
Andrew B. Barras
Dermot Lynch
Kilby Macfadden
Criminal Division
Fraud Section
United States Department of Justice

I.    LEGAL STANDARD ................................................................................ 3

  A.  Doctors Can Be Prosecuted for Illegally Prescribing Controlled Substances. .................... 3

  B.  Defendants Kesari and Truxhall Violate 21 U.S.C. § 846 If They Agree to Unlawfully Distribute Controlled Substances and Defendant Kesari Violates 21 U.S.C. § 841(a)(1) If He Prescribes Any Controlled Substances "Not For a Legitimate Medical Purpose" or "Outside the Bounds of Medical Practice." .................................................................... 5

II.   RELEVANT FACTUAL BACKGROUND ......................................................... 9

  A.  Defendant Kesari and Defendant Truxhall Conspired to Illicitly Distribute the Controlled Substances and Defendant Kesari's Prescribing of Suboxone and Buprenorphine Violated the Law. .............................................................................................. 10

  B.  Michael Goff Will Testify About the Standards to Prescribe Controlled Substances. ...... 11

  C.  Patient Testimony Will Further Support the Conspiracy and Illegal Distribution Charges. 12

  D.  Dr. Robert Andrew Chambers' Expert Review of Defendant Kesari's Patient Records Will Confirm That Dr. Kesari's Prescribing Was Illegal. ......................................... 14

  E.  The Defendants Own Statements Will Prove Their Intent to Violate the Law. ............... 16

  F.  Defendant Kesari and Truxhall's Motive for Illegally Prescribing the Controlled Substance Was Money. ........................................................................................ 16

  G.  Other Documentary Evidence Will Show that Defendant Kesari Knew He was Illicitly Prescribing Controlled Substances. ...................................................................... 16

III.  ADDITIONAL PRETRIAL MATTERS .......................................................... 17

  A.  Cross-Examination of Dr. Chambers. ................................................................ 17

  B.  Confidential Patient Information. ...................................................................... 18

  C.  Witness Sequestration. ................................................................................... 19

  D.  Defendants' Statements. ................................................................................. 19

  E.  Business Records and Rule 902(11) Certifications. .............................................. 20

  F.  Reciprocal Discovery ..................................................................................... 20

  G.  Judicial Notice of Certain Facts ....................................................................... 21

Defendants Dr. Sriramloo Kesari, M.D., and his former assistant, Kristina Truxhall, are charged with conspiring to distribute controlled substances outside the usual course of professional practice or for no legitimate medical purpose. In addition, Dr. Kesari is charged with twelve substantive counts of illegal prescribing. Dr. Kesari's prescribing habits were dangerous, illegal and took advantage of vulnerable opioid addicts. The Government must prove beyond a reasonable doubt that the Defendants conspired to illicitly distribute controlled substances and that the twelve prescriptions written by Dr. Kesari were either "not for legitimate medical purposes" or "beyond the bounds of medical practice." *United States v. Singh*, 54 F.3d 1182, 1186–87 (4th Cir. 1995). The Government will readily meet this burden at trial.

The evidence at trial will prove that Defendant Kesari operated a cash-only, opioid-addiction clinic. Beginning in around October 2018 and continuing through around May 2019, Dr. Kesari largely operated his clinic "remotely" from California. To keep his clinic running during his absence, Dr. Kesari used his minimally trained employee—Defendant Truxhall—to serve as a proxy prescriber. Truxhall completed prescriptions that Kesari had pre-signed by filling in details for controlled substances, as well as meeting with patients, purportedly reviewing their urinalysis tests, and managing patient files. Defendant Kesari hardly saw his patients remotely: at most he had short Skype or video calls with them that barely went beyond cursory pleasantries. The evidence will establish that Defendant Kesari, with Defendant Truxhall's assistance, prescribed these dangerous drugs to vulnerable patients with substance use (opioid) disorders even as these patients raised numerous red flags as to whether they should have been receiving controlled substances in the first place, including by failing urinalysis tests indicating that they were either not taking medication prescribed or taking other illegal substances that were not prescribed.

1

For example, the evidence will reveal that Defendant Kesari, through Defendant Truxhall, prescribed and continued to prescribe Suboxone to an undercover Drug Enforcement Administration ("DEA") agent, who was posing as a new patient at the practice. This is Patient D in the Second Superseding Indictment and linked to Counts 11-13. Over the course of three months of visits, the DEA agent began to present with behaviors that were clear red flags that he was not taking the Suboxone as prescribed, diverting the Suboxone, and using other illegal substances. In particular, the agent kept testing negative for the Suboxone and then provided doctored urinalysis samples that tested for illegal substances such as methamphetamines. The evidence will show that Defendant Kesari did not alter the agent's treatment plan nor stop prescribing Suboxone and that Defendant Truxhall chose to ignore the multiple red flags presented by the agent.

The evidence will demonstrate that the DEA agent's experience at the clinic, which was surreptitiously recorded on camera, was similar to that of other patients to whom the Defendants distributed Suboxone, including to patients A, B, and C as linked to Counts 2-10 in the Second Superseding Indictment and patients CS and LM.

The Government's medical expert, Dr. Andrew Chambers, who analyzed Defendant Kesari's prescribing practices, including to these patients, will explain that Dr. Kesari's treatment was outside the usual course of professional practice and without a legitimate medical purpose and that Kesari essentially operated an expensive vending machine for Buprenorphine and Suboxone. Dr. Chambers will testify that Kesari provided virtually no treatment during these video call sessions to justify the prescriptions he was writing; kept shoddy medical records that failed to support his prescribing; and created circumstances that were ripe for the abuse and diversion of controlled substances like buprenorphine.

In addition, other testimony and documentary evidence will show that the Defendants knew what they were doing was wrong. They ignored signs posted in their clinic mandating that patients could not receive Suboxone if they failed drug tests or failed to provide proof of counseling. They also tried to trick patients into thinking that a lawsuit against Kesari would be ineffective by placing signs falsely stating that Kesari did not have medical malpractice insurance. *See also* ECF 115 (Government's August 11, 2020 Notice of Intrinsic or Rule 404(b) evidence as to evidence related to the malpractice signs and illegal contracts, which notice was never challenged in a motion *in limine* by either Defendant).

This trial memorandum is designed to provide a comprehensive overview of issues that will be touched upon in the jury instructions, witness examinations, and exhibits. Part I outlines the legal standard that the Government must meet in proving the conspiracy charge and each of the twelve substantive counts in the Second Superseding Indictment, which mirrors what the Government has proposed in the jury instructions. Part II outlines the facts that the Government expects to present at trial. Part III addresses other potential pretrial matters that may merit consideration by the Court.

## I.      LEGAL STANDARD

### A.  Doctors Can Be Prosecuted for Illegally Prescribing Controlled Substances.

This is a case about a conspiracy to distribute a controlled substance, in violation of 21 U.S.C. § 846, which makes it unlawful to "conspire[]to commit any offense defined in [the] subchapter," including by unlawfully distributing or dispending controlled substances. For Defendant Kesari, it is also about twelve distinct violations of 21 U.S.C. § 841(a)(1), which makes it unlawful for "any person" to "knowingly or intentionally . . . distribute[] or dispense . . . a controlled substance." Controlled substances are divided into five schedules based on the risk of harm and abuse.

This case concerns a Schedule III controlled substance called buprenorphine. As a Schedule III controlled substance, "[a]buse of [buprenorphine] may lead to moderate or low physical dependence or high psychological dependence," even as buprenorphine has "a potential for abuse less than the drugs or other substances in schedules I and II" and has "a currently accepted medical use in treatment in the United States."[1]

The default rule under the Controlled Substance Act (CSA) is that any distribution of a controlled substance at any schedule is illegal. An exception to this default rule permits "[d]octors who are 'registered' by the Attorney General are authorized to write prescriptions for or to otherwise dispense controlled substances, so long as they comply with the requirements of their registration." *United States v. Hurwitz*, 459 F.3d 463, 475 (4th Cir. 2006) (citing 21 U.S.C. § 822).

As detailed below, a prescription falls within this exception to the CSA only if it is written "for a legitimate medical purpose by an individual practitioner acting in the usual course of his [or her] professional practice." 21 C.F.R. § 1306.04(a). But if the prescription is not for such a legitimate purpose, the doctor can be prosecuted for violating Section 841. *See, e.g.*, *United States v. Moore*, 423 U.S. 122 (1975) (seminal Supreme Court case allowing for prosecution of physicians whose prescribing activities "fall outside the usual course of professional practice").

The Controlled Substances Act only affects a small portion of the prescribing activity of the majority of medical practitioners. This is because most common prescription medications are not controlled substances. For example, antibiotics, birth control pills, blood pressure medication, and diabetes medications are not controlled substances, so the CSA's prohibition does not apply.

---

[1] The definitions in the below table are found in 21 U.S.C. § 812(b)(2)-(4). The designations for the drugs at issue in this case are found at 21 C.F.R. §§ 1308.12-1308.14. For general information on drug scheduling, see, for example, Drug Enforcement Administration, Drug Scheduling (last visited May 2021), https://www.dea.gov/drug-information/drug-scheduling.

Even several popular and effective pain medications are not controlled substances and can be prescribed without running any risk of violating the CSA. For example, high milligram ibuprofen and other non-steroidal anti-inflammatories are not federally controlled substances.

For a small subset of prescriptions that are known to be addictive and dangerous, however, Congress has directed that prescribing be carefully limited and those limits strictly enforced— including by prosecutions under the CSA. As the Fourth Circuit has held, "Congress has given [doctors] the power to authorize the distribution of dangerous addictive drugs, and with that power, Congress also places upon [doctors] the responsibility to distribute them wisely within the course of his medical practice." *United States v. Singh*, 54 F.3d 1182, 1189 (4th Cir. 1995). But if a doctor "abuse[s] this power" by illegally prescribing, he can be prosecuted under Section 841. *Id*.

This Court is familiar with the way doctors have abused their power to prescribe powerful Schedule II opioids, such as oxycodone. But the same type of abuse can occur with Schedule III opioids, such as buprenorphine. For example, on facts similar to the this case, the Fourth Circuit in *United States v. Naum*, 832 F. App'x 137 (4th Cir. 2020), *cert pending* (2021), recently affirmed a jury verdict from the Northern District of West Virginia finding that a doctor who prescribed Suboxone violated Sections 841 and 846 because he had also delegated many of his prescribing responsibilities to unqualified staff. *Id*. at 139.

**B.  Defendants Kesari and Truxhall Violate 21 U.S.C. § 846 If They Agree to Unlawfully Distribute Controlled Substances and Defendant Kesari Violates 21 U.S.C. § 841(a)(1) If He Prescribes Any Controlled Substances "Not For a Legitimate Medical Purpose" <u>or</u> "Outside the Bounds of Medical Practice."**

To convict a defendant of conspiracy under 21 U.S.C. § 846, the government must prove beyond a reasonable doubt (1) an agreement among two or more persons to unlawfully distribute controlled substances; (2) the defendants knew of the conspiracy; and (3) the defendants

knowingly and voluntarily became a part of this conspiracy. *United States v. Boccone*, 556 F. App'x 215, 236 (4th Cir. 2014) (citing *Burgos,* 94 F.3d 849, 857 (4th Cir. 1996)).

To prove the existence of a conspiracy, the Government need not prove a formal agreement was made. *See United States v. McIver*, 470 F.3d 550, 563 (4th Cir. 2006). A "tacit or mutual understanding among or between the parties will suffice." *Id.* And to demonstrate a defendant's knowing participation, the Government may do so either through showing the person actually knew of the conspiracy or that he or she was "willfully blind to it by purposefully clos[ing] [his or her] eyes to avoid knowing what was taking place around [him or her]." *Id.* (internal quotations and citations omitted). This standard applies regardless of whether the co-conspirator is a medical doctor or someone like an office manager who has facilitated the illegal distribution of substances.[2]

To convict a physician of illegally distributing controlled substances in violation of Section 841, the Fourth Circuit has long held that the Government must prove beyond reasonable doubt: (1) the defendant "distributed or dispensed a controlled substance," (2) he "acted knowingly and intentionally," and (3) his "actions were not for legitimate medical purposes in the usual course of his professional medical practice or were beyond the bounds of medical practice." *Singh*, 54 F.3d at 1186–87 (alteration incorporated); *Hurwitz*, 459 F.3d at 475 (reiterating this holding and collecting additional authorities).

The Fourth Circuit has emphasized that the third element, which is normally the most litigated, is written in the disjunctive, so that the Government has two alternative means of proving

---

[2] *See, e.g.*, *United States v. Boccone*, 556 F. App'x 215, 236-37 (4th Cir. 2014) (applying an equal burden of proof of engagement in a conspiracy to the owner of a pain management clinic with no medical training and a nurse practitioner who prescribed the controlled substances); *United States v. Solomon*, No. CR-1340-ART-578, 2016 WL 10894663, at *5 (E.D. Ky. June 23, 2016) ("The relevant inquiry is not whether a defendant was a physician, but whether he knowingly and voluntarily played some part in a conspiracy to distribute drugs."); *see also United States v. Singleton*, 626 F. App'x 589, 591 (6th Cir. 2015) (similar).

it. Accordingly, to convict, a doctor's actions must *either* be not for a legitimate medical purpose *or* beyond the bounds of medical practice. The Fourth Circuit has repeatedly rejected attempts to change the standard from disjunctive to conjunctive—there is no changing the "or" in this third element to an "and." As that Court recently held, "[t]he Government is not required to prove both prongs (i.e. no legitimate purpose and beyond professional bounds)." *Naum*, 832 F. App'x at 142.[3]

The Fourth Circuit has also noted that determining whether the Government has established either of these two alternatives is necessarily dependent on the facts of a particular case. "[T]here are no specific guidelines concerning what is required to support a conclusion that an accused acted outside the usual course of professional practice." *Singh*, 54 F.3d at 1187. Instead, the focus is on "a case-by-case analysis of evidence to determine whether a reasonable inference of guilt may be drawn from specific facts." *Id.*

Moreover, while it has offered no specific guidelines, the Fourth Circuit has offered some guideposts on establishing "not for a legitimate medical purpose" or "beyond the bounds of medical practice." For example, although a "violation of applicable professional regulations . . . does not in and of itself establish a violation of the criminal law," such civil violations are relevant to a criminal case, as a jury can consider the "extent and severity of any violations of professional norms [the defendant] committed" in determining whether his actions also give rise to criminal liability. *United States v. McIver*, 470 F.3d 550, 556 n.9 (4th Cir. 2006).[4] In a similar vein, the

---

[3] *See also, e.g.*, *United States v. Reese*, 442 F. App'x 8, 10 (4th Cir. 2011) (rejecting this argument in part by relying on *Singh* and collecting authorities in support of the Government meeting its burden by establishing prescribing either not legitimate medical purpose or beyond the bounds of medical practice); *United States v. Hitzig*, 63 F. App'x 83, 86 (4th Cir. 2003) (similar).

[4] *See also Hitzig*, 63 F. App'x at 86–87 (upholding a jury instruction that in part provided that "you should also consider the extent to which, if at all, any violation of professional norms you find to have been committed by [the defendant] interfered with his treatment of his patients and contributed to an over-prescription and/or excessive dispensation of controlled substances").

Government can show that the Defendant "prescribe[d] controlled substances not for treatment of a patient, but for the purpose of assisting another in the maintenance of a drug habit or some other illegitimate purposes, such as his own personal profit." *Id.* at 559.

Finally, part of what distinguishes a criminal case against a doctor and his staff under the CSA from a medical malpractice case is that the doctor and his staff can raise a "good faith" defense in the criminal context, which requires the person to establish that he or she "acted in accordance with what he [or she] *reasonably believed* to be proper medical practice" in treating the patient. *Id.* at 556 n.9 (emphasis added).

Importantly, the "good faith" defense does not embrace a "subjective standard," which would improperly allow a doctor "to decide for himself what constitutes proper medical treatment" or allow him to avoid criminal liability by showing that he "complied with his own idiosyncratic view of proper medical practices . . . ." *Hurwitz*, 459 F.3d at 478 (noting such a subjective standard would be "inconsistent with" Supreme Court precedent (citing *Moore*, 423 U.S. 122)).

Instead, the Fourth Circuit has instructed that "the inquiry" on good faith "must be an objective one." The question is one of "***reasonable*** belief," and "a practitioner is not free deliberately to disregard prevailing standards of treatment." Indeed, to "permit a practitioner to substitute his or her views of what is good medical practice for standards generally recognized and accepted in the United States would be to weaken the enforcement of our drug laws in a critical area." *Id*. at 479 (alterations incorporated; emphasis added; holding that the same conclusion "has been reached by every court to specifically consider the question" and collecting authorities in support of this position).

## II.    RELEVANT FACTUAL BACKGROUND

The Government will apply the above-articulated legal standards to the facts concerning the conspiracy (Count 1) between Defendant Kesari and Defendant Truxhall as well as to the substantive counts of Defendant Kesari's illicit prescribing of Schedule III drugs—Buprenorphine and Suboxone—to Patients A, B, C, and D (Counts 2-13)) as charged in the Second Superseding Indictment. *See generally* ECF 34 (Second Superseding Indictment). Prescriptions to each of these individuals constitute different counts in the Second Superseding Indictment: Patient A's prescriptions are covered in Counts 2-4, Patient B in Counts 5-7, Patient C in Counts 8-10, and Patient D in Counts 11-13. *See* ECF 34. This case also implicates the treatment of Patients CS and LM.

The Government's focus will be on proving the agreement among the Defendants to distribute the illicitly prescribed controlled substances and proving that these prescriptions "were not for legitimate medical purposes in the usual course of [Defendant Kesari's] professional medical practice or were beyond the bounds of medical practice" *Singh*, 54 F.3d at 1186–87.

The Government anticipates using former patient testimony, along with the testimony of an undercover agent to prove that Defendant Kesari's actions "were not for legitimate medical purposes in the usual course of his professional medical practice or were beyond the bounds of medical practice," *United States v. Singh*, 54 F.3d 1182, 1187 (4th Cir. 1995), and that the Defendants conspired together to distribute these substances. The Government will also support its case by relying on the expert testimony of Dr. Andrew Chambers, who reviewed Defendant Kesari's medical records and is expected to confirm that Defendant Kesari's treatment fell egregiously below what the relevant standard of care requires. Moreover, witnesses associated with both the West Virginia Board of Medicine and the Controlled Substances Monitoring

Program will testify, respectively, about what is required to receive and maintain one's medical license and the standards required under West Virginia law to prescribe controlled substances, including Suboxone.

The Government will further introduce the testimony of DEA Diversion Investigator DeAndra Lee, who will testify about the overall investigation of Defendant Kesari's practice, the gathering of evidence from the search warrant, the collection of prescriptions related to the counts charged in the Second Superseding Indictment, Defendant Kesari's interview during the execution of the search warrant, and Kesari's surrender of his DEA 104. DEA Diversion Investigator Sandra McMillian will testify about Defendant Truxhall's interview that also took place during the execution of the search warrant.

> **A.    Defendant Kesari and Defendant Truxhall Conspired to Illicitly Distribute the Controlled Substances and Defendant Kesari's Prescribing of Suboxone and Buprenorphine Violated the Law.**

The evidence will prove that from October 2018 through May of 2019, Defendant Kesari conspired with his minimally medically trained employee, Defendant Truxhall, to illicitly prescribe Schedule III drugs, including Suboxone and Buprenorphine, to vulnerable opioid addicts as well as illicitly prescribed these substances on twelve separate occasions. The evidence will show that Dr. Kesari operated a cash-only opioid-addiction treatment center and that during the time period of the conspiracy, he operated his clinic remotely, practicing telemedicine from California.

The evidence will reveal that while Defendant Kesari was a licensed medical doctor in the State of West Virginia, where he also was registered with the DEA to prescribe controlled substances and registered with the Substance Abuse and Mental Health Services Administration ("SAMSHA") Center for Substance Abuse Treatment ("CSAT") as a Drug Addiction Treatment Act of 2000 ("DATA") Waived Practitioner with the authority to treat substance abuse patients—

he was not licensed to practice medicine in California; nor was he registered to prescribe controlled substances or treat substance abuse patients in that State.[5]

Defendant Truxhall had no additional medical certification or training and was not qualified to prescribe controlled substances or serve as a practitioner for telemedicine purposes. In fact, in 2017, Kesari originally hired Truxhall to work at a gas station he owned, but subsequently employed her at his addiction clinic when she wanted to work more hours.

The evidence will show that in Defendant Kesari's absence, Defendant Truxhall became the *de facto* prescriber at the clinic by filling in the details for controlled substances prescriptions that Kesari pre-signed. Kesari barely saw his patients remotely: at most he had seconds-long Skype calls with them that hardly went beyond cursory pleasantries. Kesari provided virtually no "treatment" during these sessions to justify the prescriptions he was writing. In addition, he maintained sloppy medical records that lacked justification for his prescribing and created circumstances that were ripe for the abuse and diversion of controlled substances, including Suboxone. In addition to filling out pre-signed prescriptions, Truxhall, for her part, reviewed urinalysis tests but did not inform Kesari of failed tests, inadequately maintained the patient files, and advised patients they had to pay cash for the drugs.

**B.    Michael Goff Will Testify About the Standards to Prescribe Controlled Substances.**

Michael Goff, the Executive Director of the Controlled Substances Monitoring Program, will testify about the standards to prescribe controlled substances and will explain how Suboxone can assist individuals trying to treat their addiction to opioids by managing symptoms of

---

[5] Pursuant to 21 U.S.C. § 822(e)(1), 21 C.F.R. § 1301.12(a), and 71 FR 69478, a provider practicing in more than one state must obtain a separate DEA registration for each state in which the provider practices.

withdrawal. He will note that Suboxone contains an active ingredient called Buprenorphine that can be abused or sold on the street in exchange for illegal drugs. In addition, he will testify that only pregnant patients should be prescribed Buprenorphine (also known as Subutex). He will further testify that physicians treating patients with addiction problems must follow certain protocol and be aware of and address various red flags that patients may present, particularly if these patients are prescribed controlled substances. For example, he will testify that if an addiction-therapy patient tests negative in a urinalysis test for Suboxone after receiving prior prescriptions for the drug, that is a red flag that the patient might be selling the prescribed Suboxone on the street including in exchange for other illegal drugs. Relatedly, he will explain that if a patient tests negative for Suboxone—after receiving a prescription for it—and positive for other illegal drugs—such as marijuana or methamphetamines—that is a red flag that the patient has relapsed and may also be diverting the prescribed controlled substances.

> **C.     Patient Testimony Will Further Support the Conspiracy and Illegal Distribution Charges.**

DEA Special Agent ("SA") Joshua Tripp (identified as Patient D in Counts 11-13), who posed as a new patient at Defendant Kesari's clinic and received prescriptions for Suboxone despite presenting numerous red flags in his patient encounters will testify about his three visits to the clinic, which were video recorded.

As an example, he will describe his third visit to the clinic, which occurred on February 21, 2019 (and which is charged Count 13 and is also part of the conspiracy charge). SA Tripp will testify that at that visit he provided doctored urine for his urinalysis test, which Defendant Truxhall reviewed. SA Tripp will explain that the urinalysis is a simple test that is easily understandable. The urinalysis cup has several testing strips on its sides and each strip provides a test for a different controlled substance. He will testify that he could immediately observe the strips on the cup and

that the strips plainly showed that the doctored urine tested negative for the prescribed Suboxone but also tested positive for methamphetamine, revealing that that the urine showed he was using illegal and not prescribed substances.

The evidence will reveal that Defendant Truxhall understood the import of these positive and negative tests. On the undercover recording of this encounter, Truxhall confronted the agent about the results by telling him, "I'm going to let you look at it and see if you can tell me what's wrong with it." The evidence will show that Truxhall believed that the SA Tripp/Patient D could deduce the answer himself and that no technical expertise was required to interpret the test or know the correct course of action.

The evidence will also demonstrate that Defendant Truxhall detected another red flag raised by the agent when he tried to explain the lack of Suboxone in his system for the second time in a row. The undercover recording will show that the agent claimed that he only picked up a partial prescription from the pharmacy because he could not afford the cost of a full prescription. On that recording, the agent further claimed that he had run out of the partial prescription and had not taken the drug in a few days. But the evidence will show that when Truxhall logged into a database maintained by the West Virginia Board of Pharmacy, she noted that the database indicated that the agent had picked up his full prescription of 56 Suboxone strips, which should have lasted him 28 days or the full period of time between his last visit to the clinic and his current visit. And Truxhall never tried to resolve the contradiction between what the agent had said and what the Board of Pharmacy database revealed.

The evidence will further show that Defendant Truxhall ignored another red flag—that the agent admitted to running out of Suboxone strips and had to "take somebody else's" Suboxone. This evidence will raise another contradiction: why would a patient who had plainly picked up a

13

full prescription need to borrow any Suboxone? In short, the evidence will show that Truxhall knowingly and willfully ignored the red flags presented by the agent and that she failed to note any of these problems in the agent's medical records.

The evidence will additionally demonstrate that Defendant Kesari failed to inquire about the agent's treatment. Instead, Kesari participated in a video conference that lasted less than a minute, in which he engaged in little more than cursory pleasantries with the agent and asked no questions about the agent's urinalysis testing or a plan of further treatment. After the conversation, Defendant Truxhall used Kesari's prescription pad to write another Suboxone prescription for the agent.

The evidence at trial will also include testimony of other patients who will describe experiences similar to that of the agent. These patients received prescriptions for controlled substances after short conversations with Defendant Kesari via Skype or a similar video-conferencing program. These patients will also describe their willingness to pay cash for non-existent "treatment" so long as they could receive prescriptions for Suboxone.

### D. Dr. Robert Andrew Chambers' Expert Review of Defendant Kesari's Patient Records Will Confirm That Dr. Kesari's Prescribing Was Illegal.

The Government's medical expert, Dr. Robert Andrew Chambers, will corroborate that the prescriptions Defendant Kesari prescribed with Defendant Truxhall's assistance (including the prescriptions identified in the substantive counts of the Second Superseding Indictment) were not for legitimate medical purposes in the usual course of professional medical practice or were beyond the bounds of medical practice. Dr. Chambers, an Associate Professor of Psychiatry at the Indiana University School of Psychiatry, is board-certified in the areas of general psychiatry, addiction medicine, and addiction psychiatry. He reviewed the treatment of certain patients, including the four patients identified in the Second Superseding Indictment as Patients A-D and another patient,

LM. Dr. Chambers determined that the prescriptions authorized to the patients as alleged in the Second Superseding Indictment were improperly and dangerously prescribed.

Dr. Chambers will provide an overview of treating opioid abuse disorders. He will explain that addressing aberrant urinalysis tests is only one facet of treating opioid addiction. He will describe that legitimate treatment of substance use disorder patients generally also requires doctors to conduct "hands on" examinations of patients, talk to patients, and advise them to seek and confirm they are undergoing counseling, which is part of comprehensive medically assisted treatment—and all of which is particularly important for first-time patients. Legitimate treatment also entails documenting the treatment provided in detailed notes justifying a particular course of action. Dr. Chambers will testify that the written justification of treatment decisions is especially important when prescribing controlled substances because it allows a practitioner to demonstrate that his prescribing is in the usual course of professional practice or for a legitimate medical purpose.

Dr. Chambers will explain how Defendant Kesari failed to provide proper care of his vulnerable patients. He will discuss how Dr. Kesari's lack of substantive contact with his patients was concerning and violated standards of care for opioid use disorder patients. He will describe how Kesari failed to diagnose his patients, counsel his patients, or medically "treat" his patients. He will further testify that Dr. Kesari's apparent lack of access to medical records meant that any medical "treatment" Kesari provided was not grounded in any legitimate basis. Dr. Chambers will additionally describe his concerns about, among other things, the exceptionally poor manner in which patient medical records were maintained, Kesari's lack of supervision over Defendant Truxhall, and Kesari's entrusting of Truxhall—who lacked the appropriate qualifications—to essentially act as a doctor and prescribe controlled substances to the patients.

**E.** **The Defendants Own Statements Will Prove Their Intent to Violate the Law.**

Through agent testimony, the government will introduce into evidence the Defendants' own statements revealing their intent to illicitly distribute the controlled substances. For example, Diversion Investigator DeAndra Lee will testify about statements Defendant Kesari made during the execution of the search warrant at Kesari's medical practice, including admissions he made regarding his improper use of telemedicine from California while treating patients in West Virginia; his lack of medical license and DEA registration in California while practicing telemedicine from California; his prescribing of Buprenorphine to female patients who were not pregnant; and his pre-signing of blank prescriptions for his staff to fill out and issue to patients in his absence. Diversion Investigator Sandra McMillian will also testify about statements Defendant Truxhall made during interviews, including admissions that she completed pre-signed prescriptions, that she questioned Kesari about the legitimacy of the manner in which they were treating patients, and that she told patients that it was a cash only practice.

**F.** **Defendant Kesari and Truxhall's Motive for Illegally Prescribing the Controlled Substance Was Money.**

The evidence will further demonstrate that the Defendants' scheme was profitable. In exchange for a few seconds or minutes of work (through the Skype calls) Kesari could earn $270 in cash. Truxhall participated in the scheme for the money. She admitted to investigators when confronted about her own role in the scheme that she wanted more work hours than the few she was offered for working at Defendant Kesari's gas station.

**G.** **Other Documentary Evidence Will Show that Defendant Kesari Knew He was Illicitly Prescribing Controlled Substances.**

Finally, other documentary evidence will buttress the case against Defendant Kesari and prove his knowledge and intent of the illicit conduct. For example, the government intends to introduce a DEA form (Form 104) that Defendant Kesari signed, which terminated his ability to

prescribe controlled substances and in which he admitted that he was surrendering his DEA registration "for cause" to "remedy any incorrect or unlawful practices on [his] part." The government also seeks to introduce evidence (either as intrinsic to the scheme or as extrinsic 404(b) evidence) that Defendant Kesari lied to his patients—he had signs in his clinic representing that he did not have medical malpractice insurance, when he, in fact, did—and that he required his patients to sign contracts precluding them from suing him. This evidence thus reveals his intent to prevent his patients from confronting him about the egregiously poor medical care he knowingly and intentionally provided.

## III.    ADDITIONAL PRETRIAL MATTERS.

With the exception of the Oak Hill matter, the Government believes that nearly all substantive pretrial matters have been resolved in previous pretrial hearings and pleadings before the Court.

### A.    Cross-Examination of Dr. Chambers.

The Government anticipates that the Defendants will attempt to introduce the results of a regulatory examination the DEA conducted of Dr. Chambers in 2012.  In 2012, Dr. Chambers was engaged in a study of addiction and mental health, funded by the National Institute on Drug Abuse and National Institute on Alcohol Abuse and Alcoholism, specifically as to the addictive properties of cocaine. Dr. Chambers' research involved the exposure of rats to a cocaine/saline solution in order to study their behavioral reaction and loco motor activity.  Pursuant to 21 C.F.R. § 1304.11(c), 21 U.S.C. § 827(a)(1) and 21 U.S.C. § 842(a)(5), Dr. Chambers was required to take a new inventory of all stocks of controlled substances on hand every two years.  Dr. Chambers most recent receipt of cocaine occurred on January 7, 2010.

As part of its review as to Dr. Chambers, the DEA detailed the thorough security measures instituted by Dr. Chambers as to the controlled substances in his possession, and no issues were

noted as to the accuracy of the receipts and dispensing of his controlled substance inventory. The DEA's sole comment was simply that Dr. Chambers did not fill out a separate inventory form within a two-year period.  Dr. Chambers' DEA registration, and his ability to prescribe and work with controlled substances was not impacted by not maintaining a biennial inventory of controlled substances on hand.  Evidence of Dr. Chambers' minor regulatory issue, from nine years ago, is irrelevant as to his expert opinion regarding whether Dr. Kesari's actions were not for a legitimate medical purpose in the usual course of professional practice or were beyond the bounds of medical practice. *See* Fed. R. Evid. 401.  Furthermore, the probative value of such a technical violation unrelated to the matter before the jury is substantially outweighed by the danger of unfair prejudice and confusion of the issues. *See* Fed. R. Evid. 403.  As such, evidence as to Dr. Chambers minor regulatory transgression should not be permitted.

### B.    Confidential Patient Information.

During its case in chief, the Government needs to introduce voluminous records that contain both personally identifiable information and sensitive health information regarding Defendant's former patients. Redaction of these records is impracticable and would likely result in deletion of nearly the entirety of these records. Therefore, the United States respectfully moves the Court to seal the records that contain such sensitive information about defendant's former patients (the United States has redacted much personal identifying information from these exhibits, such as dates of birth, social security numbers, and addresses of the patients). Should this motion be granted, the United States will designate which of its exhibits contain such information. *See, e.g.*, *United States v. Abdallah*, 2009 WL 2246156, (S.D. Tex. July 24, 2009) (granting motion to seal patient records).

### C.      Witness Sequestration.

Federal Rule of Evidence 615 provides that "[a]t the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses…" However, the rule provides an exception to mandatory sequestration for "an officer or employee of a party which is not a natural person designated as its representative by its attorney. Fed. R. Evid. 615(b). An agent who participated in the investigation in a criminal prosecution falls within this exception. *United States v. Parodi*, 703 F.2d 768, 773 (4th Cir. 1983). Another exception allows "a person whose presence a party shows to be essential to presenting the party's claim or defense" to be present during other testimony. Fed. R. Evid. 615(c). Regarding this Rule 615 exception, the Fourth Circuit has pointed out that the Rule "is designed to preclude fact witnesses from shaping their testimony based on other witnesses' testimony," but does not "does not mandate the sequestration of expert witnesses who are to give only expert opinions at trial." *Opus 3 Ltd. V. Heritage Park, Inc*., 91 F.3d 625, 629 (4th Cir. 1996).

Here, the Government seeks to enforce the witness sequestration rule. Pursuant to *Parodi*, however, the Government does anticipate requesting that the expert Dr. Andrew Chambers and Diversion Investigator DeAndra Lee be permitted to remain in the courtroom, with Lee at counsel table, for the Government during the course of the trial.  *See Parodi*, 703 F.2d at 773.

### D.      Defendants' Statements.

At trial, the United States intends to introduce Defendants' statements in the form of statements given to law enforcement, including a recorded statement and records signed by Defendants. A statement is not hearsay if "[t]he statement is offered against a party and is (A) the party's own statement, in either an individual or representative capacity." Fed. R. Evid. 801(d)(2)(A). The Government will seek to introduce several of the Defendants' statements,

including their statements to investigative agents, and admissions on Defendant Kesari's DEA registration.

### E.    Business Records and Rule 902(11) Certifications.

There will be no stipulations as to the authenticity and admissibility of banking records, physical prescriptions received from pharmacies, and other records because the Defendants have rejected all proposed stipulations. However, the Government has served Defendant with Rule 902(11) Certifications in the form of affidavits from custodians of these records that provide a basis for their admissibility. The Defendants have not provided a basis for contesting these affidavits, and they should be admitted at trial as business records, given the notice the Government has provided—since February 24, 2020 in some instances—that it considers these records business records, and provided formal notice of this uncontroversial request almost a week before trial. *Cf. United States v. Olguin*, 643 F.3d 384, 390–91 (5th Cir. 2011) (such notice sufficient under Rule 902(11)).

### F.    Reciprocal Discovery

Pursuant to the pretrial order in this case, *see* ECF 18, the Government has complied with its discovery obligations by promptly turning over to Defendant all materials covered by the order, including on an ongoing basis as it continues to investigate this case. Under the terms of the pretrial order, the Defendant must also turn over relevant discovery within 14 days of the Defendant receiving materials from the Government. At the May 13, 2021 hearing, counsel for both Defendants stated that they had provided all discovery under Federal Rule of Criminal Procedure 16. Accordingly, to the extent that Defendant would seek to rely on undisclosed materials at trial that would have been covered by the Government's discovery requests, the Government reserves the right to move to exclude that evidence based on violations of the pretrial order.

The Government also made an affirmative request for any "reverse-*Jencks*" material under Rule 26.2 in advance of trial to streamline the examination of defense witnesses who may have statements that fall within this rule. As of the date of this filing, no such evidence has been provided.

### G.    Judicial Notice of Certain Facts

Pursuant to Federal Rule of Evidence 201, the Government asks that the Court take judicial notice of the following facts, all of which are generally known within the Court's territorial jurisdiction or can be accurately and readily determined from sources whose accuracy cannot be questioned:

1.  Until September 30, 2020, and at all times relevant to the Indictment, Dr. Sriramloo Kesari (Kesari) was a medical doctor, with license number 12006, licensed by the State of West Virginia. Additionally, Kesari maintained Drug Enforcement Administration Registration ("DEA") Numbers AK8887739 and XK8887739.

2.  Kesari owned and operated a practice located in Danville, Boone County, West Virginia within the Southern District of West Virginia.

3.  The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States.

4.  Under the CSA, the United States Drug Enforcement Administration ("DEA") regulated certain pharmaceutical drugs designated as "controlled substances" because of their potential for abuse or dependence, their accepted medical use, and their accepted safety for use under medical supervision.

5.  The DEA issued registration numbers to qualifying practitioners, including physicians, which permitted those practitioners to dispense Schedule II, III, IV, and V controlled substances consistent with the terms of that registration.

6. Buprenorphine, Suboxone, Tramadol, and Butalbital/Acetaminophen/Caffeine are Schedule III controlled substances.

7. Alprazolam is a Schedule IV controlled substance.

8. The Code of Federal Regulations governed the issuance of prescriptions and provided, among other things, that a prescription for a controlled substance "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." The Code of Federal Regulations further directed that "[a]n order purporting to be a prescription issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent of [the CSA] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

Respectfully Submitted,

LISA G. JOHNSTON
Acting United States Attorney


*/s/ Maryam Adeyola*
Maryam Adeyola

Andrew Barras
Dermot Lynch
Kilby Macfadden
Health Care Fraud Unit
Appalachian Regional Opioid Strike Force
207 Grandview Drive, Suite 400
Fort Mitchell, KY 41017
Maryam.L.Adeyola@usdoj.gov

22

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing was served electronically on all counsel of record on May 18, 2021.

*/s/Maryam Adeyola*
Maryam Adeyola