```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
 2                        AT CHARLESTON


 3   _____x

 4   UNITED STATES OF AMERICA,        : CRIMINAL ACTION NUMBERS
                                      : 2:19-cr-00241-01 and 02
 5              Plaintiff,            :
        -vs-                          :
 6                                    :
     SRIRAMLOO KESARI, M.D., and      :
 7   KRISTINA TRUXHALL,               :
                                      :   KELLY CLARK, M.D.
 8                                    :   TESTIMONY
              Defendants.  :
 9   _____x

10

11                  JURY TRIAL PROCEEDINGS
         BEFORE THE HONORABLE JOHN T. COPENHAVER, JR.,
         SENIOR UNITED STATES DISTRICT JUDGE, and a jury
12                  TUESDAY, MAY 25, 2021

13

14

15

16

17

18

19

20

21

22

23        Proceedings recorded by mechanical stenography,
     transcript produced by computer.
                    _____
24                  CATHERINE SCHUTTE-STANT, RDR, CRR
                       Federal Official Court Reporter
25                    300 Virginia Street, East
                        Charleston, WV 25301
```

```
 1
    APPEARANCES:
 2  For the Plaintiff:          DERMOT LYNCH
                                MARYAM L. ADEYOLA
 3                              Department of Justice
                                1400 New York Avenue, NW
 4                              Washington, DC 20005

 5
                                KILBY MACFADDEN
 6                              Department of Justice
                                Suite 500
 7                              307 Grandview Drive
                                Ft. Mitchell, KY 41017
 8

 9
                                ANDREW B. BARRAS
10                              Department of Justice
                                Suite 400
11                              207 Grandview Drive
                                Ft. Mitchell, KY 41017
12

13
    For the Defendant,
14  Sriramloo Kesari M.D.:

15
                                NELSON MCKOWN
16                              DINSMORE & SHOHL LLP
                                P. O. Box 11887
17                              707 Virginia Street, East
                                Suite 1300
18                              Charleston, WV 25339-11887

19
                                MICHAEL J. FERRARA
20                              DINSMORE & SHOHL LLP
                                Suite 300
21                              191 West Nationwide Boulevard
                                Columbus, OH  43215
22

23
                                JOSEPH WILLIAM HARPER
24                              DINSMORE & SHOHL LLP
                                1900 Chemed Center
25                              255 East Fifth Street
                                Cincinnati, OH  45202-3172
```

CONTINUED APPEARANCES:

For the Defendant,
Sriramloo Kesari M.D.:

                    **KRYSTA K. GUMBINER**
                    DINSMORE & SHOHL LLP
                    Suite 3400
                    222 West Adams
                    Chicago, IL 60606

For the Defendant,
Kristina Truxhall:

                    **MICHAEL B. HISSAM**
                    **ISAAC RALSTON FORMAN**
                    **SKYLER A. MATTHEWS**
                    Hissam Forman Donovan Ritchie
                    P. O. Box 3983
                    Charleston, WV 25339

INDEX

DEFENSE
WITNESSES          DIRECT      CROSS      REDIRECT   RECROSS

KELLY CLARK, M.D. 5           100           ^          ^


GOVERNMENT'S
EXHIBITS          ADMITTED


    508                 164
    509                 164
    510                 179


DEFENDANT'S
EXHIBITS          ADMITTED

    6 -                 44

1     (The following proceedings were held before the

2   Honorable John T. Copenhaver, Jr., Senior United States

3   District Judge, in the case of the *United States of America*

4   *versus Sriramloo Kesari, M.D., and Kristina Truxhall,* on

5   Tuesday, May 25, 2021, at Charleston, West Virginia.)

6     (The following is an excerpt.  Proceedings preceded and

7   followed but were not transcribed.)

8     **(Jury in.)**

9     (All counsel present, defendant Kesari and defendant

10  Truxhall present.)

11           THE COURT:  Call your next witness.

12           MR. FERRARA:  Your Honor, Dr. Kesari calls Dr.

13  Kelly Clark.

14           THE CLERK:  Please stand and raise your right hand

15  to be sworn.

16         **KELLY CLARK, DEFENSE WITNESS, SWORN**

17           THE CLERK:  State your name and spell your last

18  name for the record.

19           THE WITNESS:  Kelly Clark.  K-E-L-L-Y, C-L-A-R-K.

20           THE CLERK:  Thank you.  You can have a seat.

21                 **DIRECT EXAMINATION**

22  **BY MR. HARPER:**

23  **Q.**   Good afternoon, Ms. Clark.  Can you begin by telling

24  the jury what your profession is?

25  **A.**   I'm a medical doctor.  I specialize in psychiatry and

1    in addiction medicine.  And I've done a lot of work in

2    Appalachia, as well as in making policies around treating

3    addiction.

4    **Q.**   Can you please give us an overview of your educational

5    background?

6    **A.**   I went to college at Coe College, Cedar Rapids, Iowa.

7    I majored in psychology.  I got my Doctor of Medicine degree

8    at the University of Wisconsin.  I did my psychiatric

9    residency at the University of Wisconsin, Milwaukee, and the

10   Medical College of Wisconsin, also in Milwaukee.  I did my

11   MBA at Duke.

12   **Q.**   And, Dr. Clark, do you hold any Board certifications?

13   **A.**   Yes.  I'm Board-certified in psychiatry, as well as in

14   the practice of addiction medicine.

15   **Q.**   And let's go to the first one.  What does it mean to be

16   Board-certified in psychiatry?  Could you please explain

17   that to the jury?

18   **A.**   Sure.  After medical school, we do additional training.

19   So there is one year of training that all doctors do called

20   an internship.  And then it shows that -- we take a test and

21   it shows that we can get licensed to be a doctor.  And then

22   there is additional kinds of specialties on top of that that

23   are done in residencies.

24        And there is three more years of residency and training

25   to be a specialist in psychiatry.  Like, there is four more

1    years to be a surgeon and so on.

2         Oh, and then you have to take a test to show that you

3    know what you're supposed to know to be a psychiatrist.  And

4    that's what that means.

5    **Q.**   And are there continual training requirements as well?

6    **A.**   Yes.  There are continuing training elements, and there

7    is also taking tests every 10 years to make sure that you

8    continue to know what you are supposed to know to be a

9    Board-certified psychiatrist.

10   **Q.**   And then, I believe, you also testified that you were

11   Board-certified in addiction medicine?  Can you please

12   explain to the jury what that means?

13   **A.**   Yes.  So addiction medicine is -- it's actually a

14   subspecialty of preventive medicine.  And it is -- it has to

15   do with preventing, diagnosing, and treating people who have

16   addictive disease, which is a chronic brain disease.

17   **Q.**   And how long have you practiced in the field of

18   addiction medicine?

19   **A.**   Over 20 years -- 25 years.

20   **Q.**   During that course of 20 years of experience treating

21   patients in -- I'm sorry.

22        Have you treated patients in addiction medicine?

23   **A.**   Say that again.

24   **Q.**   I'm sorry.  I apologize.

25        During the course of the 20 years of experience, have

1  you treated patients in the field of addiction medicine?

2  **A.**   Oh, yes.  Thousands of patients.

3  **Q.**   And have you performed consulting work in the field of

4  addiction medicine over the course of your 20 years of

5  experience?

6  **A.**   Yes.

7  **Q.**   Can you just describe the nature of the work?

8  **A.**   Well, I've performed through volunteer consulting work

9  and paid consulting work.  So volunteer consulting work,

10  I've worked for a variety of organizations, like American

11  Society of Addiction Medicine, and the federal government,

12  and other kinds of organizations as a volunteer.  And then I

13  do consulting, as well as paid work.

14  **Q.**   What is Addiction Crisis Solutions?

15  **A.**   That is a consulting company that I cofounded, and it's

16  focused on helping to improve the quality of addiction

17  treatment and make it more cost-efficient and more available

18  and quality access to everyone.

19  **Q.**   And what is Bicycle Health?

20  **A.**   Bicycle Health is a company that I consult for as a

21  clinical advisor, and they provide treatment for opiate use

22  disorder, using Buprenorphine, to patients at home over

23  telemedicine.

24  **Q.**   Can you give the jury a little bit more detail about

25  how patients are treated at Bicycle Health?

1          MR. LYNCH:  Objection, Your Honor.  This is the

2     subject of a prior motion.

3          MR. HARPER:  I respectfully submit, Your Honor,

4     it's not.  I believe, as Mr. Ferrara stipulated earlier, the

5     prior motion was focused on a specific piece of DEA guidance

6     as opposed to the general concept of telemedicine, which has

7     been discussed, I think, by numerous witnesses in this case.

8          THE COURT:  The witness may answer this question.

9          THE WITNESS:  So people will basically do

10    audiovisual through an app.  They'll contact Bicycle Health

11    and they will do sort of an initial kind of receptionist

12    information.  So, for example, Bicycle Health has contracts,

13    national contracts with health insurance companies.  And so

14    they'll get that information or to see if a patient has to

15    self-pay for care, and see if they seem to understand what's

16    appropriate.

17         And then the patient will be set up with a clinician,

18    and then see a person who's capable of prescribing to have

19    an evaluation and see if they meet the criteria to -- have

20    opiate addiction and might be appropriate for treatment with

21    Buprenorphine.

22         And then they will prescribe that medication over

23    electronic prescribing.  And then the patient would continue

24    to see the providers.  They'll schedule more appointments

25    and so on.

BY MR. HARPER:

**Q.**   Can you tell the jury about your personal experience and qualifications relating to telemedicine?

**A.**   Well, sure.  I've practiced telemedicine.  It's just a way of doing medical care.  And, particularly, when I was treating opiate addiction in eastern Kentucky -- I live in Jeffersontown, Kentucky.  And when I was seeing patients in Paintsville, Pikeville, and Hazard, Kentucky, that's 500 miles a round-trip.  There just aren't providers out there.

And so I would, you know, see the patient from wherever I was.  As long as the patient -- that patient would, you know, come in and see the staff member, get their vitals done, and a staff member would sit there with them in the room, and I would be wherever I would be, whatever state I happened to be in or wherever, and I would just see the patient because I'm licensed in Kentucky.

So I would continue to see the patients through telemedicine when I was not available to make the drive in person.

**Q.**   Are you familiar with the concept, Dr. Clark, of utilization review?

**A.**   Yes.

**Q.**   Can you please explain what utilization review is to the jury?

**A.**   That's something that happens with your insurance

1    company.  So you might know that you might need a prior

2    authorization for something or there is different tiers of

3    medicine that might be -- gets covered by an insurance

4    company.

5              MR. LYNCH:  Objection, Your Honor.  Relevance.

6              THE COURT:  How is it relevant?

7              MR. HARPER:  It relates directly, Your Honor, to

8    the issues in this case.  Utilization review, as I believe

9    Dr. Clark has explained, involves reviewing the records

10   related to care that was provided and looking for indicia of

11   fraud or legitimacy.

12             THE COURT:  The objection is overruled.

13       You may continue.

14   BY MR. HARPER:

15   **Q.**   Please explain.

16   **A.**   So part of what I've done in my work in the past is to

17   work with insurance companies for fraud, waste, and abuse.

18   And claims are doctors practicing in a way that is outside a

19   legitimate medical practice as with some of the information

20   that they would have through claims organizations, you know,

21   fraudulent billing.  But also what kind of care specifically

22   and what medical records specifically a provider has,

23   because they have to send that into the insurance company if

24   there is any question around the bills that they provided

25   to show what it is they did to the insurance company.

1      So I have seen and evaluated cases, thousands of cases

2      of how care is done around the country.

3      **Q.**   Dr. Clark, my understanding is that you've been

4      involved with setting national policy on opiate use disorder

5      and treatment.  And I want to discuss some of that work.

6          For starters, can you please explain to the jury what

7      ASAM is?  What that stands for and generally what the

8      organization is?

9      **A.**   ASAM is the American Society of Addiction Medicine.

10     Now, all specialties of medicine have their own

11     organizations.  Pediatric doctors, pediatricians have their

12     organizations.  The psychiatrists, you heard before, have

13     the American Psychiatric Association.  Surgeons have a

14     group.

15         Addiction doctors have a group called the American

16     Society of Addiction Medicine.  It's about 6,600 doctors,

17     mostly -- some allied personnel, but thousands of doctors

18     that are specialized and work in the field of addiction

19     medicine.

20     **Q.**   Dr. Clark, have you personally ever held a leadership

21     position within ASAM?

22     **A.**   Yes.

23     **Q.**   Could you please tell the jury what that position was?

24     **A.**   Well, my peer doctors elected me as President of the

25     American Society of Addiction Medicine.  I did two years of

1    President Elect, two years of President, two years of

2    Immediate Past President, and represented the addiction

3    doctors in the field in that capacity.

4    **Q.**   And when you were President Of ASAM, were you helping

5    develop the guidelines that the doctors used to treat opioid

6    addiction?

7    **A.**   Yes.  I've been doing this for many years.  The variety

8    of kinds of documents and information and education for all

9    kinds of providers on treating opiate use disorder.  I'm

10   just going to say opiate addiction.

11   **Q.**   I have another acronym for you, "SAMHSA."  Can you

12   explain what that is?  What the acronym stands for and then

13   what that means to the jury, please?

14   **A.**   SAMHSA is the Substance Abuse and Mental Health

15   Services Administration, or SAMHSA, which I think was

16   mentioned earlier.  And basically that's the part of the

17   U.S. Department of Health and Human Services that deals with

18   substance abuse and mental health services.  So they try to

19   make quality treatment more accessible to people and improve

20   that quality of care.

21   **Q.**   I want to take these one at a time, but, for starters,

22   if you could please identify for the jury the three major

23   documents that provide guidelines to physicians for treating

24   opioid addiction?

25   **A.**   Well, the three major guidelines are the national kinds

1    of documents here.  Two are really clinicians.  One is

2    around sort of policies and clinicians.

3        The first is ASAM's Practice Guidelines for treating

4    opiate addiction using medications.

5        And the second one is a document by SAMHSA.  It's

6    called TIP 63.  And TIP is for Treatment Improvement

7    Protocol.  It was the 63rd one that they did.  And it is

8    also on using the medications that have been FDA-approved to

9    treat opioid addiction.

10       And the third document that has a lot of the science

11   and policy in it was by the National Academy of Medicine,

12   which was referenced earlier, I think.  And that's called

13   "Medications for Opiate Use Disorder Save Lives."

14   **Q.**  So let's do these one at a time.  Let's take the first

15   one.  Can you please tell the jury what, generally, what the

16   ASAM National Practice Guidelines for treatment of opiate

17   use disorder are, and how you were involved with those?

18   **A.**  Sure.  They -- for clinicians, how to approach a

19   patient who might have opiate addiction.  They explain the

20   three FDA-approved medications.  One of them is Suboxone,

21   Buprenorphine, Subutex -- however you want to call it --

22   Buprenorphine or Bup.  And they are to help guide clinicians

23   in their treatment decisions.  And I was -- you know, I was

24   a leader at that point in the organization.  I was an

25   invited reviewer to go through the draft and, you know,

1    provide comments and help edit that, as that was coming

2    forward.

3    **Q.**   Can you please explain to the jury what TIP 63 is, and

4    what your role was in relation to that set of guidelines?

5    **A.**   TIP 63, again, that treatment improvement protocol that

6    the federal government put together, not the Department of

7    Justice, but the folks that treat mental health and

8    addiction, okay, SAMHSA, put together -- again, talking

9    through all three of the documents -- all three of the

10   medications that are used to treat opiate use disorder.  And

11   giving sort of that federal guidance treatment viewpoint

12   on -- to help prescribers, to help other kinds of clinicians

13   understand using medications to treat opiate addiction.

14   **Q.**   And in doing this at a very high level, 30,000 --

15   **A.**   I'm sorry.

16   **Q.**   No, no. I'm not much -- this was a preface to my next

17   question.  Not a criticism.

18        Doing this at a high level view, because these are

19   obviously extensive documents, just generally speaking, can

20   you summarize the guidance that is set forth in TIP 63?

21   **A.**   Yes.  So here, I was asked actually as a consultant --

22   to be paid consultant and to do the work on editing this

23   document and providing, you know, information back.  And at

24   the very core level, what TIP 63 from the treating part of

25   the federal government says is that medication, like

1    Buprenorphine, is a core treatment; that the evidence around

2    using the medication is better than the evidence for

3    anything else to treat opioid addiction; that patients

4    should stay on that medication until they feel like they

5    want to try to decrease it.  It talks through the science

6    about how, when people stay on their dose, they stay alive.

7         It talks about how -- I am going to say the word

8    "counseling" here, in general.  I'm going to use it the way

9    that Dr. Chambers did, to mean psychotherapy, okay.

10   Psychotherapy.

11        It talks about what is -- what is sort of good to do,

12   and that's different than things that are must to do.  But

13   it talks about lots of things that are good to do.

14        And that's what, you know, I see with Dr. Kesari's

15   practice.

16   **Q.**   What is the National Academy of Medicine?

17   **A.**   I am going to use Dr. Chambers' definition, because I

18   like it.  He said something like the National Academy of

19   Medicine is a group of scientists who use their knowledge

20   for the benefit of the people of the United States.

21   **Q.**   And do you have any role with regard to the National

22   Academy of Medicine?

23   **A.**   Yes.  They asked me to be part of the leadership team

24   that is running a very large collaborative with dozens and

25   dozens of organizations, looking at how the country can

1    address the opioid crisis.  They asked me to -- of course I

2    said yes.  They asked me to chair one of their working

3    groups.  I've put out a document through them on what we

4    need to do for our treatment system going forward.  And they

5    also put out a document before they asked me to do this,

6    called "Treatment For" -- "Medication for Opioid Use

7    Disorder Save Lives," and they asked me to consult and

8    review that document.

9    **Q.**    Okay.  And can you tell the jury a little bit about

10   that document "Medication for Opioid Use Disorder Save

11   Lives"?

12   **A.**    Yes.  So they are actually asked -- they were paid by

13   the federal government to take a look at this, to take a

14   look at the science and, et cetera.  And they were actually

15   asked to do a document on medication-assisted treatment.

16   And what they decided was they couldn't do a document on

17   medication-assisted treatment, because medication doesn't

18   assist treatment.

19        Medication is treatment.  Right?  We don't see insulin

20   assist the treatment of diabetes.  Right?

21        Medication is a treatment for a disorder.  And what

22   they said in that was really very clear, that that kind of

23   language about medication assisting treatment, it's

24   stigmatizing.  It's part of this concept that this is a --

25   not a brain disease; that these are just choices people make

1    and they can talk themselves out of it.

2        And really what the National Academy of Medicine is

3    saying, like the federal government, like the addiction

4    doctors, is that this is not something you talk yourself out

5    of when your brain is changed here.  This is a chronic brain

6    disease and needs to be treated like one.

7        So they refused to say -- talk about MAT.  And they

8    talk about how the people get on and stay on the medication

9    for opioid use disorder; it saves lives.

10   **Q.**   Besides the work that you've already described helping

11   to set national policy, have you done other consulting work

12   for the federal government?

13   **A.**   Yes.

14   **Q.**   And can you tell the jury about some of that other

15   work?

16   **A.**   Well, I've done volunteer work.  I do a lot of

17   volunteer work.  And I've done some paid work.  So in terms

18   of sort of volunteer work, the Food and Drug Administration

19   asked me to come to their headquarters and speak to them in

20   a large kind of lecture room about addiction and medications

21   and et cetera.  And, of course, I did that.

22       And I was asked by SAMHSA, the Substance Abuse Mental

23   Health Services Administration, to be part of a -- an

24   invitation kind of group that met to talk about how they

25   could increase access to Buprenorphine, because not enough

1    people were prescribing.  And they asked me to run a

2    breakout group, to lead a breakout group, talking about

3    payment, because that's such a big problem with insurance

4    not covering this.  And, of course, I did that.

5        I testified in front of President Trump's Opioid

6    Commission.  I testified in front of a variety of, you know,

7    Congressional kinds of situations.

8        So it's a lot of -- kind of volunteer work like that.

9    **Q.**   Who's the current drug czar?

10   **A.**   Regina LaBelle.

11   **Q.**   Do you know Regina?

12   **A.**   Yeah.

13         MR. LYNCH:  Objection, Your Honor.  Relevance at

14   this point.

15         MR. HARPER:  It's just to establish her extensive

16   qualifications and connections and experience in the field

17   of addiction medicine, Your Honor.

18         THE COURT:  You may inquire.

19         THE WITNESS:  It's Regina LaBelle.

20   BY MR. HARPER:

21   **Q.**   I'm sorry.  Can you tell us about your relationship,

22   professional relationship with Regina LaBelle?

23   **A.**   Sure.  She's a lawyer.  She used to be the Chief of

24   Staff at the Office of National Drug Control Policy or

25   ONDCP, which is the drug czar office.  And she's currently

1   the acting drug czar, yes.  And we have a fine relationship.

2   We worked together, actually, on a document, I should say.

3   We worked together for a document --

4           MR. LYNCH:  Your Honor, this is nonresponsive at

5   this point.

6           THE COURT:  The witness may continue.

7           THE WITNESS:  We worked together on a document

8   with recommendations for the current administration on how

9   to address the opioid epidemic, the kinds of changes we need

10  to make in the treatment system and payment system, and the

11  kinds of changes we need to make in the employment system so

12  people can't get discriminated against in the workplace or

13  not get time off to go to their doctor appointments, and

14  those kinds of things.  And we worked before she became drug

15  czar.  And we worked on a document together that was

16  published by the Duke-Margolis Center.  M-A-R-G-O-L-I-S.

17  BY MR. HARPER:

18  **Q.**   Have you ever worked as an expert witness for the

19  Department of Justice?

20  **A.**   Yes.

21  **Q.**   And in what capacity?

22  **A.**   Well, I've been at trial, I think, four times for the

23  U.S. Department of Justice, in four different cases, I mean.

24  And I currently have well over a dozen cases in which -- not

25  this team, but different teams of the federal government

1    have hired me to be their consulting expert or their expert

2    witness on cases that are involving things like prescribing

3    outside of the course of legitimate medical practice, and

4    conspiracy, as well as, you know, lots of healthcare fraud

5    issues and et cetera.

6    **Q.**   And do some of those cases in which you have worked to

7    help the Department of Justice involve doctors?

8    **A.**   Yes.

9    **Q.**   When you help the Department of Justice prosecute

10   doctors and other healthcare providers, what do those types

11   of cases typically involve?

12   **A.**   Well, every case that has been brought to me has been

13   different than this kind of case.  The cases that have been

14   brought to me that I have helped them with are involving

15   things like doctors prescribing -- having, you know, no

16   seeing of the patient, no relationship with the patient,

17   never -- knowing nothing about the patient, and just

18   prescriptions going out without the doctor's approval,

19   doctors that are prescribing Buprenorphine and other kinds

20   of controlled substances without any medical reason to

21   prescribe those.

22        Doctors who are ordering those definitive tests, those

23   tests that you heard before about Dr. Chambers and getting

24   billed four, 4-, 5-, 6 - $8,000 per urine test as part of,

25   like, conspiracies and kickbacks that are involving millions

1     of dollars.  Large treatment center places where there

2     are -- we heard about a treatment center before.  I have no

3     idea what that one was, but where there are counselors and

4     doctors and all kinds of people there engaging in fraud and

5     prescribing a lot for those patients.  And -- but the

6     government never brought me a case like this.

7     **Q.**   Speaking of the times that you've worked for the

8     government, in your preparation for this trial, did you

9     charge Dr. Kesari the same rate that you charged the

10    Department of Justice when you helped it prosecute doctors?

11    **A.**   Yes.

12    **Q.**   And what is that rate?

13    **A.**   $750 an hour.

14    **Q.**   So I'm just going to recap what we've been discussing

15    thus far this afternoon.  Do you have extensive experience

16    -- extensive training and experience in the field of

17    addiction medicine?

18    **A.**   Yes.

19    **Q.**   Have you treated thousands of patients in the field of

20    addiction medicine?

21    **A.**   Yes.

22    **Q.**   Have you performed substantial consulting work in the

23    field of addiction medicine?

24    **A.**   Yes.

25    **Q.**   Have you worked as an expert witness for the Department

1    of Justice to help prosecute doctors on numerous occasions

2    in cases involving addiction medicine?

3    **A.**    Yes.

4    **Q.**    Do you have experience helping set national policy on

5    treatment for opioid use disorder?

6    **A.**    Yes.

7    **Q.**    Including helping write documents that doctors across

8    the country look to for guidance on how to practice

9    addiction medicine?

10    **A.**    Yes.

11           MR. HARPER:  At this time, I would like to tender

12    Dr. Kelly Clark as an expert witness in addiction medicine.

13           MR. FORMAN:  No objection.

14           MR. LYNCH:  No objection, Your Honor.

15           THE COURT:  You may continue.

16           MR. HARPER:  I just want to mention to the Court,

17    if Your Honor desires, we're about to dive into the

18    substance.  And this might be an appropriate lunch break.

19    I'm happy to continue, if you prefer.

20           THE COURT:  No. I think you are right.  We are at

21    a point, a good stopping point for lunch.

22       And, Doctor, during the break, treat yourself as though

23    you're on the witness stand in the sense that you're not to

24    discuss the case with anyone.

25           THE WITNESS:  Yes.

1          THE COURT:  And we'll return at 20 minutes till

2     2:00, if you'll be back at that time.

3          THE WITNESS:  Yes.

4          THE COURT:  Ladies and gentlemen, as I've

5     indicated to you, once again, during the break, find some

6     topic other than this case to talk about.

7       Thank you.  And we'll see you back at 20 till 2:00.

8          THE CLERK:  All rise.

9       **(Jury out at 12:32 p.m.)**

10      (All counsel present, defendant Kesari and defendant

11    Truxhall.)

12         THE COURT:  If counsel have nothing further.

13      Yes?

14         MR. FERRARA:  Your Honor?

15         THE COURT:  Please be seated.

16         MR. FERRARA:  I apologize, Judge.  Just as an

17    ultra-quick housekeeping issue.  Dr. Santosh Kesari has now

18    been released as a witness, I believe, by all parties.

19      At this time, we would request permission that he be

20    permitted to sit in the gallery to observe the rest of his

21    father's trial.

22         MR. FORMAN:  No objection.

23         MR. LYNCH:  No objection, Your Honor.

24         THE COURT:  You may do so.

25         MR. FERRARA:  Thank you, Judge.

1     THE COURT:  And so we'll be back again at 20 till

2  2:00.  And we'll -- the doctor already left, so we'll see

3  you back then.

4     So thank you.

5     THE CLERK:  All rise.

6     (A recess was taken at 12:33 p.m.)

7     **(Afternoon Session, May 25, 2021, 1:42 p.m.)**

8     THE CLERK:  All rise.

9     THE COURT:  Good afternoon.  And please be seated.

10     (All counsel present and defendant Kesari and defendant

11  Truxhall.)

12     THE COURT:  And ask the jury in.

13     Please be seated.

14     It's going to be another moment or two.

15     **(Jury in at 1:44 p.m.)**

16     THE COURT:  Please be seated.

17                    **DIRECT EXAMINATION RESUMED**

18  **BY MR. HARPER:**

19  **Q.**  Good afternoon, Dr. Clark.

20  **A.**  Good afternoon.

21  **Q.**  So we are trying to streamline this a little bit for

22  the benefit of the jury.  My understanding is that you were

23  in the courtroom and listened to the entirety of Dr.

24  Chambers' testimony; is that correct?

25  **A.**  Yes.

1    Q.   And is it fair to say that you have substantial

2    disagreement with much of what he said?

3    A.   Oh, yes.

4    Q.   And, again, in the interest of getting everyone home

5    for Memorial Day, we are not going to go into everything.

6    And I want to start with kind of the introductory stuff.

7         So he talked about what an opioid is; generally what

8    opioid use disorder is, medications, Suboxone, Subutex, et

9    cetera.  Not getting into the treatment side, but just

10   general background, basic science, was he close enough on

11   that stuff?

12   A.   Close enough.

13   Q.   Okay.  As a physician, do you recommend using

14   Buprenorphine for treating opioid use disorder?

15   A.   Yes.

16   Q.   Can you tell the jury why?

17   A.   Well, for the same reason that other addiction doctors

18   and the federal government talk about using medication to

19   treat opiate addiction.  The evidence is clear that it

20   works.  It saves lives.  People stay alive.  They don't get

21   medical complications from their opiate addiction.  They

22   don't end up in jail and prison at the same rates they do if

23   they stop taking this medication.  Buprenorphine itself or

24   Suboxone, that thing that is in both Suboxone and Subutex,

25   is -- it's safer than all of those other pain pills, all of

1    those other treatments that are out there.  It's its own

2    kind of medication.  So it's safe and it's effective.  And

3    it's convenient for the patient.  It's the only one of the

4    three approved medications that I can actually just pick up

5    the phone and call into a pharmacy and a patient can go in

6    and pick it up at their pharmacy and take it at home.

7    **Q.**   Based on your extensive experience working with the

8    federal government, is the United States federal government

9    trying to get more patients who suffer from opioid use

10   disorder to take Buprenorphine?

11   **A.**   Aggressively.  Through the past three administrations:

12   Obama, Trump and Biden, they've been working very diligently

13   to try to get more people to try to be able to access this

14   medication.

15   **Q.**   And a companion question.  Does the patient population,

16   those who suffer from opioid use disorder, do they have

17   sufficient access to Buprenorphine?

18   **A.**   No, absolutely not.  Most of them don't.

19   **Q.**   And can you tell the jury why?

20   **A.**   Multiple reasons.  One reason is that there is

21   discrimination and stigma against people who've got an

22   addiction.  There's this leftover feeling that this is a

23   moral choice.  Like anybody wants to get up in the morning

24   and have to hunt for opioid pills to feel not sick.

25       There is a misunderstanding about what is needed to be

1    able to prescribe Buprenorphine to treat opiate addiction.

2    There is just not enough providers.  There are -- there's

3    problems in the payment.  So a lot of insurance companies

4    will only pay for doctors to do this work if they are

5    psychiatrists.  And there are not many of us psychiatrists

6    out there.

7         So often, if you are not a psychiatrist, doctors'

8    offices have to run their normal doctor's office, and then

9    they run a special, you know, Wednesday afternoon, self-pay

10   kind of Buprenorphine clinic.  It's called office-based

11   opioid treatment, because there is a problem with payment.

12        And there is also that National Academy of Medicine

13   paper that we talked about before.  It cites a study that

14   one in seven doctors, primary care doctors in rural areas

15   don't prescribe, because they are concerned about government

16   interference in their practice.

17   **Q.**   And, Dr. Clark, what is the net effect of this shortage

18   of providers?

19   **A.**   People die.  People die, and kids are orphaned or go

20   into care because their parents aren't around to take care

21   of them.

22   **Q.**   I want to turn to the usual course of professional

23   practice for treating opioid use disorder.  Dr. Chambers

24   testified at length about how doctors should treat opioid

25   use disorder.

1      Is what he described the usual course of professional

2  practice?

3  **A.**   No, absolutely not.  I disagree with him fundamentally

4  on what is needed to treat opioid use disorder using

5  Suboxone.  And I disagree with him and his opinion about the

6  kind of work that Dr. Kesari is doing in his office.

7  **Q.**   If you had to pick one, what is the single-most

8  important thing that Dr. Chambers left out about the proper

9  way to treat patients suffering from opioid use disorder?

10  **A.**   Oh, gosh.  I have to pick one?

11  **Q.**   Pick one.

12  **A.**   Well, the primary thing he left out when he was talking

13  about this, when he appeared to be thinking about this, was

14  this concept we have of objective good faith.  So the

15  issues -- when I'm asked to look at a case as an expert, I

16  look at this case, and I say what are the questions that are

17  out there.  And the bottom line is, is Dr. Kesari doctoring

18  or is he a drug dealer?  That's the bottom line.

19      MR. LYNCH:  Objection, Your Honor.  This is

20  testimony on the ultimate issue.  And it doesn't --

21      THE COURT:  The objection is sustained, and the

22  jury will disregard the statement.

23      MR. LYNCH:  Move to strike that testimony, Your

24  Honor.

25      THE COURT:  I've already stricken it.

1          THE WITNESS:  Okay.  When I look at the case to

2     determine legitimate medical practice, my opinion gets based

3     on whether the doctor is looking at -- is trying to do his

4     best to practice appropriately; is he doing a legitimate

5     medical practice.  And part of that is, can I see or hear

6     things that he is doing that show me he is trying to run an

7     appropriate medical practice.

8          And I'm on the objective side.  And that was one of the

9     things that Dr. Chambers seemed to totally ignore, along

10    with most of the evidence in the medical record, and most of

11    the other evidence that was there.

12    BY MR. HARPER:

13    **Q.**   Okay.  Let's take them one at a time.

14         First of all, backing up to just kind of a basic

15    question that I think may be relevant to your analysis.

16         What kind of doctor is Dr. Kesari?

17    **A.**   Dr. Kesari is a general practice doctor.  He is -- he

18    is a general country rural doctor.  What Dr. Chambers was

19    describing when he was talking about, you know, practices

20    and doctor's training, he was describing himself and his own

21    training; that he got all his training in medical schools in

22    the U.S. for the unified training, and then in residency,

23    all doctors are trained for this kind of thing.

24         It's not required to do medical school in the U.S.

25    About one in four doctors that are seeing patients right now

1   are trained overseas.

2       It's not required to do a residency, that additional

3   training in order to practice medicine or to prescribe

4   Buprenorphine to treat opioid addiction.

5       So Dr. Kesari did his training in India.  He came to

6   this country.  And he worked an internship in Chicago and

7   got that license to practice medicine; passed the test

8   that we all passed to say, yeah, we can be doctors.

9           MR. LYNCH:  Objection, Your Honor.  This is fact

10  testimony about Dr. Kesari's prior history.

11      It's improper.

12          MR. HARPER:  Just basic background, Your Honor.

13          MR. LYNCH:  It's based on hearsay.

14          THE COURT:  The Court is going to leave you to

15  cross-examine on the point.

16          THE WITNESS:  Then afterward, came to Boone County

17  in the late '70s and worked as a general practice doc.  He's

18  not a specialist of anything.  He is just a general country

19  doctor in a one-person office.

20      And at some point, he retired from doing that and was

21  working in what we call OBOT, an office-based opioid

22  treatment, which means prescribing Buprenorphine, treating

23  opioid use disorder.

24      What Dr. Chambers was talking about -- I don't know

25  what Dr. Chambers was talking about.  He was talking about

1    his own version of things.

2    BY MR. HARPER:

3    Q.    Okay.  And on that point, now, that we've established

4    that Dr. Kesari was a general practice -- general

5    practitioner, did Dr. Chambers accurately describe the usual

6    course of professional practice for a general practice

7    doctor who prescribes Suboxone?

8    A.    No.  He said that in order to prescribe Suboxone

9    legitimately, you have to do a full psychiatric evaluation;

10   you have to do a detailed assessment and diagnosis of all of

11   the medical and -- well, with all of the psychiatric

12   conditions that the patient has.  Then the patient has to go

13   to get psychotherapy -- we can say counseling for that --

14   counseling for their mental health and their addiction

15   issues in order for this to be appropriate, you know, meet

16   that -- to be legitimate care.

17        I mean, even in West Virginia, they license counselors

18   for addiction different than they license counselors for

19   mental health.  I mean, Dr. Chambers wants every patient to

20   go see a lot of different kinds of clinicians to make his

21   what-has-to-happen concept.

22   Q.    Speaking of different types of clinicians and

23   healthcare providers, is it possible for someone who's not a

24   doctor to legally prescribe Buprenorphine?

25   A.    Yes.

1  **Q.**  Can a nurse practitioner prescribe Buprenorphine?

2  **A.**  Yes.

3  **Q.**  Can a physician's assistant prescribe Buprenorphine?

4  **A.**  Yes.

5  **Q.**  Can a certified nurse midwife prescribe Buprenorphine?

6  **A.**  Yes.

7  **Q.**  Did Dr. Chambers accurately describe the usual course

8  of professional practice for non-doctors who prescribed

9  Buprenorphine?

10  **A.**  No.  He didn't describe -- he didn't describe them at

11  all.

12  **Q.**  What is something that all three of those non-doctors

13  we just talked about cannot do that is pertinent to Dr.

14  Chambers' testimony about the usual course of professional

15  practice?

16  **A.**  They can't do an intensive psychiatric evaluation.

17  **Q.**  So certified midwife, they can't do an intensive

18  psychiatric evaluation?

19  **A.**  That's not part of their training, no.  Not -- not with

20  Dr. Chambers -- what Dr. Chambers is talking about.

21  **Q.**  Dr. Chambers said that specialized training is required

22  before a prescriber can prescribe Buprenorphine.  Is that an

23  accurate statement?

24  **A.**  No.  That is not true.  Sorry, I just -- I've never

25  seen a fellow psychiatrist do what he did.

1          MR. LYNCH:  Objection, Your Honor.  There is no

2    question pending.  And move to strike.

3          THE COURT:  The objection is sustained.

4      The last statement is stricken.

5    BY MR. HARPER:

6    **Q.**   Does the federal government agree with the way Dr.

7    Chambers defined the usual course of professional practice

8    for prescribing Buprenorphine?

9    **A.**   No.

10   **Q.**   What would happen if all of the doctors and non-doctors

11   in the United States were held to the usual course of

12   professional practice as defined by Dr. Chambers?

13         MR. LYNCH:  Objection.  This is an improper

14   hypothetical.

15         MR. HARPER:  It's not an improper hypothetical at

16   all, Your Honor.  It relates directly to the case.

17         THE COURT:  The objection is sustained.

18   BY MR. HARPER:

19   **Q.**   You testified earlier today that there is a shortage of

20   providers for opioid use disorder?

21   **A.**   Yes.

22   **Q.**   And is it fair to say that the standard of Dr.

23   Chambers --

24         MR. LYNCH:  Objection; leading.

25         THE COURT:  This is an expert witness.  You may

1    continue.

2    BY MR. HARPER:

3    **Q.**   Is it fair to say that the standard that Dr. Chambers

4    described for treating opioid use disorder would be hard for

5    a number of folks to meet, including the non-doctors that

6    you just described?

7    **A.**   I don't know about the standards, but what he said has

8    to happen is not true.  And it would be almost impossible

9    for most prescribers to do what he says has to be done.

10   **Q.**   And if there were fewer prescribers available in the

11   United States to treat opioid use disorder, what would

12   happen?

13   **A.**   People would die.

14           MR. LYNCH:  Objection, Your Honor.  This is an

15   improper hypothetical.

16           THE COURT:  It's the same matter, in effect, that

17   the Court sustained an earlier objection to.

18       Stay away from those areas.

19           MR. LYNCH:  Move to strike the response, Your

20   Honor.

21           THE COURT:  And so you may continue.

22   BY MR. HARPER:

23   **Q.**   Dr. Chambers said that a full psychiatric evaluation is

24   required before prescribing Buprenorphine.  Is that correct?

25   **A.**   No.

1   **Q.**   Dr. Chambers said to write a prescription for

2   Buprenorphine, a patient has to undergo a controlled

3   induction and come back another day and take the medication

4   in front of the doctor.  Is that true?

5   **A.**   No.  That's rarely done.

6   **Q.**   What is confirmatory testing?

7   **A.**   It's when -- usually, a urine specimen is sent off to a

8   very large, expensive machine that can determine what is and

9   what isn't in it.

10  **Q.**   Dr. Chambers said confirmatory testing is required when

11  treating opioid use disorder with Buprenorphine.  Is that

12  true?

13  **A.**   No.

14  **Q.**   And why not?

15  **A.**   Well, first, it would be wasteful or ridiculous.  If

16  you've got a cup and it comes back positive for marijuana,

17  and you show it to the patient, and the patient says, "Yes,"

18  you don't have to send it off to a big machine to confirm

19  it.

20       Dr. Chambers said that he would send off results of

21  every positive test, which is absolutely not -- not what

22  should be done or appropriate.  And it is just -- it's

23  ridiculous.  And he also got -- said that he would send off

24  every invalid test to see what's in it.

25       An invalid test is when somebody cheated; they put

1    something in it.  And the only time you would really want to

2    do this -- I mean, you might do that if you're doing

3    research studies, but you don't send off every time somebody

4    gives you tampered-with urine.

5    **Q.**   And if you did that, what would be the effect on the

6    cost of medical care, if you sent out all these samples for

7    confirmatory testing?

8    **A.**   Well, it's huge.

9    **Q.**   And that would be an increase?

10   **A.**   It would be an increase.

11   **Q.**   What is a supervised urine drug screen?

12   **A.**   A supervised or an observed urine drug screen is when a

13   staff member actually goes into the toilet with the patient

14   and is in the room to watch while the patient gives the

15   specimen of urine.

16   **Q.**   Is a supervised or observed urine drug screen a

17   required component of treating opioid use disorder?

18   **A.**   No.  And it is often considered invasive.

19   **Q.**   And, in fact, is urine drug testing at all required

20   when treating opioid use disorder with Buprenorphine?

21   **A.**   No.  It's considered something good to do, but it is

22   not a requirement.

23   **Q.**   Dr. Chambers said that the initial patient evaluation

24   is such an important component of treatment that it must be

25   done in person.  Is that correct?

1    **A.**    No.

2    **Q.**    Dr. Chambers said that treatment for opioid use

3    disorder is worse when it is done through telemedicine.

4    Is that true?

5    **A.**    No.    The studies do not show that it is true.

6              MR. LYNCH:    Objection, Your Honor.

7              THE COURT:    What's the objection?

8              MR. LYNCH:    It mischaracterizes Dr. Chambers'

9    testimony.

10             MR. HARPER:    We submit, Your Honor, it does not.

11   He's also free to inquire on cross-examination if he

12   believes that I misstated his testimony.

13             THE COURT:    Well, if you misstated it, you

14   shouldn't have stated it in the first place.

15        The question is whether or not it is supported by what

16   Dr. Chambers said.

17        Are you representing you don't know, and it's up to the

18   government to cross-examine the witness?

19             MR. HARPER:    Your Honor, I'm absolutely not

20   representing that.    I am representing that I accurately

21   characterized his testimony.

22             THE COURT:    That you, what?

23             MR. HARPER:    That I accurately characterized Dr.

24   Chambers' testimony.

25             MR. LYNCH:    My recollection of the testimony is

1    that he did not say that in all instances telemedicine is

2    inherently inferior to -- to in-person treatment for opioid

3    use disorder.

4              MR. HARPER:  Your Honor, that was also not my

5    statement.

6         My question was, quote:  "Dr. Chambers said that

7    treatment is worse for opioid use disorder over

8    telemedicine.  Is that true?"

9         I did not use the qualifiers Mr. Lynch just injected.

10             THE COURT:  You may ask the question.

11             MR. HARPER:  Thank you, Your Honor.

12   BY MR. HARPER:

13   **Q.**   Dr. Clark, Dr. Chambers said that treatment for opioid

14   use disorder is worse when it's done through telemedicine.

15   Is that an accurate statement?

16   **A.**   No.  The data shows that that is not true.

17   **Q.**   Dr. Chambers testified at length about the requirements

18   -- or his perception of the requirements relating to an

19   opioid use disorder treatment clinic.  Are those

20   requirements applicable to Dr. Kesari; why or why not?

21   **A.**   Absolutely not.  Absolutely not.  There are treatment

22   clinics, there are treatment programs, there are programs

23   and clinics that have multiple clinicians there, usually,

24   that are licensed by the state for whatever levels of care

25   they're providing.

1      We heard about one program in Arizona, for example,

2    with lots of different kinds of clinicians, okay.  Those are

3    -- when people -- when an organization is putting together

4    this kind of a clinic or a program treating addiction,

5    usually, all of addiction is what they typically do.  And

6    they give it to the state, in order to be licensed, policies

7    and procedures.

8      This is what we do at our partial hospital program.

9    This is how many hours of counseling we give, that kind of

10    thing.  And they are held to, you know, what they told the

11    state they were going to do in their treatment programs for

12    addiction.

13      Dr. Kesari did not run a treatment program.  He did not

14    run an addiction clinic.  He was doing office-based opioid

15    treatment.  He was doing OBOT in a doctor's office.  And all

16    it is is office-based opioid treatment.

17      He was not treating methamphetamine addiction.  He was

18    not treating -- he was not, you know, assessing and treating

19    all of the other things that Dr. Chambers was talking about.

20      He was doing a specific thing in a doctor's office,

21    because we have -- he is doing what the federal government

22    on the treatment side are saying we need more of,

23    prescribing Buprenorphine for opioid addiction.  That's what

24    he was doing, in a doctor's office.  Not an addiction

25    treatment clinic.

1  **Q.**  Dr. Chambers testified at length about Dr. Kesari not

2  always following the policies or procedures that were set

3  forth on some of his signs or forms perfectly.

4     Do you have an opinion on Dr. Kesari's adherence to all

5  of his signs and all of his paperwork?

6  **A.**  Well, yes.  So it's always a good idea to follow your

7  policies and procedures.  I see lots of notes saying,

8  "Payment due in 30 days.  No exception."  Okay.  That is an

9  internal policy.  Okay.

10    It is not the same thing as telling the state or

11  billing insurance -- which is another issue around this --

12  that you are going to be providing all of this stuff in

13  order to get your license to be a treatment center.

14    These were his internal things that he set himself up

15  as a bar, and while it might be good to do that, it's not

16  needed, required, must, illegal not to.

17  **Q.**  Dr. Chambers said that Dr. Kesari was prescribing high

18  doses of Suboxone.  Is that an accurate statement?

19  **A.**  No.  That is not an accurate statement.  He was

20  prescribing, at maximum, two pills or strips of Suboxone,

21  Subutex, Buprenorphine.  Two, okay.  And those are 8

22  milligrams each.  We can consider that like taking two

23  aspirin for a headache.  Okay.

24    The government approves of taking up to three a day.

25  He was doing two.  Not a high dose.  A normal dose.

1    Q.   Dr. Chambers said that there were about 30 Suboxone

2    doctors in Dr. Kesari's area and implied, therefore, that

3    Dr. Kesari should not have been worried about his patients

4    being able to find --

5         MR. LYNCH:  Your Honor, this is counsel testifying

6    at this point.

7         MR. HARPER:  It's a question, Your Honor.

8         THE COURT:  You may ask.

9    BY MR. HARPER:

10   Q.   I'll repeat my question.

11        Dr. Chambers said that there were about 30 Suboxone

12   doctors in Dr. Kesari's area and implied, therefore, that

13   Dr. Kesari should not have been concerned about his

14   patient's ability to find another alternative Suboxone

15   doctor in their area.  Is that an accurate statement?

16   A.   He said that.  It's not true.

17   Q.   Did you fact-check Dr. Chambers' statement over the

18   weekend?

19   A.   Yes, I did.

20   Q.   And can you please tell the jury how you did that?

21   A.   I went to the same site that he referenced, the SAMHSA

22   Buprenorphine locator site.  And I queried Dr. Kesari's

23   area, Danville.  And I saw what came up.

24   Q.   Okay.  And what came up in your search regarding the

25   number of Suboxone doctors available in Danville, where Dr.

1    Kesari's clinic was located?

2    **A.**   One.

3    **Q.**   One doctor, not 30?

4    **A.**   One doctor, not 30.

5           MR. HARPER:  At this point, I would like to please

6    publish to counsel and the witness, but not the jury, what

7    we'll be marking as Defendant's Exhibit 6.

8    BY MR. HARPER:

9    **Q.**   Can you see that, Dr. Clark?

10   **A.**   Yes.

11   **Q.**   And do you recognize this document?

12   **A.**   That's what I looked up when I pulled up the same site

13   when he said it had 30 prescribers.

14   **Q.**   Is this the printout report that you printed from the

15   SAMHSA website?

16   **A.**   Yes.

17   **Q.**   And how do you know that?

18   **A.**   Because I did it.

19   **Q.**   Is this a true and accurate copy of the report

20   summarizing the results of your search for Suboxone doctors

21   in the area of Dr. Kesari's former practice?

22   **A.**   Yes.  One in Danville, three more in all of Boone

23   County today.

24           MR. HARPER:  Move to admit Defendant's Exhibit 6,

25   and permission to publish to the jury.

1          MR. FORMAN:  No objection.

2          MR. LYNCH:  No, objection, Your Honor.

3          THE COURT:  Admitted.

4     **(Defendant's Exhibit 6 admitted.)**

5     BY MR. HARPER:

6     **Q.**   Can you explain to the jury what this document shows?

7     **A.**   Sure.  So this shows -- there are four lines going

8     across.  And it shows the names -- the columns show the

9     first and last names of the prescribers.  And then it, as

10    you go along, there is a column that says "City."  And then

11    a column that says "County."  And it shows that it is in

12    West Virginia.

13         This is the totality of all the names that came up when

14    I queried that SAMHSA locater site.

15    **Q.**   And just to clarify for the record, there were four

16    names that appear on this list.  It looks like two of them

17    are doctors and two of them are non-doctors; is that

18    correct?

19    **A.**   I think that's correct, yes.

20    **Q.**   And how many of these healthcare providers are located

21    in Danville?

22    **A.**   One.  An emergency room doctor.

23    **Q.**   Nothing more on this exhibit.

24         Dr. Chambers talked a great deal about the importance

25    of counseling.  First question on this topic.

1       Is counseling a good alternative to medication for

2   treating opioid use disorder?

3   **A.**   Absolutely not.

4   **Q.**   And why not?

5   **A.**   Well, because of what the data shows and what the

6   studies show, and what the government tells us, that the

7   part treats, that when people are on their dose of Suboxone,

8   Subutex, and they stay on that dose, then they do better

9   than any other option.

10      When they start to taper, which means decreasing their

11  dose, they immediately go at a higher risk to start using

12  and have all of those problems that happen when they use

13  opioids.

14      Having -- adding additional counseling to the

15  medication actually hasn't been shown in studies to help

16  much -- well, actually to help the outcomes versus just

17  taking the medications.

18      The government in TIP 63 says really clearly that in

19  treating patients with opiate use disorder, they should --

20  they should be informed, they should know that the

21  medication is really the thing that is the core piece, and

22  their risks when they don't take it go up.

23  **Q.**   A related question to what you just explained to the

24  jury.  Is counseling a required component of treating opioid

25  use disorder with Buprenorphine?

1    **A.**    No, it's not.

2    **Q.**    Can you explain to the jury what tapering is?

3    **A.**    Tapering is going down and down and down on your dose.

4    Sometimes to stop taking the medication overall.

5    **Q.**    And within your expertise as an addiction medicine

6    expert, is tapering the typical goal of treatment with

7    Suboxone?

8    **A.**    No.  That's not the medical goal.  We don't start a

9    medicine with the goal of how quick or when can I get you

10   off of the medicine.  Now, patients may have a goal they

11   would love not to take their medicine for blood pressure or

12   high cholesterol, but that doesn't mean their doctor's goal

13   is to get them off of those, right.

14        Our goal is to make sure that they stay alive and don't

15   die early from their disease; that they don't get medical

16   complications from their disease because it's not treated

17   well enough; that they are functioning in society and they

18   are leading their best lives.

19        That is the goal of treating any kind of chronic

20   disease state.  And that's the goal.

21   **Q.**    What does the term "abstinence" mean in the context of

22   treating opioid use disorder with Buprenorphine?

23   **A.**    Well, being picky, it would mean that the patient is

24   not taking another opiate, an illicit opioid.  So they would

25   be abstinent from opioid use.

1      We would also love it if they didn't take any kind of

2   mind-altering drugs, alcohol, or any kind of substances.

3   And not taking substances that are mood-altering substances

4   is called abstinence.

5   **Q.**   And is abstinence -- whether it be from other illegal

6   opioids or from other mind-altering substances or illegal

7   drugs, is that a requirement for continued treatment of

8   opioid use disorder with Buprenorphine?

9   **A.**   Absolutely not.  Even Dr. Chambers said that he would

10   not discharge somebody if they were positive for

11   methamphetamine.  It's -- that is not how we treat.  If a

12   person isn't following their treatment plan, a person with

13   diabetes is not following their treatment plan, they are not

14   doing their diet and exercise, we don't take away their

15   insulin because they had a candy bar.  That's punishing the

16   patient.

17      That's not how we're supposed to treat patients.

18   **Q.**   Okay.  So in that scenario you just described, Dr.

19   Clark, if a doctor is treating a patient who suffers from

20   opioid use disorder, treating them through Buprenorphine,

21   and a urine drug screen reveals that patient has improperly

22   taken an illegal opioid, what is the appropriate thing for

23   the doctor to do in that scenario?

24   **A.**   Talk to the patient.

25   **Q.**   Not terminate them?

1    **A.**    No.  No, no, no.  We don't expect people to be perfect

2    in their treatment plans forever.

3        Now, coming back positive time after time after time,

4    that means the treatment isn't working.  If the treatment

5    isn't working, then we have to change it.

6        But, no, a positive opioid -- or any other drug -- is

7    not a reason to terminate a patient.  Because if you take

8    them off this medication, their risk goes up of dying

9    prematurely from their addiction.

10   **Q.**    We've been talking a bit about Dr. Kesari's practice,

11   and I want to focus on some more particular aspects of that.

12       To set up the next piece, Dr. Kesari prescribes

13   Suboxone to an undercover agent during the course of the

14   alleged conspiracy that's been testified to in various ways

15   during this trial.

16       We are going to show the jury some clips from a video

17   you've already seen.  It's the March 21st, 2019, encounter

18   between Dr. Kesari and the undercover that we believe is

19   representative of the care Dr. Kesari provided.  And we are

20   going to break it up in little parts as we do that.

21       MR. HARPER:  So if the Court could please display

22   Government's Exhibit 5, which has already been admitted and

23   published to the jury.

24   BY MR. HARPER:

25   **Q.**    And, Dr. Clark, if you could please give the jury a

1    little bit of a preview of the important things that they

2    are going to see in this brief segment of video?

3    **A.**    Well, what they are going to see in this segment is

4    that the fake patient, Jason Price, tells Dr. Kesari and Ms.

5    Truxhall that he sold his medication.  And it seems like Dr.

6    Kesari first understands this, and then he gets --

7              MR. LYNCH:  Objection, Your Honor.

8         Could we have a sidebar, please?

9              THE COURT:  You may.

10             **(Sidebar via headsets.)**

11             MR. LYNCH:  Can I proceed, Your Honor?

12        Can you hear me?  I don't think I can hear you, Your

13   Honor.

14             THE COURT:  You may proceed.

15             MR. LYNCH:  All right.  This is the subject of the

16   government's Motion in Limine to exclude.  I believe they

17   are about to start talking about issues related to Dr.

18   Kesari's alleged cognitive impairment, and that's been

19   excluded.  The motion to allow that testimony has been

20   withdrawn.

21        Our motion was effectively granted.

22        And to the extent she's going to talk -- she cannot

23   talk about Dr. Kesari's alleged confusion.  That is an issue

24   that has been litigated, and they've withdrawn it.

25        We can't have testimony around those grounds for the

1    reasons we've already stated in our motion.

2         And I am very concerned about this, because she is --

3    she wrote a 25-page report on this specific issue.  And I'm

4    concerned she's going to get into an issue that we've

5    already ruled -- you've already ruled is not allowed.

6              MR. HARPER:  Your Honor -- Mr. Harper for Dr.

7    Kesari -- I believe you have already ruled on this precise

8    issue.  And you already said in response to repeat

9    objections by Mr. Lynch that a simple passing reference to

10   Dr. Kesari being confused on video does not fall into the

11   category of cognitive decline testimony, because that is

12   simply referencing literally what he says on the video.

13   This is a government exhibit.  They've already played it in

14   its entirety for the jury.

15        And the focus of her testimony, to be very clear, is

16   not going to be on cognitive decline, which we are not

17   trying to address.

18        The focus of her testimony is going to be that this

19   video is chockfull of evidence of good faith medical

20   practice.  And the jury should hear it or see it again.  And

21   the jury should have the opportunity for Dr. Clark in her

22   expert capacity to opine on the significance of the various

23   data points that relate to the care that Dr. Kesari is

24   providing.

25              THE COURT:  The issue, of course, is the question

1   of confusion.  That's all.  And I don't know the

2   government's suggested otherwise.

3       Mr. Lynch, what is the scope of your objection?

4           MR. LYNCH:  The scope -- well, first of all, I

5   don't exactly know what she's going to say.  If she's going

6   to say that he was momentarily confused, but, perhaps,

7   because of a language issue, that's one issue.  But I

8   thought I needed to flag it for the Court that this is, you

9   know -- she's already offered extensive testimony in the

10  form of a written report on this.  And a lot of what's in

11  that report is improper.

12          MR. HARPER:  I don't understand the objection

13  about a question I haven't asked and a statement she hasn't

14  provided.

15      We are not talking at all about the subject of the

16  prior reports that were the subject of various motions and

17  that we withdrew.

18      This, again, is simply talking about evidence of Dr.

19  Kesari's good faith attempts to practice medicine, and a

20  passing reference again to him being confused.  When she

21  said he's confused is very different from a medical

22  diagnosis of dementia.

23          THE COURT:  What the Court will permit you to do

24  is to lead the witness at that juncture and confine it at

25  that point to the witness not getting into impairment.  It

1    will be up to you to control it.

2        Anything further?

3            MR. LYNCH:  No, Your Honor.

4            THE COURT:  Thank you.

5        **(Sidebar ends.)**

6        **(Open Court.)**

7    BY MR. HARPER:

8    **Q.**   All right, Dr. Clark, if you would, before we roll this

9    video segment, could you identify for the jury any

10   particular evidence or facts, things that occur in this

11   video relating solely to Dr. Kesari's good faith practice of

12   medicine?

13   **A.**   Yes.  He works to try to get information and understand

14   the patient's situation.  He talks about how he's unsure

15   what to do.  He thinks about who else he could ask about

16   what to do, to do the right thing.  The group that he thinks

17   about asking is not law enforcement; it's the public health

18   department, to ask about the right thing to do to treat the

19   patient.

20       And then he determines that if the patient comes back

21   negative for Suboxone again, then he would be terminated.

22   **Q.**   Thank you, Dr. Clark.

23           MR. HARPER:  If we could please play this first

24   video clip.

25       (Playing audio-video recording.)

1          (Audio-video recording stopped.)

2     BY MR. HARPER:

3     **Q.**  So we are going to play another video clip for the

4     jury.  The same question.  Could you identify, again, just

5     focusing briefly on evidence that you see, based on your

6     expertise in addiction medicine, evidence of good faith

7     practice by Dr. Kesari in this video as opposed to any

8     other --

9     **A.**  This is immediately after what we just saw, and Dr.

10    Kesari sort of changes the treatment plan from

11    immediately -- immediately from come once a month to

12    something that's a therapeutic intervention, which is, if

13    this happens again, if you come back negative again, you're

14    going to have to come more often, and it's going to be

15    inconvenient for you, and it's going to cost you more money.

16    And that's -- that's something we call a behavioral

17    intervention.  Just what we do to help patients keep on

18    track with their treatment plan; explain why following your

19    treatment plan is in their best interests.

20          That is the kind of behavioral intervention that is --

21    intervention that is -- I don't want to say what they're

22    supposed to do -- that is a good practice.

23    **Q.**  Thank you, Dr. Clark.

24          MR. HARPER:  If we could please continue with

25    Volume 2 of Government's Exhibit 5.

1          (Playing audio-video recording.)

2          (Audio-video recording stopped.)

3     BY MR. HARPER:

4     **Q.**   Same question with respect to the next clip, Dr. Clark.

5     Focusing again on evidence of good faith medical practice by

6     Dr. Kesari, and hit just a couple quick highlights the jury

7     is going to see in this next clip.

8     **A.**   Yes.  So you will see Dr. Kesari trying to again

9     understand what's going on with the patient, saying that

10    he's confused and doesn't understand.  And then in the end,

11    he -- it becomes clear that this Jason Price sold the

12    prescription that Dr. Kesari provided him with, and he just

13    very clearly says, "No, no, no.  Give him a month's supply

14    and terminate him."

15    **Q.**   Thank you.

16          MR. HARPER:  And if we could, please, actually

17    play the next clip, and then also the one after that.

18          (Playing audio-video recording.)

19          (Audio-video recording stopped.)

20          (Playing audio-video recording.)

21          (Audio-video recording stopped.)

22          MR. HARPER:  The jury will probably be happy to

23    know this is our last clip.

24    BY MR. HARPER:

25    **Q.**   Dr. Clark, again, if you'll please just preview briefly

1    what the jury will see in this final clip that we are going

2    to show from the March 21st, 2019, encounter in regard -- in

3    your expert opinion regarding evidence of good faith medical

4    practice by Dr. Kesari.

5    **A.**    Well, Dr. Kesari tells the patient something we often

6    tell patients when we are doing something they don't want,

7    which is that we're legally required and the insurance

8    requires something, he remains firm that it is not okay that

9    Jason Price sold the medication that Dr. Kesari wrote for

10   him.  He explains the difference that if -- if Jason Price

11   had borrowed or, you know, bought or rented, until he could

12   get his own medication paid for, that would be one thing,

13   and that wouldn't cause him immediate sort of discharge.

14   But selling what the doctor provided is what caused this

15   discharge.

16       He's going to give him a month's supply and terminate

17   him after that.  He's going to put it very clear in front of

18   the patient that the medical record is going to say,

19   "because he sold the strips."

20       And so the patient is very well aware that this is why

21   it's going into that medical record.

22       And then for me, objective evidence of good faith

23   practice is, so the doctor's discharging him, the patient is

24   not coming back again.  There is nothing else that, you

25   know, Dr. Kesari could, quote, "get out of," end quote,

1    Jason Price.

2         The paperwork is being done.  And Dr. Kesari takes the

3    stethoscope and goes and listens to the heart and the lungs

4    of the patient and asks him about major medical problems.

5    He's doctoring.  The only reason to do that is that he is

6    doctoring.

7    **Q.**   Thank you, Doctor.

8              MR. HARPER:  If we could play the final clip,

9    please.

10        (Playing audio-video recording.)

11        (Audio-video recording stopped.)

12   BY MR. HARPER:

13   **Q.**   And, Dr. Clark, what is your expert opinion on this

14   encounter based on the video clips that you just observed?

15   **A.**   That he was doctoring.  He was doing -- he was doing

16   the requirements to be practicing office-based opioid

17   treatment, which is what he was doing.

18   **Q.**   In addition to watching these video clips, what else

19   have you done to familiarize yourself with Dr. Kesari's

20   practice?

21   **A.**   I've read dozens of patient files.  I have interviewed

22   several patients.  I have read the entire files that I was

23   given.  I've looked at the Prescription Drug Monitoring

24   Program notes.  I sat through this trial.

25   **Q.**   And why did you sit through this trial?

1    **A.**    To get additional information so I would see all of the

2    evidence as I'm -- it's available, so I can give my opinion.

3    **Q.**    Before we even get to the precise treatment modalities

4    that Dr. Kesari employed, does the number of patients that

5    he was treating tell you anything about the legitimacy of

6    his medical practice?

7    **A.**    Well, he was approved --

8            MR. LYNCH:  Objection; relevance, Your Honor.  The

9    number of -- the six patients are at issue here.

10           MR. HARPER:  It's absolutely relevant.  I believe

11   the witness is about to explain.

12           THE COURT:  The witness may answer that question.

13           THE WITNESS:  He was approved by the DEA and

14   SAMHSA to treat 275 patients.  He had about 60 -- 64

15   patients.  So if he were -- and he was retired from his

16   general practice.  So if he were trying to maximize his

17   income, then he could have seen many more patients.

18       But as we heard from -- as I heard from patients and

19   read in notes, he was picky about who he would take.

20   BY MR. HARPER:

21   **Q.**    You mentioned that you attended the trial and you

22   listened to Dr. Chambers' testimony, correct?

23   **A.**    Yes.

24   **Q.**    And did you hear Dr. Chambers' testimony in terms of

25   his opinions regarding the specific treatment modalities

1    that Dr. Kesari employed?

2    **A.**    Yes.

3    **Q.**    And do you agree with Dr. Chambers' opinions regarding

4    Dr. Kesari's medical care?

5    **A.**    No.

6    **Q.**    Can you give some examples of Dr. Kesari's good faith

7    practices that Dr. Chambers failed to identify to the jury?

8    **A.**    Well, he pulled the prescription drug monitoring Board

9    of Pharmacy before he saw every patient.  That is not

10   required under federal law.  That's a good practice.  He

11   pulled those reports again if he was seeing a patient for a

12   longer period of time.

13       I see in the charts here that he would occasionally run

14   these again to see what was going on with the patient.

15       Dr. Chambers didn't mention that.

16       He did urine drug screens.  A good practice; not

17   required.

18       He acted on the results of the drug screens.

19       We heard that in that really long and incredibly boring

20   audiotape, the very first thing that the fake patient was

21   taping was sitting next to a patient who had failed her drug

22   screen and had to sit there and drink some water and give

23   another specimen.

24       So he ignored this -- this.

25       He ignored the physical examinations being done on the

1    patients.  He ignored the patients being sent for -- some of

2    the patients were sent for recommended blood work, which

3    again, not required, but part of a good practice.  One of

4    those suggested things.

5        He ignored the Prescription Drug Monitoring Program

6    that showed the patients had been on Subutex.  He made a big

7    deal about Kristie Truxhall -- I'm sorry -- about Kristen

8    Bennett being on Subutex.  And one of the things he said

9    was, one of the ways it's a legitimate prescription is that

10   it's Suboxone or Subutex.

11       Suboxone has got that blocker in it, again.  It's less

12   street value and safer.

13       Subutex, they call it a mono-product; it's just the

14   Buprenorphine, okay.

15       So of these six patients, he ignored the fact that Dr.

16   Kesari prescribed Subutex for one of them who had a

17   documented prior problem with the combination of it.

18       He switched -- he switched people from the Subutex, the

19   divertible tab, mono-product with higher street value, the

20   unsafe one -- or less safe one, not unsafe -- but less safe

21   one to the Suboxone, but he only talked about that one

22   patient.

23       He ignored lots of things.

24   Q.   If Dr. Kesari had wanted to maximize his income, could

25   he have kept his patients on a weekly prescription?

1          MR. LYNCH:  Objection, Your Honor.  Speculation.

2          THE COURT:  Sustained.

3    BY MR. HARPER:

4    **Q.**   Is it ever appropriate for a physician to pre-sign a

5    prescription?

6    **A.**   The -- "appropriate" is not really a good word in

7    court.  Wouldn't be my primary choice here.

8          So pre-signing a prescription, it is like pre-signing a

9    check in your checkbook or checks in your checkbook.

10         Is it illegal to pre-sign checks in your checkbook?

11         No.

12         Is it a good idea?

13         No, it's not a good idea.  Because you are responsible

14   for whatever goes on top of that, right.  Those blank checks

15   are going to be paid because it's got your name on it.

16         And the same way for a pre-signed prescription, that

17   prescriber is responsible for what actually goes out.

18         And in this case, Dr. Kesari instructed Ms. Truxhall to

19   not be sending out prescriptions that he didn't approve.

20         And when I look at that Board of Pharmacy, the

21   prescription drug monitoring, there is no evidence that any

22   of these pre-signed prescriptions there were for any other

23   -- they weren't for Xanax and amphetamines; they weren't out

24   there for other kinds of drugs; they weren't for people who

25   weren't his patients.

1    They were for exactly the things that he was approving.

2  **Q.**   Are there other ways Dr. Kesari could have provided

3  prescriptions to his patients when he was in California

4  besides using written prescriptions?

5  **A.**   Oh, yes.

6  **Q.**   And can you tell the jury about some of those

7  alternative things?

8  **A.**   He could have picked up the phone and called the

9  pharmacy.  This is, you know -- you heard about those

10  schedules before.  Schedule I, LSD; Schedule II, OxyContin;

11  Schedule III, Buprenorphine.  This is Schedule III.  You can

12  pick up the phone and call it in.  You can call it in for a

13  month with five refills.  He could have e-prescribed it with

14  a push of a button.  He could have -- I don't know about

15  West Virginia, but general medical assistants in your office

16  can call it into the pharmacy, nurses in your office.  All

17  of those things can occur.

18  **Q.**   Dr. Chambers made a big deal about the signs that said

19  Dr. Kesari didn't have malpractice insurance.

20    Do you have thoughts on that signage?

21  **A.**   Yes.  He said he'd never seen one before.

22  **Q.**   Can you provide your expert opinion regarding the

23  significance of that signage, and perhaps provide some

24  context to the jury?

25  **A.**   Sure.  So I have seen signs like that before.  Not

1    having -- when we don't have malpractice insurance, it's

2    called going bare.  You're bare because you are not covered

3    by insurance.  And a lot of states, including West Virginia,

4    don't require a doctor to have malpractice insurance.  But

5    some states -- I don't know about West Virginia -- I know in

6    Florida, where I have a license, when a doctor doesn't have

7    malpractice insurance, we're required to post signs to this

8    effect in the lobby, in the patient areas.  And the reason

9    that we are required to do that by the medical board in

10   Florida is so that patients have an opportunity to go

11   elsewhere.

12          MR. LYNCH:  Objection, Your Honor.  I have no idea

13   why law in Florida is relevant to this case.

14          THE COURT:  Sustained.

15          MR. LYNCH:  Move to strike, Your Honor.

16          THE COURT:  Stricken.

17   BY MR. HARPER:

18   **Q.**   Dr. Chambers relied heavily on the electronic medical

19   record as a basis for his opinion regarding Dr. Kesari's

20   medical practice.  What is your opinion about his heavy

21   reliance upon that electronic medical record?

22   **A.**   It was ridiculous.  The medical -- electronic medical

23   record is one small piece of the totality of the

24   information.  And our job is to look at the totality of the

25   information.  The medical record is, at its very core, is

1    the doctor's diary.  It's what we write down about what's

2    going on with the patient, and how they change, how our

3    treatment changes.  It's our diary.  And, particularly, in a

4    one-doctor office, it's -- you know, that is there for the

5    doctor.  The electronic medical records were built not to

6    help doctors take care of patients.  Electronic medical

7    records were built to help bill for higher amounts, because

8    the more boxes you check, the higher amounts you can bill

9    for.

10            MR. LYNCH:  Objection, Your Honor.  This is all

11    speculative.

12            MR. HARPER:  Your Honor, it's absolutely not

13    speculative.  She's an expert in addiction medicine and has

14    extensive experience treating addiction medicine.  And we're

15    reviewing medical records --

16            THE COURT:  The objection is overruled.

17        You may continue.

18            MR. HARPER:  Thank you.

19            THE WITNESS:  So we hate them.  The studies show

20    that the average primary care doctor spends about two hours

21    after-hours every night typing in information in the

22    electronic medical records.  They are very burdensome and

23    very hard to use and very confusing.  And they were built

24    for billing, okay.

25        Dr. Kesari didn't bill insurance, okay.  He had a

1    one-person doctor office, doing a very small, small thing.

2    He was doing just office-based opioid treatment.  And that

3    was it.  OBOT.

4        The other thing electronic medical records are good

5    for, lots of people, a big hospital, and you need to get

6    information back and forth, okay.

7        Again, one-doctor office, not billing insurance.  And

8    he had this huge medical record -- you know, these are big

9    computer programs, relying -- and in this case, to your

10   question about his reliance on it, it's very clear that

11   these electronic medical records were not the primary

12   medical record.  This was not the diary.

13       He talked about the electronic medical records being

14   falsified and fraudulent and manufactured and just multiple

15   words about the electronic medical records, because what it

16   showed is that time after time after time things would show

17   up the same.  Okay.

18       The correct word is "prepopulated."  These big computer

19   programs, you hit one button when the patient comes in a new

20   day, it puts up the new day and it brings in your last note.

21   Okay.  You would have to go back in and either reprogram

22   your medical record or change every little thing on that,

23   right, if he was going to make that the note of record.

24       But that -- and as he said, you know, I don't think

25   that this is -- that a person would show up this many times

1    for -- I think it was methamphetamine and Suboxone over and

2    over and over again.

3        Well, that's right, because there was another part of

4    the medical record that actually captured the information

5    that he didn't talk about.

6    BY MR. HARPER:

7    **Q.**   Thank you, Dr. Clark.  Could Dr. Kesari, as a general

8    practitioner prescribing Buprenorphine, could he have been

9    within the usual course of professional practice and not

10   even used the medical record?

11   **A.**   Yes.

12   **Q.**   Did you start your review in this case based on looking

13   at the electronic medical records provided by the Department

14   of Justice?

15   **A.**   Yes.

16   **Q.**   And you laughed, right?  I think I'm interested to know

17   why.

18       Was the electronic medical record that the Department

19   of Justice provided for these patients complete?

20   **A.**   No.

21   **Q.**   And why not?

22   **A.**   Well, apparently, they didn't know how to pull all the

23   information out.  So they were just parts of the electronic

24   medical record.

25   **Q.**   So Dr. Kesari is not the only one who is not super

1    familiar with the medical record?

2    **A.**    Apparently not.

3    **Q.**    Is "plagiarized" a medical term?

4    **A.**    No.

5    **Q.**    Dr. Chambers sometimes used the word "plagiarized" to

6    describe electronic medical record.  Were those accurate

7    characterizations?

8    **A.**    No.  Plagiarized from school -- it's when you copy

9    someone else's work.  I don't know who else's work he

10   thought Dr. Kesari was copying.

11   **Q.**    During the course of Dr. Chambers' testimony, was there

12   an instance where you heard him mischaracterize the medical

13   record?

14   **A.**    Many times.

15   **Q.**    Was there a particular instance that involved Shawn

16   Shaffer?

17   **A.**    Oh, yes.  Yes.

18            MR. HARPER:  If we could please show Government

19   Exhibit 209, page 27.  It's already been admitted and

20   published to the jury.

21   BY MR. HARPER:

22   **Q.**    Dr. Clark, if you could take a look at this record.

23   Did Dr. Chambers testify about what he characterized as a

24   positive drug test for methamphetamine, morphine, ectasy,

25   and amphetamines for Shawn Shaffer based on this record?

1    **A.**   Yes.

2    **Q.**   Now, I am also going to show you what has been

3    previously marked as Government's Exhibit 204, page 4.  It's

4    previously been admitted and published.

5              MR. HARPER:  Krysta, if you could please put this

6    up with a split screen.

7    BY MR. HARPER:

8    **Q.**   Do you recognize this document?

9    **A.**   Yes.

10   **Q.**   And what is it?

11   **A.**   It is another part of the medical record, not the

12   electronic medical record, but part of the record for Shawn

13   Shaffer.

14   **Q.**   And based on your extensive experience in addiction

15   medicine, based on having utilization review and reviewed

16   thousands of medical records, can you please interpret these

17   two conflicting records for the jury?

18   **A.**   Yes.  The record on the left is the electronic medical

19   record, which Dr. Chambers said shows a lack of legitimate

20   medical practice, because Dr. Kesari ignored all of the

21   methamphetamines, amphetamines, morphine, ectasy, and the

22   amphetamines that were in there.

23              Could you scroll that down a little bit?  On the

24   left-hand side to the next page?

25              Yes.  So see where it says "signed," blank.

1          Dr. Kesari didn't sign this.  This is not what he used

2     for his medical record.  Okay.

3          MR. LYNCH:  Your Honor, this is speculation.

4     There is a lot of these pages that aren't signed.

5          MR. HARPER:  This is absolutely not speculation,

6     Your Honor.  This is an expert explaining, who has decades

7     of experience reviewing medical records and interpreting

8     those medical records, just as Dr. Chambers did.

9          And I will reiterate, the government has changed its

10    theory of the case.  This is --

11         MR. LYNCH:  Objection, Your Honor.

12         MR. BARRAS:  Objection, Your Honor.

13         THE COURT:  That is sustained.

14         And it, too, is stricken.

15    Mr. Harper, that statement should not have been made.

16         MR. HARPER:  I will simply reiterate, medical

17    records are at the heart of this case, and I believe it

18    would be appropriate for Dr. Clark to opine regarding what

19    they mean.

20         THE COURT:  And the government may cross-examine

21    on the point.

22         Please go ahead.

23         MR. HARPER:  Thank you, Your Honor.

24    BY MR. HARPER:

25    **Q.**  Dr. Clark, if you would just proceed with your

1    explanation.

2    **A.**   These two notes are on the same day.  These two notes

3    are on the exact same day, 11-9-18.  On what I see on the

4    left looks like, hit a button, prepopulated same note as

5    before, same note as before.  That's what's on the left.

6    That is unsigned by the doctor.

7        On the right, same day, is a note in the medical

8    record, written medical record, showing that Dr. Kesari

9    signed it.  The urine screen was okay, checkmark; and the

10   strip count was okay, checkmark.  And he did a physical, as

11   we all heard he does.

12       The one on the right is the signed-by-the-doctor

13   medical note.

14   **Q.**   And just a couple more questions about the record on

15   the right.  Were you present in Court yesterday when Shawn

16   Shaffer testified?

17   **A.**   Yes.

18   **Q.**   Was his testimony consistent with the medical record on

19   the right?

20   **A.**   The one on the right, the written one, yes.  He said he

21   was -- he failed when he came in.  And he did exactly what

22   happens; people get off of their Suboxone, they relapse.

23       He came back in, he failed the first one, and then when

24   he got on Suboxone, he passed the rest.  And that's what the

25   written medical record is.

1    **Q.**    Thank you, Dr. Clark.  I'm done with this exhibit.

2         What are other ways that Dr. Chambers could have

3    evaluated Dr. Kesari's practice besides just looking at the

4    medical record?

5    **A.**    He could have talked to the patients.  He could have

6    looked at the totality of the Prescription Drug Monitoring

7    Program.  He -- you know, he said he did those things.  I'm

8    sorry -- he didn't say he talked to the patients.  He said

9    that he looked at the records.

10   **Q.**    But you believe that he --

11              MR. LYNCH:  Objection; leading and speculation.

12              THE COURT:  Sustained.

13   BY MR. HARPER:

14   **Q.**    Let's move on to some of the -- the six specific

15   patients that are at issue in this case, starting with

16   Shawna Scott.

17        Are you familiar with a patient of Dr. Kesari's named

18   Shawna Scott?

19   **A.**    Yes.

20   **Q.**    Have you had the opportunity to review the medical

21   records relative to the care Dr. Kesari provided to Shawna

22   Scott?

23   **A.**    Yes.

24   **Q.**    And did you hear Shawna Scott testify in open court

25   this morning?

1    **A.**    Yes.

2    **Q.**    Are you aware that the government has alleged that Dr.

3    Kesari dealt drugs to Shawna Scott on January 10, 2019,

4    February 1, 2019, and March 1, 2019?

5    **A.**    Yes.

6    **Q.**    Do you have an opinion regarding the legitimacy of

7    those prescriptions?

8    **A.**    Yes.  They were legitimate prescriptions.

9    **Q.**    Were they issued within the usual course of

10    professional practice?

11    **A.**    Yes.

12    **Q.**    Were they written for a legitimate medical purpose?

13    **A.**    Yes.

14    **Q.**    And were they written in good faith?

15    **A.**    Yes.

16    **Q.**    I want to talk about some of the specific facts based

17    on your review of the records and other investigation that

18    led you to those conclusions.

19         Was Shawna Scott first seen in person by Dr. Kesari on

20    or about October 4, 2018?

21    **A.**    Yes.

22    **Q.**    Did she complete her paperwork?

23    **A.**    Yes.

24    **Q.**    Did the office run her PDMP?

25    **A.**    Yes.

1    **Q.**   Why does that matter?

2    **A.**   It matters because he's trying to -- we can see that he

3    is trying to get information about -- historical information

4    about this patient, Shawna Scott.  She was prescribed

5    Subutex.  Subutex has only one indication that is approved

6    by the government for its use.  It is approved to be used

7    for people with opioid addiction.

8          And so he got that information as part of getting

9    the -- assuring himself of a diagnosis of opioid addiction.

10   **Q.**   Did Ms. Scott receive urinalysis tests?

11   **A.**   Yes.

12   **Q.**   Did Dr. Kesari evaluate her to see if he would accept

13   her as a patient?

14   **A.**   Yes.

15   **Q.**   What's the significance of her being transitioned to

16   monthly visits?

17   **A.**   Dr. Kesari's practice was if a person was new and not

18   stable, then they would come in for every week.  And then

19   when they were doing better, they would come in every two

20   weeks.  And then if they've been taking the medicine, they

21   would come once a month.  And that's sort of what the

22   guidelines are for practice.

23               MR. LYNCH:  Your Honor, I'd like a sidebar.

24               THE COURT:  I can't imagine why you'd need it.

25               MR. LYNCH:  Your Honor?

1          MR. HARPER:  Your Honor, I'm just asking basic

2     questions based on her extensive review.

3          THE COURT:  What is the objection?

4          MR. LYNCH:  The objection is that she's trying to

5     testify as to what was in the defendant's head.  And that is

6     improper.

7          THE COURT:  The objection is overruled.

8     You may continue.

9     BY MR. HARPER:

10    **Q.**   You can answer the question.

11    **A.**   I'm sorry.  Continue about the -- coming in monthly was

12    the question, right?

13    **Q.**   Yes.

14    **A.**   And so, as we all heard described today, when you are

15    on a medicine for a really long time and you're stable, your

16    doctor visits are short.  And this is, you know, they're

17    shorter and they're infrequent.  That's the nature of

18    doctoring.

19    **Q.**   Okay.  And based on your review of the evidence, the

20    record, did Ms. Scott's care change materially when Dr.

21    Kesari was in California?

22    **A.**   No.

23    **Q.**   Does Ms. Scott take the same medicine today?

24    **A.**   I believe she said yes.

25         MR. HARPER:  If we could display Government's

1    Exhibit 308, page 6, which has previously been admitted and

2    published to the jury.

3    BY MR. HARPER:

4    **Q.**   If you could just take a moment to look at this

5    document, Dr. Clark.  And after you've had an opportunity,

6    please just tell the jury what it is.

7    **A.**   This is a part of the admission paperwork at Dr.

8    Kesari's office.  That was done as the patients came in.

9    Dr. Chambers said that this document is something he'd never

10   seen before; that it -- characterized it as asking if the

11   patient -- if they could view their prescription drug

12   monitoring Board of Pharmacy note and said that that was not

13   consistent with legitimate medical practice.

14   **Q.**   And what is your opinion on this note?

15   **A.**   My opinion is that the note says something totally

16   different.

17   **Q.**   And what does it say?  Please explain to the jury.

18   **A.**   It says, "I, Shawna Scott, agree that I have reviewed

19   my Board of Pharmacy with Dr. Kesari and/or staff member.

20   This review has been made in order for me and Dr. Kesari to

21   be fully aware of all narcotics prescribed to me."

22        This is not asking permission to do it.

23        This is saying they did it.  Dr. Kesari's office, he or

24   his staff, pulled that Board of Pharmacy note, and we

25   reviewed it together, okay.

1       And then it says, "I understand that if there should be

2  any questions about what I am prescribed, I will give an

3  explanation and any proof necessary as to why I am receiving

4  questioned medication."

5       So that's the notice going forward to the patient.

6  This is saying, okay, we've pulled this Board of Pharmacy

7  reviewing it with patient, be on notice we do this.  There

8  is objective information out there for you.  And if there

9  are questions, you're going to have to answer these.

10  **Q.**  And is this note consistent with the usual course of

11  professional practice for treating opioid use disorder?

12  **A.**  It is a good practice.  It is not a required practice.

13  It is a good practice.

14  **Q.**  Thank you.  I have nothing more on this exhibit.

15       And we're moving on to the next patient.

16       Are you familiar with a patient named Leah Messer?

17  **A.**  Yes.

18  **Q.**  And have you had an opportunity to review the medical

19  records related to the care Dr. Kesari provided to Leah

20  Messer?

21  **A.**  Yes.

22  **Q.**  And did you watch her testify yesterday?

23  **A.**  Yes.

24  **Q.**  Are you aware that the government has alleged Dr.

25  Kesari dealt drugs to Leah Messer from October 2018 through

1    May of 2019?

2    **A.**    Yes.

3    **Q.**    Do you have an opinion regarding the legitimacy of

4    those prescriptions?

5    **A.**    Yes.

6    **Q.**    Were they issued within the usual course of

7    professional practice?

8    **A.**    Yes.

9    **Q.**    Were they written for a legitimate medical purpose?

10   **A.**    Yes.

11   **Q.**    Were they written in good faith?

12   **A.**    Yes.

13   **Q.**    All right.  Continuing with this patient.  I'd like to

14   talk briefly about what led you to that conclusion.

15         Was Leah Messer first seen in person in or about July

16   of 2015?

17   **A.**    Yes.

18   **Q.**    And had she received previous treatment at another

19   facility for opioid use disorder?

20   **A.**    She was treated at a facility.  Not another facility --

21   he's not a facility.  She was treated at a facility for

22   opioid use disorder.

23   **Q.**    That was my inartful question there.  Could you please

24   fix that and unpack it.

25         Explain to the jury the difference between the facility

1    she was seeing and Dr. Kesari's medical office.

2    **A.**    She was in a -- she described it as an inpatient

3    facility, where she went through a detox protocol from

4    opioids, which she was very clear that she was addicted to.

5    She saw very many kinds of clinicians.  There were dorms.

6    This was a living environment.  There was equine therapy,

7    horse therapy.  These kinds of programs are at least $30,000

8    a month and they are very -- you know, that is a different

9    kind of treatment program than an office-based opioid

10   treatment doctor's office is.

11   **Q.**    When Leah Messer first came to Dr. Kesari's office, did

12   they try to run her PDMP report?

13   **A.**    They did.

14   **Q.**    Were they successful in that endeavor?

15   **A.**    No.  They couldn't get the information from Arizona.

16   **Q.**    Even though they weren't successful, does the attempt

17   to run the PDMP tell you anything in terms of good faith

18   medicine practice?

19   **A.**    Yes.  He's objectively doing things that are not

20   required, but are good practice, to assure himself of the

21   appropriate diagnosis.

22   **Q.**    Did Dr. Kesari lower Ms. Messer's dosage from her prior

23   doctor?

24   **A.**    Yes.  The intake documentation from the medical records

25   said she called up and said she was taking two and a half a

1    day, or 20 milligrams, and was told that the doctor didn't

2    prescribe more than two, or 16 milligrams.  And when she

3    came in, she wrote down that she was taking two and a half a

4    day.  And he doesn't prescribe that much.

5         So he lowered it to 16 a day.  Although, she did say

6    she didn't remember writing that.

7    **Q.**   Leah Messer's appointments were monthly.  Do you have

8    any opinion as to the appropriateness of her having monthly

9    appointments?

10   **A.**   The recommended range is weekly to monthly for

11   office-based opioid treatment.  Pretty typical.  She was --

12   you know, she also came in, and it was clear when she came

13   in, she had psychiatric diagnoses.  She was seeing a

14   psychiatrist.  She was seeing a psychotherapist.  And, you

15   know, the records are really clear on those.  And as she

16   went along, the medical record showed when they changed her

17   antidepressant medication, so there was -- there was

18   documentation, and, you know, information following along

19   with those things.  But that's not what he was treating.

20   **Q.**   The records show that the office ran the PDMP again in

21   April of 2018.  What's the significance of that?

22   **A.**   So, again, it is not required under federal law, but it

23   is a good idea to run a prescription drug monitoring Board

24   of Pharmacy at certain intervals.  Dr. Kesari didn't do them

25   at specific intervals, but he did do them.  Just

1    intermittently would run these.  And her Board of Pharmacy

2    report showed exactly what it was supposed to show.

3    **Q.**   And did Dr. Kesari use drug screens for Leah Messer and

4    generally count her wrappers?

5    **A.**   Yes.

6    **Q.**   And what's the significance of that?

7    **A.**   Again, these are not required, but these are good

8    practices.  This is part of a pattern of looking to make

9    sure that the medication is not being diverted.  If the cup

10   comes back with no Buprenorphine in it, over time you're

11   wondering -- you're wondering what happened.  Did you not

12   get your prescription filled?  You know, what happened?

13       What we don't want to do is be diverting medicine into

14   the community.

15       And he, you know, his pattern with these patients was

16   to say, bring in your wrappers.  Again, that's an internal

17   thing that he was doing as good practice, not a federal

18   requirement.

19   **Q.**   Are you familiar with a patient of Dr. Kesari's named

20   Shawn Shaffer?

21   **A.**   Yes.

22   **Q.**   Have you had an opportunity to review the medical

23   records related to the care that Dr. Kesari provided to

24   Shawn Shaffer?

25   **A.**   Yes.

1    **Q.**   Did you have the opportunity to watch Shawn Shaffer

2    testify?

3    **A.**   Yes.

4    **Q.**   Are you aware that the government has alleged that Dr.

5    Kesari dealt drugs to Shawn Shaffer on October 26, 2018,

6    November 2nd, 2018, and February 25, 2019?

7    **A.**   Yes.

8    **Q.**   Do you have an opinion regarding the legitimacy of

9    those prescriptions?

10   **A.**   Yes.

11   **Q.**   Were they issued within the usual course of

12   professional practice?

13   **A.**   Yes.

14   **Q.**   Were they issued for a legitimate medical purpose?

15   **A.**   Yes.

16   **Q.**   And were they written in good faith?

17   **A.**   Yes.

18   **Q.**   Again, let's talk about what led you to those

19   conclusions.

20        Was Shawn related to another patient of Dr. Kesari's?

21   **A.**   Yes, sir.  His wife had been in treatment with Dr.

22   Kesari for years.

23   **Q.**   And why did that matter?

24   **A.**   Because Dr. Kesari was -- he's been seeing this

25   patient's wife every month, at least, for several years.

1    He's -- you know, this is a small kind of practice.  You

2    know, it is not unknown that Mr. Shaffer had problems with

3    opioid addiction.

4    **Q.**   And did Dr. Kesari see him in person shortly after his

5    initial telemedicine encounter?

6    **A.**   Yes.  Patients often have, you know, problems with

7    memory.  He didn't go six months without seeing Dr. Kesari.

8    He went two weeks without seeing Dr. Kesari.

9    **Q.**   Seeing him in person?

10   **A.**   Seeing him in person.

11   **Q.**   Right.  Did Dr. Kesari's office review the PDMP,

12   according to the medical records?

13   **A.**   Yes.  And it showed that he had for a period of time --

14   for several years been getting, again, Subutex, that

15   mono-product.  And Dr. Kesari prescribed him Suboxone.

16   **Q.**   Okay.  I don't want to beat a dead horse, but what is

17   the significance of the fact he was switched from Subutex to

18   Suboxone?

19   **A.**   It's the recommended formulation, because it has the

20   blocker in it.  It's less diverted and less street value.

21   And it's safer if people are going to misuse it.

22   **Q.**   Did Shawn Shaffer complete intake paperwork?

23   **A.**   Yes.

24   **Q.**   Did he complete a urine drug screen?

25   **A.**   Yes.

1  Q.   Yesterday, Shawn Shaffer testified his initial

2  screening was dirty, but his later screens were clean.

3      What does that show?

4  A.   That shows that the treatment was working.  It was

5  doing what it was supposed to do.

6  Q.   And did Shawn Shaffer receive Suboxone from another

7  doctor after Dr. Kesari's office was closed down?

8  A.   Yes.

9  Q.   And what is the significance of that?

10 A.   Patients were getting Buprenorphine before they came to

11 Dr. Kesari, they were getting Buprenorphine while they were

12 seeing Dr. Kesari, and they were getting Buprenorphine when

13 they stopped seeing Dr. Kesari.

14      MR. HARPER:  If we could, at this time, please

15 introduce Government's Exhibit 209, page 68.  It's

16 previously been admitted and published.

17 BY MR. HARPER:

18 Q.   If you could, Dr. Clark, read this document.  And after

19 doing so, if you could please tell the jury what it is and

20 what its significance is as it relates to Shawn Shaffer's

21 treatment?

22 A.   Sure.  This is -- the significance here is Dr. Kesari

23 was not trying to bring in patients; that he was actually

24 trying to help patients make sure that they got their

25 treatment when appropriate.

1  **Q.** Let me slow you down. Would you mind actually just

2  reading the first -- or just read the document to the jury,

3  just so they have it?

4  **A.** Okay. "As you all know, the Doctor has been

5  preoccupied with his wife and her medical situation. The

6  doctor has many priorities in life, however, his wife and

7  family are number one, as is to be expected. At this time,

8  Dr. Kesari's asking each patient to seek another doctor for

9  your addiction treatment. Dr. Kesari has not made a solid

10  decision to close, as this is just a possibility. He may or

11  may not continue his practice. I understand how complicated

12  it may be to find another doctor, so please keep me up to

13  date. By signing below, you confirm that you've been made

14  aware of the possibilities that stand with the doctor's

15  situation. Sincerely, Kristina Truxhall."

16  **Q.** Thank you, Dr. Clark.

17  And, again, if you could just briefly explain the

18  significance of that document in terms of Dr. Kesari's good

19  faith practice.

20  **A.** Well, Dr. Kesari was telling his patients around this

21  time here that it's possible that he would have to close his

22  practice because of problems with his family. And he didn't

23  know for sure if he would or not. But he was giving people

24  notice and he was asking all of his patients to please find

25  another doctor, because it could take a while to find one

1    and so on.  He was -- he was trying to take care of his

2    patients and make sure that they wouldn't have a gap if

3    suddenly he -- he needed to no longer be taking care of them

4    through the telemedicine.

5    Q.   Moving on.  Are you aware of a patient who used the

6    alias Jason Price?

7    A.   Yes.

8    Q.   Have you had the opportunity to review Jason Price's

9    medical records, both the real ones and the fake ones?

10   A.   I don't think there are real ones.

11   Q.   By real, I mean the ones that were recorded by

12   individuals who believed him to be a patient?

13   A.   Yes.

14   Q.   And did you watch Agent Tripp who was posing as Jason

15   Price testify in this case?

16   A.   Yes.

17   Q.   Did Dr. Kesari write prescriptions for Suboxone for

18   Jason Price?

19   A.   Yes.

20   Q.   And are you aware that the government alleges that

21   some, but not all, of those prescriptions were drug deals;

22   specifically, the government focused upon the January 14th,

23   2019, the January 23, 2019, and February 21, 2019

24   prescriptions, and alleges that those are drug deals?

25   A.   Yes.

1    **Q.**   Do you have an opinion regarding the medical legitimacy

2    of those prescriptions?

3    **A.**   Yes.

4    **Q.**   Were they issued within the usual course of

5    professional practice?

6    **A.**   Yes.

7    **Q.**   Were they written for a legitimate medical purpose?

8    **A.**   Yes.

9    **Q.**   And were they written in good faith?

10   **A.**   Yes.

11   **Q.**   And, again, I'd like to talk about some of the reasons

12   why.

13        First off, did the fake patient who was posing as Jason

14   Price present as suffering from opioid use disorder?

15   **A.**   Yes.

16   **Q.**   Did he lie about his prescription history to deceive

17   Dr. Kesari and Ms. Truxhall?

18   **A.**   Yes.

19   **Q.**   When Jason Price first called the clinic, did Ms.

20   Truxhall check his PDMP?

21   **A.**   Yes.

22   **Q.**   And what did she --

23   **A.**   She got it on the phone right then.

24   **Q.**   And what did it show?

25   **A.**   It showed one prescription for Subutex that he had

1    filled for a month's supply.

2    **Q.**   Did she take efforts to get a full patient history?

3    **A.**   Yes.  Not on that phone call, but later, yes.

4    **Q.**   Would Dr. Kesari prescribe Subutex for Jason Price?

5    **A.**   No.  He prescribed Suboxone.

6    **Q.**   Did Jason Price receive urine drug screens?

7    **A.**   Yes.

8    **Q.**   Did the results matter?

9    **A.**   It depends.  So, can I talk about that for a minute?

10   **Q.**   Yes.  Please explain.

11   **A.**   Sure.  So one of the things that was told to the jury

12   was an issue about the invalid drug screen.  Okay, there are

13   -- and these drug screens are not perfect.  They are big,

14   expensive machines.  We consider those perfect.

15       These drug screens, they are not perfect.  He didn't

16   charge for them, but he did them every time anyway.

17       There are things that can happen with the urine drug

18   screens.  The patient can pass, they can fail, or they can

19   cheat.  Okay.

20       It passes if it has in there what it's supposed to,

21   like a Buprenorphine that I'm prescribing, and it doesn't

22   have in there what is not supposed to be there, like heroin.

23   If those things aren't met, there is something in there that

24   shouldn't be in there or something is not in there that

25   should be in there, that's a fail.

1    And the third option is cheat on the test.  Okay.  And

2    we call that invalid.

3    And on the cups that we heard -- we saw in the video,

4    and then we heard Dr. Chambers talk about, there is a line

5    on that that shows invalid.  Okay.  And what that means is

6    that that is not just human urine anymore.  That has been

7    tampered with.

8    And you might see things at convenience stores, gas

9    stations, little packets of things, "Pass your drug test"

10   things.  People will sometimes pour in -- just like fake

11   patient, Jason Price, did, poured things in there to try to

12   fake their drug test.  Okay.

13   And so there is the line that it looks for -- we call

14   them adulterants, things that -- things that try to mess up

15   the test.  Okay.

16   And so when Ms. Truxhall looked at that and said, "I've

17   never seen this before.  That says it's not valid," Dr.

18   Chambers said, well, there is a couple things that could do

19   that, like if there was marijuana in there, you might think

20   it's not valid.  That's not true.  That would be -- that

21   would be a failed test.

22   Invalid means that it is not just human urine.

23   And what Ms. Truxhall said -- and we saw -- is, "I've

24   never seen that before."

25   Okay.  That's a really different interpretation of

1    what's going on.

2    **Q.**   I believe the first time that Jason Price spoke with

3    Dr. Kesari, Dr. Kesari asked him about doctors in

4    Charleston.  What is the significance of that exchange?

5    **A.**   He's trying to see if this is a valid patient.  You

6    know, we can be tricked.  We can be tricked.  Absolutely, we

7    can be tricked.

8        The question is, are we, you know, objectively doing

9    things to try to assure ourselves that we're not being

10   tricked, that things are okay.

11       And so one of the issues is, how far are you coming

12   from?  Why are you coming from here?

13       Did you have a problem with your last doctor?  Right?

14       You know, is there an issue by which you're driving

15   this far?

16       And it's the same thing with "Are you working?"

17       You know, if people aren't working, there is a

18   possibility that they may be more likely to sell their

19   medication.  It's not -- these are not, you know, specific

20   things that must be there.  It's just, again, it's part of

21   looking at the whole situation, the whole situation.

22   **Q.**   Thank you, Dr. Clark.

23           MR. HARPER:  At this point, I would like to

24   display Government's Exhibit 362, page 35, as well as

25   Government's Exhibit 362, page 39.  That exhibit has already

1    been admitted and published.

2    BY MR. HARPER:

3    **Q.**   Starting with the note on the left, Dr. Clark, can you

4    tell the jury what this is?

5    **A.**   Yes.  That is the paper-and-pencil chart note that Dr.

6    Kesari made from his patients -- made on his patients.  He

7    made this note on March 21st.

8            MR. HARPER:  I'm sorry.  Permission to publish.

9    This has been previously admitted and previously published.

10           THE COURT:  You may.

11           THE WITNESS:  So on the left is the paper and

12   pencil medical record from March 21st, 2019.  And it shows

13   that -- the statement that "patient stated he has been

14   selling his Suboxone.  Automatically terminated.  Provided

15   one month."  That's what that one says.

16   BY MR. HARPER:

17   **Q.**   And can you turn to the document on the right and

18   explain the significance of that one to the jury?

19   **A.**   This note is signed by Dr. Kesari, Jason Price, and Ms.

20   Truxhall.  And it says, "Today, March 21, 2019, at 10:54

21   a.m. Jason Price has been discharged due to selling his

22   Suboxone.  Patient admitted he needed the money so he sold

23   his strips to a guy he works with.  The doctor is providing

24   the patient with a one-month supply to give him time to find

25   a new doctor."

1    **Q.**  And do you have an opinion regarding these two notes as

2    they relate to good faith practice of medicine?

3    **A.**  Yes.  This is -- this is -- this is not a situation

4    where, you know, Dr. Kesari is, like, "Oh, you sold your

5    medicine?  That's fine.  I'm not going to" -- you know, "I

6    don't care."

7         This is a situation where this patient sold his

8    medication, which we just heard Ms. Truxhall say, "I've

9    never heard this happen in the practice before.  He sold his

10   medication."

11        He is being discharged from the clinic, and the doctor

12   is not covering this up.  The doctor is not saying, "Oh, you

13   know, this is okay.  I wish he hadn't told me," you know.

14        The doctor is saying, this is what happened, "You sold

15   your medicine," so that the next doctor who asks for the

16   medical record sees that.

17        The next -- the next, you know, clip, he's very clear,

18   he's very clear with Jason Price.  That's what's in there.

19        I don't know what retaliation Dr. Chambers was talking

20   about before, but Dr. Kesari is being very clear with Jason

21   Price that this is what he's documenting.

22             MR. HARPER:  Krysta, if you could, if you could,

23   highlight the bottom three sentences in the note on the

24   right that begins with "The doctor."

25             Yes.  Thank you.

1    BY MR. HARPER:

2    **Q.**   Using that as a reference, Dr. Chambers testified that

3    the last prescription, which I believe was this

4    prescription, Dr. Kesari wrote for Jason Price proved that

5    Dr. Kesari was a drug-dealing doctor.

6         Do you have thoughts on that opinion of Dr. Chambers?

7    **A.**   Yes.  I think that's ridiculous.

8    **Q.**   And why is that?

9    **A.**   He's discharging the patient when he sold his

10   medication, is one.  But the other thing is, we often have

11   to juggle competing things.  Okay.  And so, on the one hand,

12   we don't want to be a source of getting drugs out into the

13   community, medication, controlled substances out into the

14   community.  On the other hand, this shows to me Dr. Kesari

15   thought that this patient had opiate addiction, where we

16   can't abandon a patient.

17        So you heard a lot about this.  Did the doctor refer

18   you out to somebody else?  You know.  Because if we cut a

19   patient off from a lifesaving medication, they can die.

20        And so the sort of standard -- standard that we use is

21   one-month's supply; find another doctor.  That's just a sort

22   of a standard -- I don't like to say standard -- that's just

23   a normal approach when terminating a patient from the

24   doctor's care.

25   **Q.**   Usual course of professional practice?

1    **A.**    Yes.

2    **Q.**    Thank you.  That's all I have on this document and this

3    patient.

4          Are you familiar with a patient by the name Chasity

5    Shaffer?

6    **A.**    Yes.

7    **Q.**    Have you had an opportunity to review the medical

8    records related --

9                THE COURT:  Would this be a good time to break?

10               MR. HARPER:  Up to you.

11               THE COURT:  Well, what were you about to say?

12               MR. HARPER:  I have five minutes left.  But if the

13   Court -- I'm happy to continue after a break.

14               THE COURT:  Well, if you can do that, go ahead.

15   BY MR. HARPER:

16   **Q.**    Have you had the opportunity to review the medical

17   records related to the care Dr. Kesari provided to Chasity

18   Shaffer?

19   **A.**    Yes.

20   **Q.**    Are you aware that the government has alleged Dr.

21   Kesari dealt drugs to Chasity Shaffer from October 2018 to

22   May of 2019?

23   **A.**    Yes.

24   **Q.**    Do you have an opinion regarding the legitimacy of

25   those prescriptions?

1    **A.**   Yes.

2    **Q.**   Were they issued within the usual course of

3    professional practice?

4    **A.**   Yes.

5    **Q.**   Were they written for a legitimate medical purpose?

6    **A.**   Yes.

7    **Q.**   Were they written in good faith?

8    **A.**   Yes.

9    **Q.**   Let's talk about what led you to those conclusions.

10        Was Chasity Shaffer first seen in person on December of

11   2015?

12   **A.**   Yes.

13   **Q.**   Did she have a long history of drug use?

14   **A.**   Yes.

15   **Q.**   Was she initially seen weekly?

16   **A.**   Yes.

17   **Q.**   Was she later transitioned to biweekly, and then

18   monthly?

19   **A.**   Yes.

20   **Q.**   Was she prescribed Subutex or Suboxone?

21   **A.**   Suboxone.

22   **Q.**   Did she have to take drug screens and have her wrappers

23   counted?

24   **A.**   Yes.  Didn't have to.  That was the normal practice.

25   That's what the written documentation showed was occurring.

1   **Q.**   Okay.

2   **A.**   They were checking for those things.

3   **Q.**   Thank you for clarifying, Dr. Clark.

4        I believe the record shows that on one occasion Dr.

5   Kesari took multiple blood pressure readings.

6        What's the significance of that?

7   **A.**   He was doctoring.  The blood pressure was high.  He saw

8   that, and he had it repeated.  He referred her to a primary

9   care doctor.

10  **Q.**   Can you explain to the jury why it was objectively

11  reasonable for Dr. Kesari to have concerns about treating

12  Ms. -- excuse me, I lost my note -- concerns about treating

13  Ms. Shaffer when she was pregnant?

14  **A.**   Sure.  So when women get pregnant and they're on

15  Buprenorphine, it had been recommended that they take --

16  that the doctor prescribe the mono-product, that Subutex,

17  because what we don't want to do is to have them, as you

18  heard from Dr. Chambers, you know, inject the combination

19  product and go into withdrawal.  Okay.

20       So as we saw in the texts, Dr. Kesari said, there is no

21  evidence that there is a problem with taking the Suboxone

22  combination, which is right.  But it's recommended you take

23  the Subutex, which is right.

24       Doctors often won't treat pregnant women -- don't want

25  to treat pregnant women because of the liability concerns,

1     if they are not specialists.  That is not at all uncommon.

2         What I saw in the texts that happen is that Chasity

3     told Ms. Truxhall that she was pregnant, and that the

4     response back was, Dr. Kesari wants you to get your OB guy

5     right away and tell them that you need the Subutex.  And if

6     you can't get it, let us know.

7         There is nothing weird there.

8     **Q.**   Thank you, Dr. Clark.  Moving on to our last patient.

9     Are you familiar with Kristen Bennett?

10    **A.**   Yes.

11    **Q.**   Have you had an opportunity to review the medical

12    records related to the care Dr. Kesari provided to Kristen

13    Bennett?

14    **A.**   Yes.

15    **Q.**   Are you aware that the government has alleged Dr.

16    Kesari dealt drugs to Kristen Bennett on January 4th, 2019,

17    January 31, 2019, and February 27, 2019?

18    **A.**   Yes.

19    **Q.**   Do you have an opinion regarding the legitimacy of

20    those prescriptions?

21    **A.**   Yes.

22    **Q.**   Were they issued within the usual course of

23    professional practice?

24    **A.**   Yes.

25    **Q.**   Were they written for a legitimate medical purpose?

1    **A.**   Yes.

2    **Q.**   And were they written in good faith?

3    **A.**   Yes.

4    **Q.**   And I want to briefly discuss those reasons.

5         Was Kristen Bennett seen in person for her initial

6    visit in March of 2018?

7    **A.**   Yes.

8    **Q.**   Did the office run her PDMP?

9    **A.**   Yes.

10   **Q.**   Even though it's not required, did Dr. Kesari discuss

11   tapering with Ms. Bennett?

12   **A.**   Yes.

13   **Q.**   Did she receive a physical examination and blood work?

14   **A.**   Yes.

15   **Q.**   Did Dr. Kesari discuss with her the risks of taking

16   benzodiazepine with Buprenorphine?

17   **A.**   Yes.

18   **Q.**   Did she receive --

19   **A.**   She signed that she did.

20   **Q.**   Did she receive urinalysis tests?

21   **A.**   Yes.

22   **Q.**   Was Subutex an appropriate medically-indicated medicine

23   for this patient?

24   **A.**   Yes.

25   **Q.**   The record reflects an instruction to refrain from

1    coming for early refills.  Why does that matter?

2    **A.**   Well, because if patients start coming early, then they

3    can build up a supply.  And there is a concern that maybe

4    they are selling those or diverting them -- diverting is

5    selling on the street -- or could be giving to your family

6    members, something like that.  And so they were -- Dr.

7    Kesari was monitoring this and said, "No.  You have to come

8    just on time.  We don't want you building up a supply."

9         And she said, well, because of work, sometimes she had

10    to be flexible.  But she said, okay, I'll come.

11    **Q.**   Did Ms. Bennett relapse after Dr. Kesari's practice

12    closed?

13    **A.**   Yes.

14    **Q.**   Is she now receiving the same medication that Dr.

15    Kesari prescribed to her?

16    **A.**   I believe so.

17    **Q.**   Dr. Chambers said that Dr. Kesari should have been

18    aware of all of Ms. Bennett's prescribed medications in

19    order to prescribe Buprenorphine.  Is that an accurate

20    statement?

21    **A.**   That's what he said.  That's not true.

22    **Q.**   Okay.  Can you elaborate, please?

23    **A.**   Well, yes.  The -- when a prescriber is starting a

24    person on the medication, it's -- what's a good idea to do

25    is exactly what we've seen over and over and over again.  At

1    the start of a new prescription, that clinician pulls that

2    Board of Pharmacy result and sees what has that patient been

3    filling.  So when -- when this patient went to see a new

4    provider, who started them on another medication, that is

5    the provider that had to pull that Board of Pharmacy -- they

6    didn't have to -- that's the provider where it would have

7    been a really good idea to pull that Board of Pharmacy

8    report to see that she was being prescribed Suboxone before

9    they started prescribing whatever else it is.

10        There is no psychic way that Dr. Kesari would know what

11   somebody else wrote.  The only way to do that is to run the

12   Prescription Drug Monitoring Program at intervals.

13        And he did.  He didn't run them at a specific

14   frequency, but he did run them.

15   **Q.**   Okay.  And, Dr. Clark, my final question.  Do you have

16   an opinion as to whether every prescription issued to all

17   six patients:  Shawna Scott, Leah Messer, Shawn Shaffer,

18   Jason Price, Chasity Shaffer, and Kristen Bennett, treated

19   from October of 2018 to May of 2019, was issued within the

20   usual course of professional practice?

21   **A.**   Yes.

22   **Q.**   And it is?

23   **A.**   It is.  Yes, they were.

24   **Q.**   Do you have an opinion as to whether every prescription

25   issued to all six patients over the course of October 2018

1    to May 2019 was written for a legitimate medical purpose?

2    **A.**    Yes.

3    **Q.**    And do you have an opinion as to whether every

4    prescription issued to all six patients over the course of

5    October 2018 to May 2019 was issued in objective good faith?

6    **A.**    Yes, they were.

7             MR. HARPER:  No further questions at this time,

8    Your Honor.

9             THE COURT:  Thank you.

10            Doctor, we'll be in recess for 15 minutes or so.  And,

11   if you will, treat yourself as though you're on the witness

12   stand in the sense that you're not to discuss your testimony

13   with anyone until the trial is finished.

14            THE WITNESS:  Yes, sir.

15            THE COURT:  And, ladies and gentlemen, we'll be in

16   recess now for about 15 minutes.

17            **(Jury out at 3:30 p.m.)**

18            THE CLERK:  All rise.

19       (A recess was taken at 3:30 p.m. until 3:50 p.m.)

20            THE CLERK:  All rise.

21            THE COURT:  Ask the jury in.

22            **(Jury in at 3:50 p.m.)**

23            THE COURT:  Please be seated.

24            MR. FORMAN:  I have no questions for this witness,

25   Your Honor.

1           THE COURT:  Thank you.

2                **CROSS-EXAMINATION**

3 **BY MR. LYNCH:**

4 **Q.**  Dr. Clark, I want you to look at Government's Exhibit

5 81.  We are going to pull it up for you.  It's already been

6 published for the jury.

7           MR. LYNCH:  And can we publish, Your Honor?

8           THE COURT:  You may.

9 BY MR. LYNCH:

10 **Q.**  I want to be crystal clear about one point, Dr. Clark.

11 This is a pre-signed prescription, right?

12 **A.**  It is.  It is signed.  And it says, "Void."  That's

13 what it says on it.

14 **Q.**  Can we get a copy -- can I have the original of Exhibit

15 81?

16           MR. LYNCH:  May I approach the witness, Your

17 Honor?

18 BY MR. LYNCH:

19 **Q.**  I'm going to give you, Dr. Clark, one page of a 32-page

20 exhibit.  These are blank prescriptions, right?  The only

21 thing on these prescriptions is the defendant's signature;

22 isn't that right?

23 **A.**  It is a piece of paper with the defendant's signature

24 on it.

25 **Q.**  These are blank prescriptions?

1   **A.**   It is a piece of paper with the defendant's signature

2   on it.

3   **Q.**   And they're blank prescriptions?

4   **A.**   It is a blank piece of paper with the defendant's

5   signature on it.

6   **Q.**   All right.  It's always improper for somebody to sign a

7   blank prescription, correct?

8   **A.**   Didn't we just discuss this earlier?

9   **Q.**   You said it was -- it wasn't a good idea.

10   I want to be crystal clear about this.  It is always

11   improper to sign a blank prescription?

12   **A.**   It is not a good idea, but it is not illegal to do so.

13   **Q.**   It always improper?

14   **A.**   It is not illegal to do so, but it is not a good idea.

15   THE COURT:  Please answer the question, and this

16   will go faster.  Ask it once more.

17   BY MR. LYNCH:

18   **Q.**   Is it ever proper to sign a blank prescription?

19   **A.**   Define "proper."  Does it mean it is illegal and it

20   cannot be done?  Or does it mean it is a bad idea and

21   shouldn't be done?

22   **Q.**   A very simple question.  Is it ever appropriate to sign

23   a blank prescription?

24   **A.**   Appropriate -- again, I answered that.  It is just like

25   signing -- pre-signing your checkbook.  Same thing.

1          MR. LYNCH:  Your Honor, this is a very easy

2    question.

3    BY MR. LYNCH:

4    **Q.**   Is it or is it not appropriate to sign a blank

5    prescription?

6    **A.**   Again, it is not illegal.  It is not a good idea.  So

7    it's just like pre-signing your checkbook.

8    **Q.**   Is it ever appropriate to give a staff member a blank

9    prescription and allow them to fill in the details?

10   **A.**   It is just like pre-signing a checkbook -- or a check.

11   It's exactly the same thing.

12   **Q.**   It's not appropriate, is it?

13   **A.**   It is exactly the same.

14   **Q.**   Do you recall testifying for the Department of Justice

15   in the *Abovine* case?

16   **A.**   Part of it, yes.

17   **Q.**   And do you recall you were testifying for the United

18   States in that case?

19   **A.**   Right.  This was a doctor who was prescribing

20   amphetamines, and --

21          MR. LYNCH:  Your Honor, move to strike as

22   nonresponsive.  I asked a very simple question.

23          THE COURT:  The motion is granted.

24       Beyond the witness' categorical answer, the rest of her

25   statement is stricken.  Please go ahead.

1    BY MR. LYNCH:

2    **Q.**    So you did testify in the *Abovine* case for the

3    Department of Justice, correct?

4    **A.**    Yes.

5    **Q.**    And in that case, part of what was at issue was the

6    doctor signing blank prescriptions, correct?

7    **A.**    Yes.

8    **Q.**    Okay.  I'm going to put up on the ELMO right now a

9    portion of your testimony.  We are going to walk through

10   this once, and then we'll walk through it a couple more

11   times today.

12              MR. HARPER:  Objection, Your Honor.

13              THE COURT:  What is the objection?

14              MR. HARPER:  I believe he can read her prior

15   testimony, but I don't think it's appropriate for him to

16   publish it.

17              THE COURT:  What do you propose to do?

18              MR. LYNCH:  I'm going to put it up on the ELMO,

19   and I think I'm going to read it aloud.  And I think the

20   jury can follow along by -- we are not going to admit it as

21   an exhibit, but they can follow along with what I'm reading

22   for the record, Your Honor.

23              THE COURT:  Is there an objection to that?

24              MR. HARPER:  I don't believe it's appropriate for

25   him to publish to the jury in this situation.  I think it's

1  appropriate for him to ask her about -- he can ask her a

2  question relating to the prior testimony.

3         MR. LYNCH:  Your Honor, I'm going to read the same

4  words that are on the page.  Same thing.

5         THE COURT:  The objection is sustained.

6     And you may proceed with the witness.

7         MR. LYNCH:  May Dr. Clark be able to see what I'm

8  showing?

9         THE COURT:  Yes.  She should have a copy of it.

10  BY MR. LYNCH:

11  **Q.**   Do you see, this is the first page of your -- of a

12  transcript from the *Abovine* case; is that right?

13  **A.**   Looks to be, yes.

14  **Q.**   And you testified in this case?

15  **A.**   Yes.

16  **Q.**   All right.  Page 33.

17     Now, you were asked in the *Abovine* case at line 18, on

18  page 33 -- and I am going to read it out loud.

19     You were asked:  "Can a nurse practitioner write

20  prescriptions on a prescription pad that the doctor has

21  already signed, and let's limit that to controlled

22  substances?"

23     "Answer:  Appropriately, no, no, no, no, no."

24     Five "Noes."

25     Did I read that correctly?

1    **A.**   Yes.  But you're not taking the context --

2    **Q.**   I asked you a very simple question --

3    **A.**   You're not taking the context --

4            THE COURT:  Please make your explanation later.

5    Listen to the question first.

6            THE WITNESS:  Okay.  Sorry, Your Honor.

7    BY MR. LYNCH:

8    **Q.**   Five "Noes."  Is that correct?  Did I read that

9    correctly?

10   **A.**   That's correct.

11   **Q.**   And you did say that signing a blank -- signing a blank

12   prescription is like signing a blank check, right?

13   **A.**   I said it was like pre-signing a check is what I think

14   I just said.

15   **Q.**   Because you lose control over whether or not you're

16   prescribing a certain drug, right?

17   **A.**   You're responsible for what happens with that

18   prescription.

19   **Q.**   Right.  And you lose control over the quantity that it

20   is on that blank prescription; isn't that right?

21   **A.**   Yes.  You're responsible for what's on the

22   prescription.

23   **Q.**   The defendant, Dr. Kesari, is responsible; is that

24   correct?

25   **A.**   For what is on the prescription.

1  **Q.**   On the blank prescription; is that correct?

2  **A.**   Right.

3  THE COURT:  It's confusing.  You're talking over

4  the witness.  Put a question, and let the witness answer,

5  and then go to your next question.

6  MR. LYNCH:  Yes, Your Honor.

7  THE COURT:  And respect that, if you will.

8  BY MR. LYNCH:

9  **Q.**   Okay.  To be clear, the defendant, Dr. Kesari, is the

10  one who is responsible for what happens to a blank

11  prescription after it leaves his hands; is that correct?

12  **A.**   That's correct.

13  **Q.**   I want to also talk about -- you had talked on direct

14  examination about documenting things in the medical record

15  and the need for the medical record.

16  You agree with me that in medicine, if it's not written

17  down, it didn't happen?  Isn't that a pretty common saying

18  in medicine?

19  **A.**   It depends on what you're talking about here.  But

20  that's particularly true for insurance billing, yes.

21  **Q.**   Okay.  You testified -- I'm going to bring up another

22  piece of your testimony.  You were testifying for the

23  Department of Justice in the *Abovine* case.

24  This time I'm going to go to page 208.

25  MR. HARPER:  Objection, Your Honor.  I believe

1    he's bringing up a prior consistent statement as opposed to

2    an inconsistent statement?

3              THE COURT:  Is it -- just a moment.

4         Is it consistent or inconsistent.

5              MR. LYNCH:  It's inconsistent.  She just gave a

6    qualification for insurance purposes.  There was no such

7    qualification in her testimony in the *Abovine* case when she

8    was testifying for the DOJ.

9              THE COURT:  You may inquire.

10   BY MR. LYNCH:

11   **Q.**   Okay.  On page 208, go to line -- do you see page 208

12   on the screen in font of you?

13   **A.**   Yes.

14   **Q.**   I'm going to direct you to lines 10 and 11?

15   **A.**   Yes.

16   **Q.**   I'm sorry, I've given you the wrong one.  Actually, I'm

17   going to go to the *Ahmed* case.

18        You also testified in the *Ahmed* case; is that correct?

19   **A.**   Yes.

20   **Q.**   And in the *Ahmed* case, you're also testifying for the

21   Department of Justice?  Right?

22   **A.**   Yes.

23   **Q.**   And you were testifying about several doctors illegally

24   prescribing Buprenorphine, right?

25   **A.**   Among other things.

1    **Q.**    Sure.  In that case -- and I am going to read out loud.

2    You can read along silently with me.

3          You state, in the case, on lines 4 through 5, "If it's

4    not in the note" -- referring to the medical note -- "it

5    didn't happen."

6          Did I read that correctly?

7    **A.**    No.  I don't see where you've got that.

8    **Q.**    Lines 4 through 5?

9    **A.**    Oh, yes.

10    **Q.**    "If it's not in the note, it didn't happen"?

11    **A.**    Yes, that's what I said.

12    **Q.**    If it's not in the note, it didn't happen, means if you

13    are not recording things in a patient's record, that's a

14    problem, isn't it?

15    **A.**    The default position is if you -- if it's not in the

16    record, it didn't happen if you're billing things, if you're

17    -- for a variety of reasons.  But we do not write down

18    everything that happens, as you would see through the rest

19    of the testimony.

20    **Q.**    Is it not the case that actually a medical record

21    should read like a book?  Have you not said that in prior

22    testimony for the Department of Justice, that the medical

23    record should read like a book?

24    **A.**    And, in fact, when we look at the totality of this

25    medical record --

1          MR. LYNCH:  Move to strike, Your Honor.

2          THE COURT:  The answer is stricken.

3     Restate the question.  And the witness can answer that

4   question.

5   BY MR. LYNCH:

6   **Q.**   My question, again, Dr. Clark, is:  When you have

7   testified for the Department of Justice against doctors who

8   are illegally prescribing, you have said, "The medical

9   record should read like a book"?  Yes or no?

10  **A.**   For the clinic?  Which is what these are, yes.

11  **Q.**   Okay.  And some of the things that should be included

12  in the medical record are any substantive interaction with

13  the patient, even over the phone; is that correct?

14  **A.**   It's a good idea to do that.

15  **Q.**   It's a good idea or it's required?  Did you say, when

16  you testified for the Department of Justice --

17         THE COURT:  No.  Just a moment.

18     You asked one question, and then you're starting

19  another.  Just slow it down and ask one question at a time.

20         MR. LYNCH:  Okay.

21  BY MR. LYNCH:

22  **Q.**   Dr. Clark, is it required to document every substantive

23  interaction you have with a patient, including over the

24  phone?

25  **A.**   It is not required to do so.

1  **Q.**  Okay.  Is it required to do so for purposes of

2  prescribing controlled substance?

3  **A.**  It is not required to do so.

4  **Q.**  In the *Abovine* case, I'm going to direct you -- we are

5  going to go to page 207.  One second.

6  I'm going to direct you to the end of this page, page

7  207, line 23.  And I'm going to read aloud, and you can

8  follow along silently.  Continuing on to the next page.

9  "I can tell you it is the responsibility of a doctor to

10  be writing down why you are prescribing a controlled

11  substance, like an amphetamine, risks, benefits, and

12  alternatives, getting an informed consent.  And I had not

13  seen anything in the record that showed that amphetamine" --

14  in this case, that was the controlled substance -- "was

15  going to be prescribed to this particular patient."  And

16  that's why you were surprised.

17  Did I read that correctly?

18  **A.**  That's correct.

19  **Q.**  Okay.  Two final points on medical records.

20  It's true that you've said in the past that medical

21  notes must also be truthful and honest and factual; is that

22  correct?

23  **A.**  To the best of their ability of the person writing

24  them, yes.

25  **Q.**  And it's actually also improper to include in the

1    medical notes something you know to be false; is that

2    correct?

3    **A.**   That's correct.

4    **Q.**   It's also unethical to falsify medical records,

5    correct?

6    **A.**   That's correct.

7    **Q.**   In a similar vein, you've said in the past that records

8    that makes no sense because of inconsistencies can suggest

9    that a physician is either incompetent or does not care; is

10   that correct?

11   **A.**   That is possible.

12   **Q.**   And you've also criticized in the past what you've

13   termed virtually identical progress notes with no actually

14   useful information?

15   **A.**   Oh, yes.  I can tell you that where I said that and

16   what about, but --

17   **Q.**   But I just want to understand that it's -- it has been

18   your position, when you were testifying for the Department

19   of Justice, that virtually identical progress notes that

20   contain no useful information present a problem?  Yes or no?

21   **A.**   Yes, they can.  Yes.

22   **Q.**   Is it fair to say virtually identical progress notes

23   cannot justify in many instances controlled substance

24   prescribing?

25   **A.**   Boy --

1  **Q.**   Is that a yes?

2  **A.**   I'm just thinking of primary care offices down there

3  that -- the way they document is:  "No changes, all is

4  good," blah, blah, blah.  And that is not a problem.

5  **Q.**   But virtually identical progress notes are a problem;

6  that was your testimony just a moment ago?

7  **A.**   Right.  I'm talking about the electronic medical

8  records.

9  **Q.**   Okay.  Now, on direct examination, you also talked

10  about how you relied on more than just medical records in

11  this case.  Is that fair --

12  **A.**   Yes.

13  **Q.**   -- that was your testimony?

14  But in the *Abovine* case, in the *Ahmed* case, and even in

15  the *Snyder* case, you only relied on the medical record;

16  isn't that correct?

17  **A.**   No.  The medical records, the Prescription Drug

18  Monitoring Program, information from the healthcare

19  insurance about the kinds of charges, the billings that were

20  made, and all of the fraud, information from other treatment

21  centers where there was conspiracies between other treatment

22  centers.  So -- so, no, it's not fair to say it's just the

23  medical record.

24  **Q.**   You only -- you relied entirely on documents; is that

25  correct?

1    **A.**    Yes.

2    **Q.**    And you were able to rely entirely on documents; is

3    that right?

4    **A.**    Yes.  Yes, I was.

5    **Q.**    And you were able to come to a conclusion as to the

6    legitimacy of the prescribing for the doctors in those three

7    cases where you testified for the Department of Justice,

8    right?

9    **A.**    Yes, I was.

10   **Q.**    I want to next talk a little bit about benzodiazepines

11   and their concurrent use with opioids.  It's very dangerous

12   to prescribe Xanax with Buprenorphine, correct?

13   **A.**    No.  It is not very dangerous.  It's -- there is an

14   increased risk, okay, but it's not -- I wouldn't call it

15   very dangerous, as we're discussing this here.

16   **Q.**    I'm going to direct your attention to the *Abovine* case

17   again.  Go to page 146 now.

18        In the *Abovine* case, can you see page 146?

19   **A.**    Yes.

20   **Q.**    I'm going to direct you -- sorry -- strike that.  Let

21   me ask a different question.

22        Benzodiazepine combined with opioids enormously

23   increase the risk of overdose; is that correct?

24   **A.**    That's right.  That's why the CDC put out a document to

25   tell doctors prescribing Buprenorphine that it's -- it's

1    something that, while there is an increased risk, the -- the

2    risk of people not getting their Buprenorphine of dying is

3    much, much higher.  And so it shouldn't be that we take

4    people off of their Suboxone because they're using

5    benzodiazepine, but it is an increased risk.

6    **Q.**    And the issue -- the reason it is an increased risk is

7    because when you take an opioid with a benzodiazepine, both

8    of those substances have a tendency to slow down the body

9    and to, in some ways, stop the brain from thinking of

10   breathing?  Is that a fair laymen's explanation?

11   **A.**    That's correct.  It is an increased risk.

12   **Q.**    Okay.  All right.

13   **A.**    Not as much as the risk of stopping Suboxone.

14            MR. LYNCH:  Your Honor, I move to strike that

15   response.

16            THE COURT:  Go ahead.

17   BY MR. LYNCH:

18   **Q.**    Next, let's just talk about drug testing briefly.  You

19   agree with me that drug testing in addiction treatment is

20   primarily a therapeutic tool used to assess how well a

21   treatment plan is working, and then to alter the plan in an

22   ongoing manner?  Is that a fair --

23   **A.**    Yes, I agree with that.

24   **Q.**    Okay.  You also agree that drug testing is valuable

25   because patients with addiction have multiple reasons not to

1    be truthful with their doctors about their drug use?

2    **A.**    I agree.

3    **Q.**    And you would also agree that allowing a patient to

4    falsely claim they are not using drugs of abuse, but are

5    only taking the prescribed substances, is both

6    counter-therapeutic and actually harmful to the patient's

7    treatment?

8    **A.**    Yes, that's correct.

9    **Q.**    And just to make sure -- and that counter-therapeutic

10   is a bit of a medical word.  Counter-therapeutic, it's not

11   good therapy; it goes against therapy?  Fair?

12   **A.**    What you just said, it's not good therapy to allow the

13   patient to lie to you.  That's what you just said.

14   **Q.**    In fact, actually -- that's a good point.  It's

15   actually even more than that.  You said in the past that

16   when you allow a patient to lie to you about their drug

17   testing, you're actually colluding with the patient; isn't

18   that true?

19   **A.**    You can be, yeah.  If you're allowing them to lie about

20   their drug test, yes.

21   **Q.**    And colluding, what we are saying there, you're

22   basically conspiring with the patient to allow them to not

23   recover; is that fair?

24   **A.**    To allow them to not recover?  You are -- you are not

25   working as a doctor; you're harming the patient.

1    **Q.**   Okay.  So for all these reasons, when a doctor orders a

2    drug test, like a urine drug screen, he needs to look at the

3    results of that test himself; isn't that correct?

4    **A.**   When they come back from the laboratory and they're

5    printed out, yes, but not if they're in the cup.  He doesn't

6    have to physically look at the cup.

7         Typically, the results of that, of the person who reads

8    the cup and it goes on the piece of paper or, you know,

9    wherever it goes, but he doesn't physically look at the cup.

10   Staff does that.

11   **Q.**  So is it your testimony then that it is -- in the past,

12   have you not said that it is actually not appropriate for a

13   doctor to simply rely on the report of someone else about

14   what a drug test says?

15   **A.**   In the context of, here are all of these drug tests

16   coming back from the lab, here are all the results, it is

17   the doctor who has to look at the piece of paper or talk to

18   that lab and say, this is what it showed, that's correct.

19   **Q.**  So, okay.  That's fine.  And when -- in fact, though,

20   when a doctor orders a test without qualifications, it is

21   the responsibility of the doctor to look with their own eyes

22   at the test; is that correct?

23   **A.**   No, not at the urine cup.  No.  You're taking this from

24   testimony that I did before about the company that was

25   sending things off to -- you know, hundreds of drug tests

1    for thousands of dollars, and coming back and the doctors

2    totally ignored everything that was in there.

3         So, no, I was not saying that the doctor has to

4    physically look at the urine cup.

5    **Q.**   I want to direct your attention to page 230.  This is,

6    again, the *Abovine* case.  I'm going to read aloud, and you

7    can follow along silently with me.

8         You stated in that case, "When the doctor has ordered a

9    test, it is the responsibility of the doctor to look with

10   their own eyes at it."

11        Did I read that correctly?

12   **A.**   Yes.  And I didn't mean the actual urine cup.  Those

13   results weren't in the urine cup; they were sent off to a

14   lab, and the results came back.

15        MR. LYNCH:  Your Honor, move to strike.  There is

16   no qualifications, and the testimony was nonresponsive.

17        THE COURT:  That motion is denied.

18        MR. LYNCH:  Okay.

19                    **CROSS-EXAMINATION**

20   BY MR. LYNCH:

21   **Q.**   All right.  From 2014 to 2018, Dr. Clark, you worked as

22   Chief Medical Officer for a company called CleanSlate; is

23   that correct?

24   **A.**   Yes.

25   **Q.**   Before I talk about CleanSlate, let me --

1          MR. LYNCH:  Let me ask you to pull up just so Dr.

2    Clark can see it, Exhibit 130.

3    BY MR. LYNCH:

4    **Q.**   Can you see this Exhibit 130, Dr. Clark?

5    **A.**   Yes.

6    **Q.**   In your practice with the Department of Justice, in

7    your consulting work, you have had occasion to look up the

8    Board of Medicine records for various doctors; is that

9    correct?

10          MR. FERRARA:  Objection, Your Honor.

11          THE COURT:  What's the basis for it?

12          MR. FERRARA:  Your Honor, this was subject to

13    pretrial litigation.

14          MR. LYNCH:  Respectfully, Your Honor, I think that

15    this document was not, but I'd be happy to explain in a

16    sidebar if it's helpful.

17          THE COURT:  I think you'll need to.

18          MR. LYNCH:  Okay.

19       **(Sidebar via headsets.)**

20          MR. FERRARA:  Your Honor?

21          MR. LYNCH:  Your Honor, can you hear me?  Can you

22    hear me?

23          MR. FERRARA:  Yes, I can.

24       May I proceed with my objection, Your Honor?

25          THE COURT:  Go ahead.

1          MR. FERRARA:  Mike Ferrara on behalf of Dr.

2     Kesari.  This is a matter that was, in fact, the subject of

3     pretrial litigation, and it has to do with the sanction or

4     termination of Dr. Kesari's medical license.  The sole and

5     exclusive reason why that license was suspended or

6     terminated has to do with his cognitive impairment.

7          The Court ruled clearly, precisely on this issue.  This

8     inquiry is improper, Your Honor.

9          MR. LYNCH:  Your Honor, this is -- may I respond?

10    This document is not a summary suspension.  This is a

11    publically available document from the Board of Medicine

12    that simply shows the date that Dr. Kesari had a license and

13    when the license ceased to be valid.  This isn't going to

14    any of the reasoning from the Board of Medicine about why

15    the license was terminated.

16          MS. MACFADDEN:  Your Honor, additionally -- this

17    is Kilby Macfadden -- Dr. Clark has already testified about

18    the fact he was in India, that's he's licensed as a general

19    practitioner.  This is just codifying most of what she said

20    anyway.  Hence, we're getting in through this witness --

21          MR. FERRARA:  Judge, if I may respond?

22          You can see on the screen, the Court can see the same

23    thing I can see, it has the expiration date of the license.

24    The expiration date is tethered exclusively and solely in

25    Dr. Kesari's cognitive impairment.

1      We have no objection to Mr. Lynch inquiring about Dr.

2   Kesari's qualifications as a doctor or where he was

3   educated.

4      We do not need to do it with a piece of evidence that

5   expressly includes evidence that has been excluded by this

6   Court.

7          MS. MACFADDEN:  Your Honor, on -- the issues with

8   his license were initiated by the DEA-104.  So if it's not

9   an issue of cognitive impairment, hence, the consent order

10  is not here, it's just the Board of Medicine stating this is

11  a public record that this is Dr. Kesari -- this is his

12  general practice, and this is his location; he was a

13  licensed doctor and he had -- that was what it is.  He went

14  to school -- this is on the Board of Medicine website.  This

15  is readily available.  And the doctor has already been

16  testifying to --

17         MR. FERRARA:  Mike Ferrara.  What Ms. Macfadden

18  said is -- affirmative says, Judge, Dr. Kesari's DEA

19  registration was surrendered by the DEA-104.  That is not

20  what the document relates to.

21     This document relates to Dr. Kesari's medical license,

22  which was not issued by the DEA.  It was issued by the West

23  Virginia Board of Medicine.  That West Virginia Board of

24  Medicine license was valid all the way until it was

25  terminated due to his cognitive impairment.

1      There is no way to separate this exhibit that is

2  currently on the screen from the cognitive impairment

3  evidence that this Court has already excluded.

4      What Ms. Macfadden said about the DEA-104 is completely

5  and utterly irrelevant to this document.

6           MS. MACFADDEN:  Your Honor, if I could just

7  respond?  And I apologize.

8           THE COURT:  Let me mention to you, first of all,

9  this is the only time we are going to hear from two

10  attorneys on the same side.

11           MS. MACFADDEN:  Yes, Your Honor.

12           THE COURT:  Mr. Lynch should be handling this.

13           MS. MACFADDEN:  I agree.  And, I'm sorry.

14      He -- Mr. Ferrara made the objection and we had the

15  sidebar.  It's just to -- if you want Mr. Lynch to take the

16  argument, that's fine.  We don't need to say anything

17  further.  The document speaks for itself.  Thank you.

18           THE COURT:  The objection is sustained.

19      **(Sidebar ends.)**

20      **(Open Court.)**

21  BY MR. LYNCH:

22  **Q.**  When in 2014 did you start working at CleanSlate?

23  **A.**  I honestly don't remember.

24  **Q.**  Since 2018, you've also worked as a consultant for

25  CleanSlate; is that right?

1  **A.**   For -- yeah, for a few months.

2  **Q.**   Your resume that we received in this case, it

3  identifies you as a consultant for CleanSlate; is that fair

4  to say?

5  **A.**   Not now, no.

6  **Q.**   Okay.  Fair to say that CleanSlate is a company that

7  deals with opioid addiction treatment across multiple

8  states?

9  **A.**   Yes.

10  **Q.**   And CleanSlate providers also prescribe Buprenorphine

11  for opioid addiction; is that right?

12  **A.**   Yes.

13  **Q.**   CleanSlate used to be based in Massachusetts.  I think

14  it's now based in Tennessee; is that right?

15  **A.**   Correct.

16  **Q.**   CleanSlate does not operate in West Virginia?

17  **A.**   I don't know.  I haven't worked for them in many

18  years -- for several years.

19  **Q.**   Okay.  According to your resume, when you were the

20  CleanSlate Chief Medical Officer, you provided the company

21  your expertise on payment issues and clinical policies?

22  **A.**   Yes.

23  **Q.**   And you also state in your resume that you quote, "Work

24  collaboratively with regulators on compliance issues with

25  CleanSlate."  Is that correct?

1    A.    That's correct.

2    Q.    And your resume lists that you oversaw CleanSlate's

3    government relations function; is that right?

4    A.    For a while, yes.

5    Q.    Is it fair to say that you had responsibility to

6    CleanSlate to make sure the company complied with federal

7    and state laws that regulate opioid addiction services?

8    A.    Not true, no.

9    Q.    But you oversaw government regulations, and you worked

10   with regulators; is that correct?

11   A.    I worked with regulators, but I didn't run a compliance

12   department, no.

13   Q.    All right.  And just let me make sure this is clear.

14   When you were at CleanSlate, you weren't personally

15   prescribing Buprenorphine, right?

16   A.    Correct.

17   Q.    In fact, you haven't prescribed Buprenorphine since

18   2014; is that right?

19   A.    2014, that sounds about right, yeah.

20   Q.    Okay.  So that's about six years; is that right?

21   A.    That's correct.  I've been working in policy and trying

22   to improve the totality of the treatment system.

23   Q.    Okay.  I understand.  But you were overseeing others

24   who were prescribing Buprenorphine at CleanSlate; is that

25   correct?

1    **A.**   No.  Actually, I was not.

2    **Q.**   Okay.  Were part of your duties at CleanSlate to advise

3    on proper prescribing practices for controlled substances?

4    **A.**   To advise, yes.

5    **Q.**   Yes, okay.  And it's important, in fact, that the

6    advice of a CleanSlate employee like you be accurate,

7    because other prescribers are going to rely on that advice;

8    is that fair?

9    **A.**   Yes.  I'm just actually -- I'm sorry.  I'm trying to

10   figure out what I can and cannot answer at this point.

11   **Q.**   Okay.  Is there a reason you can't answer a question?

12   **A.**   Yes.  Because, since I left CleanSlate, there is a

13   pending charge against the company.

14   **Q.**   Okay.  We're going to talk about that.

15   **A.**   And I can't comment on any pending charges.  I'm not

16   named, but the company was.

17   **Q.**   Let's -- we'll get to that in a moment.  In fact, most

18   of the prescribers at CleanSlate -- actually, strike that

19   question.

20        You testified on direct examination that you are double

21   Board-certified, I believe, right?

22   **A.**   Yes, addiction and -- addiction medicine, and

23   psychiatry.

24   **Q.**   But in contrast, most of the actual prescribers at

25   CleanSlate don't have those qualifications; is that fair to

1   say?

2   **A.**   Correct.

3   **Q.**   And they didn't have them when you were Chief Medical

4   Officer at CleanSlate, though, right?

5   **A.**   That's correct.  Very few people do.

6   **Q.**   On November 21st of 2016, while you were CleanSlate's

7   Chief Medical Officer, CleanSlate paid $750,000 to the

8   federal government to resolve allegations of misconduct

9   related to how it provided opioid addiction services?  Yes

10  or no?

11  **A.**   I think that's right, with no admission of guilt.

12  **Q.**   With no admission of guilt.  Did the settlement

13  agreement cover individual liability?

14  **A.**   Me?  I wasn't named.  No.

15  **Q.**   But did it -- did it cover individual liability for

16  those individual prescribers at CleanSlate?

17  **A.**   I really don't know.  I wasn't involved in that piece

18  of work.  That was not what I was doing with the company.  I

19  wasn't involved in that.

20  **Q.**   There is no admission of liability, one way or the

21  other, as to you in that settlement agreement; is that

22  correct?

23  **A.**   I wasn't named in that settlement, no.  That certainly

24  hasn't kept the government from hiring me many times.

25  **Q.**   Okay.  The reason that -- one of the allegations in

1    that settlement agreement that was resolved was that

2    unqualified prescribers were prescribing Buprenorphine; is

3    that correct?

4    **A.**    Nurse practitioners, at that time -- during part of

5    that time that the allegations were made were not allowed --

6    just what you were bringing up before when I was talking

7    about the pre-signed prescriptions.

8    **Q.**    So the answer to my question is, yes, there were

9    unqualified prescribers who were prescribing at CleanSlate?

10   **A.**    That was the allegation.

11   **Q.**    Okay.  And there was another allegation related to

12   improper billing for patient visits at CleanSlate; do you

13   remember that?

14   **A.**    Yes.  That's an incident to billing.

15   **Q.**    Okay.  In November of 2016, then, you knew that the

16   federal government was investigating whether or not

17   unqualified medical personnel were issuing prescriptions for

18   Buprenorphine; is that fair?

19   **A.**    That is when the settlement happened, right?  So, yes.

20   **Q.**    So you knew they had investigated for that, correct?

21   **A.**    Yes.

22   **Q.**    And in your capacity as the Chief Medical Officer and

23   in performing duties and assisting with government relations

24   at CleanSlate, did you proactively investigate whether the

25   federal government had potentially missed any other

1    instances of backdated prescribing?

2    **A.**    No.  I did not run a compliance function.  I wasn't the

3    lawyer for the company.  No.

4    **Q.**    No.  But if -- if there were additional unauthorized

5    prescriptions that had gone out the door, that would be a

6    problem for those individual prescribers who had issued

7    those prescriptions; is that correct?

8    **A.**    If they were unauthorized, yes.  I'm not sure that

9    there was -- unauthorized was a part of the -- whatever this

10   language was in the settlement.  I wasn't involved in that.

11   **Q.**    Okay.  But you, in fact, in the *Abovine* case, you

12   testified about a doctor who didn't actually have the

13   correct DEA DATA waiver?

14   **A.**    That's right.

15   **Q.**    He didn't have -- he was an unqualified person.  He

16   couldn't be prescribing Buprenorphine for the purpose that

17   he was prescribing it; is that correct?

18   **A.**    He was literally writing "for pain" on the prescription

19   to get around the laws for hundreds of patients.  So he was

20   actively -- it was not a mistake.  He was actively

21   falsifying these prescriptions.

22   **Q.**    He was an unqualified prescriber?

23   **A.**    Yes, that's right.

24   **Q.**    All right.  Around the same time as this November 2016

25   $750,000 settlement, somebody named Wendy Welch began

1    working at CleanSlate?

2    **A.**   Somewhere around there.

3    **Q.**   Dr. Welch is an addiction medicine expert who is

4    working -- who has actually also held leadership positions

5    with the American Association of Addiction Medicine; is that

6    right?

7    **A.**   That's right, the -- I introduced her and kind of

8    pushed her up.

9    **Q.**   And like you, Dr. Welch is actually -- one of the

10   leadership positions that she held was as Chair of Practice

11   Management and Regulatory Affairs at the American Society of

12   Addiction Medicine; is that right?

13   **A.**   Right.  Committee I helped found.

14   **Q.**   Fair to say that she's quite accomplished in the field

15   of addiction medicine?

16   **A.**   I have -- I have nothing to say ill about her, and I

17   have little to say about this case.

18   **Q.**   She's, in fact, triple Board-Certified.  You're double

19   Board-Certified.  She's triple Board-Certified in addiction

20   psychiatry, two other certifications -- I forget the exact.

21   Does that sound right?

22   **A.**   I don't know how many Boards she has.

23   **Q.**   All right.  She's also served as medical director of a

24   large healthcare initiative across the southern United

25   States called -- she was in charge of Tricare for the

1    southern United States; is that correct?

2    **A.**   She wasn't in charge of it.  I think she was a medical

3    director.

4    **Q.**   Tricare is the insurance company that takes care of the

5    U.S. Armed Forces?

6    **A.**   Yes.

7    **Q.**   Is that correct?

8    **A.**   One of them.

9    **Q.**   And that was the job right before she had -- took the

10   job at CleanSlate; is that right?

11   **A.**   Yes.

12   **Q.**   I looked at Ms. Welch's LinkedIn profile over the

13   weekend.  Dr. Clark, would it surprise you to learn she

14   doesn't list the fact that she worked at CleanSlate on that

15   profile?

16             MR. HARPER:  Objection.  Hearsay.

17             MR. FORMAN:  Objection.  Relevance.

18             THE COURT:  The witness can answer if she knows.

19             THE WITNESS:  Would it surprise me to say that she

20   doesn't list CleanSlate?

21             MR. HARPER:  Also, objection; improper

22   hypothetical.

23             THE COURT:  The witness may answer.

24             THE WITNESS:  Yes, because she filed a

25   whistleblower suit.  And people who file whistleblower suits

1    don't usually put their place of employment down on their

2    websites.

3    BY MR. LYNCH:

4    **Q.**    In fact, Dr. Welch, your colleague at the American

5    Association of Addiction Medicine lasted six weeks at

6    CleanSlate; is that correct?

7    **A.**    I don't remember how long she was there.

8    **Q.**    During those six weeks that she was there, she

9    identified a number of problems that were going on at the

10    company; isn't that correct?

11           THE WITNESS:  I am going to tell you that I cannot

12    comment on the pending litigation, Your Honor.  I don't know

13    how to answer this.  I'm not allowed to comment on that kind

14    of litigation.

15           THE COURT:  What is the status of it?

16           MR. LYNCH:  Your Honor, the -- CleanSlate has been

17    sued by the Massachusetts Attorney General and sued by Dr.

18    Welch for improper prescribing, healthcare fraud, and a

19    number other things.

20           THE COURT:  That's enough.  Let's go to the

21    headset.

22           MR. LYNCH:  Sure.

23        **(Sidebar via headsets.)**

24           THE COURT:  How is it relevant?

25           MR. LYNCH:  The testimony is relevant because it

1    goes to bias, Your Honor.  This -- Dr. Clark has been

2    sitting up here talking about how it's appropriate to

3    prescribe under this, like, different standard of care where

4    you don't have to do anything other than just write the

5    prescription.  And this goes to her bias.

6         She's worked for two companies that have slipshod

7    standards and have been sued by regulators repeatedly.  So

8    this goes to her bias, and it goes to showing how -- you

9    know, it goes to the heart of the issue here.

10        She's accused Dr. Chambers of applying too high of a

11   standard.  We have to be able to show that she's actually

12   applying too low of a standard and others.  This has been

13   vindicated she's applying too low of a standard.

14             MR. HARPER:  This is Mr. Harper.  I think Mr.

15   Lynch gravely misstated her testimony regarding the actual

16   usual course of professional practice.  She certainly didn't

17   say anything close to providing prescriptions.

18        Second of all, I think we're well past the point of

19   relevance here.  We are going into a trial within a trial

20   about other litigation that she has testified repeatedly she

21   wasn't involved with.  And I just don't understand the

22   relevance of this testimony.

23             THE COURT:  Anything further?

24             MR. HARPER:  No, Your Honor.

25             MR. LYNCH:  Your Honor, I'm about to show a copy

1    of Ms. Welch's letter of resignation that she sent directly

2    to Dr. Clark and ask her if she remembers receiving that.

3    And if she denies it, I would like to impeach her with that.

4         This goes to the heart of the matter, right?  She's

5    been able to talk for a decent portion of this afternoon

6    about a different standard of care.  And we should be -- the

7    door has been opened to be able to inquire about -- about

8    the errors that's she's made in terms of that different

9    standard of care.

10        MR. HARPER:  Your Honor, I respectfully disagree

11   and believe that this is a very example of use intrinsic

12   evidence to prove a collateral point with this attendant

13   letter for another person that has nothing to do with this

14   case whatever.

15        THE COURT:  Insofar as the validity of the

16   question is concerned, is it agreed that that which took

17   place according to Mr. Lynch?

18        MR. LYNCH:  I'm so sorry.  Could you repeat that,

19   Your Honor?  I'm so sorry.

20        THE COURT:  The question is put to Mr. Harper.

21      Is it agreed that that which Mr. Lynch is saying took

22   place?  Did it, in fact, occur?

23        MR. HARPER:  I don't know what Mr. Lynch is saying

24   took place.  This is a collateral issue and I'm certainly

25   not versed in it.

1              MR. LYNCH:  Your Honor, can I address the

2    intrinsic evidence points?  I can ask the question.  If she

3    wants to deny knowledge of the letter, and -- I mean, I

4    think that would be extraordinary.  It's pretty -- the

5    letter exists.  She can do that.  But it's definitely fair

6    ground to ask her those questions, and she can issue the

7    denial.  But this is relevant cross-examination of the

8    witness' bias.

9              THE COURT:  It appears that there is a good faith

10   basis for asking the question, and you may do so.

11       But the Court does not expect the letter itself to come

12   into evidence.

13              MR. LYNCH:  Yes, Your Honor.

14              THE COURT:  You may proceed.

15       **(Sidebar ends.)**

16       **(Open Court.)**

17   BY MR. LYNCH:

18   **Q.**   Dr. Clark, Dr. Welch went to you with serious concerns

19   about what was happening at CleanSlate in your capacity as

20   Chief Medical Officer; is that correct?

21   **A.**   I will tell you that there is nothing in that -- that

22   I'm not named.  There is no allegation against me.  What it

23   says in the document to which you are referring is that Dr.

24   Clark raised problems with quality at CleanSlate, and Dr.

25   Clark left the company voluntarily.  That's what it says in

1    the documents.

2    **Q.**   And the document you're talking about is a letter of

3    resignation that she gave to you?

4    **A.**   I'm not talking about that.  I am talking -- she didn't

5    report to me.  She didn't give a letter of resignation to

6    me.  I'm talking about the -- the indictment that you are

7    referring to from which I assume you are getting all of your

8    facts, unless you spoke to Dr. Welch.

9    **Q.**   Are you denying under oath today that Dr. Welch sent

10   you a letter of resignation, informing you of serious

11   concerns that she had with CleanSlate?

12   **A.**   I am not.  I have no recollection about what happened

13   there those years ago.

14   **Q.**   You don't remember a three-page letter of resignation

15   sent to you by another member of the Board of the American

16   Addiction -- American Society of Addiction Medicine?

17   **A.**   I don't remember that.

18   **Q.**   Would it refresh your recollection if I showed you a

19   copy of the letter?

20   **A.**   It might.  But, literally, this has nothing to do --

21   you're talking about an indictment that has nothing to do

22   with me.

23          MR. LYNCH:  Your Honor, move to strike.

24      And I'd like to refresh the witness' recollection

25   without admitting the evidence.

1          THE COURT:  The motion is denied.

2      And you may exhibit the letter.

3          MR. LYNCH:  I'll let the record reflect this is a

4   publically available document on the District of

5   Massachusetts' website.

6      And I'll give a copy to the defendants, Your Honor.

7      May I approach the witness?

8          THE COURT:  You may.

9   BY MR. LYNCH:

10  **Q.**   Dr. Clark, could you go to the last page of this

11  document that I showed you here?

12  **A.**   You just gave me page 2 of 4.

13          MR. HARPER:  Objection, Your Honor.  It does not

14  appear to be a complete copy.  The first page is 1 of 5, and

15  then it goes to 3 of 5, and then 5 of 5.  It looks like

16  we're missing two pages of this.

17          THE COURT:  Well, let's retreat long enough to get

18  that straightened out.

19          MR. LYNCH:  Excuse me, Your Honor.  Give me one

20  second.

21      (Pause.)

22          MR. LYNCH:  Your Honor, it looks like we have a

23  printing issue.  We are just going to pull it up, not so the

24  jury can see it, but so the witness can see it on the trial

25  director.

1        THE COURT:  What about the distribution to

2    counsel?

3        MR. HARPER:  Your Honor, I'd like the opportunity

4    to review the record before he discusses it with the

5    witness.

6        MR. LYNCH:  We are going to e-mail it to counsel

7    right now.

8        THE COURT:  Mr. Lynch, what is missing?  A page or

9    two, or what?

10        MR. LYNCH:  It looks like we're missing page 1 and

11    page 3.

12        Your Honor, with the Court's indulgence, I'll move on

13    to a different area and come back to the letter of

14    resignation, if that's okay?

15        THE COURT:  You may do that.

16    BY MR. LYNCH:

17    **Q.**   Do you recall, approximately, when Dr. Welch resigned

18    from CleanSlate?

19    **A.**   No, I don't.

20    **Q.**   Would it be fair to say around the end of 2017?

21        Don't remember?  Okay.

22    **A.**   (No response.)

23    **Q.**   How much were you paid at CleanSlate?

24    **A.**   I don't remember that at the moment.

25    **Q.**   Even a ballpark?

1    **A.**   Probably something like $300,000 a year.

2    **Q.**   $300,000 a year at CleanSlate.

3    Did your salary go up in 2017 -- did it go up every

4    year?

5    **A.**   My worked changed.  I started part-time and went to

6    full-time.

7    **Q.**   Did your salary go up every year, starting at $300,000

8    and increasing upwards?

9    **A.**   I don't remember.  It didn't start at $300,000, no.

10   **Q.**   But in 2017, you were earning around $300,000 at

11   CleanSlate?

12   **A.**   I don't remember.  I think that was -- you just said

13   that it was a partial year of work.

14   **Q.**   You started working at CleanSlate in 2014.

15   Approximately, how much were you earning in 2017 at

16   CleanSlate?

17   **A.**   I'm going to guess around $300,000.

18        MR. HARPER:  Objection as to the relevance of this

19   entire line of questioning.  I don't understand why it

20   relates to this case, what she earned at a

21   different company.

22        THE COURT:  Sustained.

23   BY MR. LYNCH:

24   **Q.**   You now work -- you mentioned on direct examination

25   that you work at a company called Bicycle Health --

1    **A.**    Yes.

2    **Q.**    -- is that right?  That company -- does that company

3    charge a monthly fee for prescriptions for Suboxone?

4    **A.**    No.  It doesn't charge a fee for prescriptions.  It

5    charges a fee for medical care.

6    **Q.**    Is it about $200 a month that you charge?

7    **A.**    Sounds about right.

8    **Q.**    That service, also -- Bicycle Health is not offered in

9    West Virginia, is it?

10   **A.**    I don't know.  It's in many states.  As I said, it's

11   got national insurance coverage that have contracted with it

12   to provide care, but I don't know what states that's in.

13   **Q.**    You're the Chief Clinical Advisor at Bicycle Health?

14   **A.**    I'm an advisor.  I'm not an officer.  I'm not an

15   employee of them.  I'm a consultant to them.

16   **Q.**    I looked at the website over the weekend.  Does the

17   title Chief Clinical Advisor not sound accurate to you?

18   **A.**    It does.  Yes, advisor.

19   **Q.**    And you are not certain whether or not the services are

20   offered in West Virginia?

21   **A.**    No.  I advise them.  I consult to them on an incredibly

22   part-time basis.  I'm not a part of that -- running that

23   company.

24   **Q.**    All right.  Let me shift to talking about your payment

25   in this case.  Are you paid to work on behalf of Dr. Kesari?

1    **A.**    I'm paid for my time, yes.

2    **Q.**    And I think you said on direct examination -- was it

3    $700 an hour?

4    **A.**    No.  It's $750 an hour.  The same as what my current

5    contracts are with the Department of Justice.

6    **Q.**    How many hours have you worked on this case since its

7    initiation?

8    **A.**    I don't know.  But certainly more than Dr. Chambers.

9            MR. LYNCH:  Move strike, Your Honor.

10           THE COURT:  The motion to strike is granted as to

11    the reference to Dr. Chambers.

12    BY MR. LYNCH:

13    **Q.**    Let's break this down.  In -- can you give a ballpark

14    number of hours, Dr. Clark, that you have worked on this

15    case for Dr. Kesari?

16    **A.**    You want me to guess?

17    **Q.**    Give me a number.  Give me -- can you give me a number,

18    a reasonable estimate of the number of hours you've worked

19    on this case?

20    **A.**    I really don't know.

21    **Q.**    Is it over a hundred hours?

22    **A.**    I don't think so.  No.

23    **Q.**    Is it over 75 hours?

24    **A.**    I don't know.  It's over 50.

25    **Q.**    So, Dr. Clark, you said you sat through this entire

1   trial last week, right?

2   **A.**   Yes.

3   **Q.**   And --

4   **A.**   All but an hour.

5   **Q.**   All but an hour.  We were in here for about 40 hours

6   last week; isn't that right?

7   **A.**   Sounds right.

8   **Q.**   40 hours times seven -- and I had trouble with math in

9   the past.

10      Do you know what 40 hours times $750 is, ballpark?

11  **A.**   It would be the same as if I were doing the cases for

12  your colleagues, the same hourly rate, the same work.

13  **Q.**   Did you earn last week between $40,000 and $50,000?

14  **A.**   Is that 30?  Did you do $750 times four?  That would be

15  30.

16  **Q.**   I'm sorry.  You only earned $30,000 last week; is that

17  what you're telling me?

18  **A.**   That's not an only.

19  **Q.**   Oh, sorry.  So in addition to the work last week for

20  $30,000, you had to do preparatory work in the case; is that

21  correct?

22  **A.**   What I said was $30,000 isn't an only -- it's not a low

23  amount of work.  It's a high number of work, which is why I

24  do a lot of volunteering.  I do this, which lets me

25  underwrite everything else.

1    **Q.**   Let's break this down.  You made about $30,000, I

2    think, last week testifying -- or sitting in this courtroom.

3    Before that time, just give us any estimate, Dr. Clark, of

4    the number of hours you spent preparing for this case?

5    **A.**   I don't know.  Again, I guessed it was maybe -- it was

6    over 50.  It was maybe 75.  It's less than some of the hours

7    I've done for some of your colleagues' cases.  It's more

8    than some of the hours I've done for your colleagues' cases.

9    I don't know offhand.

10   **Q.**   You don't know, but can we say a reasonable ballpark is

11   about 80 hours in total, potentially?

12   **A.**   Yes, potentially 80 hours of work.

13   **Q.**   So that's, what, $60,000 for this, for your work on

14   this case?

15   **A.**   That would be right.

16   **Q.**   And that wouldn't include expenses, would it?

17   **A.**   Expenses?  No.  Like the hotel room?  That's correct.

18   **Q.**   Would it include -- did you get paid for your travel

19   time?

20   **A.**   Yes.

21   **Q.**   And so is that -- how did you get here?  Did you drive?

22   **A.**   I drove.

23   **Q.**   You flew?

24   **A.**   No, I drove.

25   **Q.**   How many hours driving is that?

1    **A.**   Three and a quarter, three and a half.  Exact same

2    thing I do when I'm working for you guys -- I'm sorry --

3    your colleagues.

4    **Q.**   So you got paid.  Do you get paid from the government

5    for travel time?

6    **A.**   Oh, not for travel time for the government, you're

7    right.

8    **Q.**   So when you drove from Louisville, Kentucky, to

9    Charleston, you made, what, like $2,100?

10   **A.**   That sounds about right.

11   **Q.**   And tomorrow, when you drive back, you're going to make

12   another $2,100?

13   **A.**   Because I'm being paid for my time.  I could be

14   spending that same four hours doing something else and

15   making the same rate.  I'm paid for my time.

16   **Q.**   So the answer to my question is, "yes," you're going to

17   earn another $2,100?

18   **A.**   That's right.

19   **Q.**   To drive back to Louisville?

20   **A.**   Yes, absolutely.

21   **Q.**   I noticed in the back of the court that some of the

22   time that you were sitting here, you were reading a book.

23   Were you reading a book during some of the trial testimony?

24   **A.**   Absolutely not.  I was writing notes, but I was not

25   reading a book.  I was reading a book during break.  I was

1    reading Macbeth.

2    **Q.**   You were reading Macbeth?

3    **A.**   I was.

4    **Q.**   You were being paid to sit in the court and read

5    Macbeth; isn't that correct?

6    **A.**   I was being paid to be here, as needed.  That's right.

7    **Q.**   How many pages of Macbeth did you read?

8    **A.**   Actually, let me change that.  It's a daily rate for a

9    court appearance.  So my error.  If I have to take a day to

10   appear in court, then it's an eight-hour day, because I have

11   to take time off from everything else.  So, no, I was not

12   being paid to sit there and read Macbeth.

13   **Q.**   What's your daily rate?

14   **A.**   It's the hourly rate times eight.

15   **Q.**   Okay.  So that's even complicated math for me, but is

16   it fair to say that that's -- that it's around -- does

17   anyone -- I cannot do the math right now in my head.

18        Eight hours times $750.

19             MR. HARPER:  Objection to the relevance of this

20   line of testimony.

21             MR. LYNCH:  Your Honor, it goes to the bias of the

22   witness.  And I want to get it clear on the record exactly

23   how much money she's making.

24             MR. HARPER:  Your Honor, I think it's quite clear,

25   she's testified to her hourly rate, and that's actually made

1    clear on direct exam.  He's spent the last 20 minutes on.

2              THE COURT:  You may continue your inquiry.

3              MR. LYNCH:  One moment, Your Honor.

4         I've been a victim of what I impose on other people,

5    Your Honor.  I think the correct figure is $6,000 a day.

6         Is that correct?

7              THE WITNESS:  Eight times $750, yeah.

8    BY MR. LYNCH:

9    Q.    Thereabouts.  So $6,000 for every day that you've been

10   here -- all six of these days; is that right?

11   A.    That's correct.

12   Q.    How much money have you billed that you haven't yet

13   received in payment from Dr. Kesari?

14   A.    None.

15   Q.    You were paid upfront?

16   A.    No.  You said how much I've billed.  I billed after I

17   did the time.  So I billed coming up to the court case, and

18   I got paid.

19   Q.    So you haven't billed for the 30,000-or-so dollars that

20   you made over the last week yet; is that right?

21   A.    I have not billed since we started the court, that's

22   correct.

23   Q.    You haven't billed.  So you are going to bill that

24   $30,000, like, next week?  Is that when it's going to

25   happen?

1    **A.**   I'm going to bill for my time when the case is done.

2    **Q.**   And that's -- you're going to send in that bill, and

3    that bill is going to need to be paid, likely, after the

4    jury reaches its verdict; is that correct?

5    **A.**   That's correct.  I get paid by the hour, not what the

6    jury decides.

7    **Q.**   Okay.  That's fine.  Let's briefly -- I have a -- I

8    think we've fixed the printing malfunction.  And I am going

9    to tender you a full copy.

10           MR. LYNCH:  And I'll tender counsel a full copy of

11   the resignation letter from Dr. Welch.

12           May I approach, Your Honor?

13           Your Honor, would you like a copy?

14   BY MR. LYNCH:

15   **Q.**   Now, we have a four-page document.  Do you see that,

16   Dr. Clark?

17   **A.**   I do.

18   **Q.**   Let's go to the last page of this document.  Do you see

19   where you're copied on this letter of resignation from Dr.

20   Welch?

21   **A.**   Yes.

22   **Q.**   Do you need a moment to review the document?

23   **A.**   Depends on what you're asking me about it.

24   **Q.**   You agree, you did receive a copy of this document in

25   December of 2016; is that right?

1    **A.**   It says here, yes.

2    **Q.**   Well, did you receive it?

3    **A.**   So it says, yes.  So it says.

4    **Q.**   So you did receive this?

5    **A.**   I have seen this document.

6    **Q.**   Okay.  It outlines a number -- do you deny that it

7    outlines a number of concerns that Dr. Welch had about

8    CleanSlate?

9    **A.**   That's what it does.

10   **Q.**   In fact, it says that on her review that -- that some

11   of the practices that she documented, you know, at

12   CleanSlate created a situation where she had patient safety

13   concerns; is that right?

14   **A.**   Can you show me where that is?

15   **Q.**   Sure.

16   **A.**   I see where it says --

17   **Q.**   Yeah.  So I'm looking at the second bullet.

18        Do you deny that she says to you, "I have seen repeated

19   instances of significant quality concerns, including

20   clinical decision-making that could have lethal

21   consequences"?

22        Did I read that correctly?

23   **A.**   I'm sorry, where are you?

24   **Q.**   The second bullet on the first page.

25   **A.**   On the first page?

1    Q.   On the first page.  And the paragraph that begins,

2    "Although all companies," -- and I'm looking at the second

3    part of that sentence, which reads, "CSC, CleanSlate lacks

4    infrastructure to ensure that patient safety comes first.  I

5    have seen repeated instances of significant quality

6    concerns."

7    A.   Can you please show me where on the bullet?  The second

8    bullet starts with "Although all companies."

9    Q.   Well, let's just read the entire bullet.  "Although all

10   companies are works in progress, and no company is

11   perfect" --

12           MR. HARPER:  Objection, Your Honor.  This is

13   improper refreshing of the witness' recollection.

14           THE COURT:  Sustained.

15   BY MR. LYNCH:

16   Q.   Long story short, Dr. Clark, Dr. Welch raised serious

17   concerns about patient safety to you at CleanSlate; is that

18   correct?

19   A.   Yes.  And I raised them as was appropriate.  And then I

20   left the company.

21   Q.   But she -- she left the company because you wouldn't

22   give voice to her concerns; isn't that correct?

23   A.   Absolutely not.

24           MR. HARPER:  Objection.

25           THE WITNESS:  Absolutely not.

1          THE COURT:  The objection is overruled.

2       The witness has answered the question.

3          THE WITNESS:  Absolutely not.

4    BY MR. LYNCH:

5    **Q.**   Let's move on to one other area.

6       Do you know, Dr. Clark, the distance between Danville

7    and Elkview, West Virginia?

8    **A.**   I do not.

9    **Q.**   I'll tell you it's around 41 miles.

10      Do you know the distance between Logan, West Virginia,

11   and Danville, West Virginia?

12   **A.**   I do not.

13   **Q.**   It's about 28 miles.

14      Do you remember on direct examination you told us you

15   had looked on the SAMHSA website and you wanted to figure

16   out how many prescribers were in Danville?

17   **A.**   Yes.

18   **Q.**   And you entered into evidence a -- an exhibit that

19   listed prescribers in the area code 25053, which is

20   Danville's area code.

21      Do you remember that?

22   **A.**   I didn't enter it.  The lawyers did.

23   **Q.**   Excuse me.  The lawyers entered the ZIP code?

24   **A.**   No.  The lawyers entered the document into evidence.  I

25   entered the information into the SAMHSA locator as Dr.

1    Chambers did.  They entered the evidence.

2    **Q.**   Let's just get it clear then.  Let's just pull up the

3    defense exhibit again.

4             MR. LYNCH:  It's -- it's Exhibit 5 or 6?

5             MS. GUMBINER:  Exhibit 6.

6             MR. LYNCH:  Can we pull that up?  It's being

7    published to the jury.

8             MS. GUMBINER:  Sorry.  I apologize.

9             MR. LYNCH:  Can I get your hard copy?

10             MR. BARRAS:  Ms. Williams has it.

11   BY MR. LYNCH:

12   **Q.**   Dr. Clark, can you see that okay?

13   **A.**   Yes.

14             MR. LYNCH:  So can we publish this to the jury,

15   Your Honor?

16             THE COURT:  It's already in evidence?

17             MR. LYNCH:  It's in evidence.  It's been admitted

18   and published.

19             THE COURT:  You may do so.

20   BY MR. LYNCH:

21   **Q.**   All right.  So, Dr. Clark, we looked at -- I'm sorry.

22   It's a little blurry.

23             THE COURT:  What's the number again?

24             MR. LYNCH:  It's Exhibit 6.

25   BY MR. LYNCH:

1    **Q.**   So we looked at this exhibit on direct examination.

2    And you said on direct examination, you know, we had this

3    information input into the SAMHSA website and, look, it only

4    came back with four results.  Do you see that?

5        Do you remember that testimony on direct?

6    **A.**   That's what I did, yes.

7    **Q.**   So I looked at that.  And I wanted to know -- this

8    isn't a complete -- this is not the entirety of what you --

9    what is revealed if you go to the SAMHSA website and look

10   for information in Danville, West Virginia, is it?

11   **A.**   This is what comes up if you search Danville, West

12   Virginia.  If you just search it open, you'll get things for

13   Minneapolis, if you go miles and miles away.  But that's

14   what I did when I went to the website.

15   **Q.**   You went to the website and you came up with the result

16   that had four responses.  I'm going to show you -- I will

17   take this exhibit down.

18       And I am going to show you outside the presence of the

19   jury Exhibit 508 -- excuse me -- 509.

20           THE COURT:  Mr. Lynch, see if you can finish up

21   with this topic.

22           MR. LYNCH:  Yes, Your Honor.

23   BY MR. LYNCH:

24   **Q.**   Dr. Clark, I'm going to show you a two-page document.

25   Do you recognize the first page of this document?

1    **A.**   That's what the SAMHSA practice locator is.

2    **Q.**   And I'm going to just flip to the second page, okay?

3    First of all, do you see a radius, distance from ZIP code on

4    this document?

5    **A.**   Yes.

6    **Q.**   It says, "10 miles," right?

7    **A.**   It does.

8    **Q.**   Okay.

9    **A.**   But I believe that Dr. Chambers said Danville, and the

10   ZIP code, and what was there.  So that's what I searched.

11           MR. LYNCH:  Your Honor, move to strike that

12   response.

13           THE COURT:  The objection is overruled.

14   BY MR. LYNCH:

15   **Q.**   And on the second page of this document, do you see

16   five names, 10-mile radius?

17   **A.**   I do see that.  The fifth one is in Logan County.

18           MR. LYNCH:  Your Honor, move to admit Exhibit 509.

19           MR. HARPER:  Object to foundation.

20           MR. LYNCH:  Your Honor, she's identified it.

21           THE COURT:  How have you substantiated the

22   validity of the exhibit?

23   BY MR. LYNCH:

24   **Q.**   Dr. Clark, to the best of your knowledge, is this a

25   accurate reproduction of the SAMHSA website, the one that

1    you used before?

2    **A.**    It is the website.  It is not what I entered in the

3    search.

4    **Q.**    Yes.  But it's the SAMHSA website?

5    **A.**    Yes, it is.

6    **Q.**    And it's reasonably accessible; it's a public record

7    run by the federal government?

8    **A.**    Yes.

9            MR. LYNCH:  Okay.  Move to admit Exhibit 509.

10           MR. HARPER:  Again, objection to foundation.

11   Also, if you look at the second page of the document, it

12   doesn't include the ZIP code.  So it's also an incomplete

13   record.

14           MR. LYNCH:  That could be the subject of direct

15   examination, but this document is being authenticated by the

16   witness as a public record.

17           THE COURT:  We'll review this after the jury is

18   excused.  And we'll recess now.

19           MR. LYNCH:  Okay.

20           THE COURT:  Ladies and gentlemen, we are going to

21   be in recess now until tomorrow morning at 9:30.

22       If you will, keep in mind the direction that you've

23   been given time and again, and that is, that you not discuss

24   the case with anyone, not even among yourselves.

25       Avoid anything on social media and anything having to

1      do with this case.

2          We'll see you back in the morning at 9:30.  Thank you.

3          **(Jury out at 5:03 p.m.)**

4              THE COURT:  And, Dr. Clark, the same direction.

5              THE WITNESS:  Yes, sir.

6              THE COURT:  We'll see you back in the morning.

7              THE WITNESS:  I'm sorry.  What time?

8              THE COURT:  9:30.

9          **(Jury out.)**

10         **(Dr. Clark out.)**

11             THE COURT:  Please be seated.

12         (All counsel present, and defendant Kesari and

13     defendant Truxhall.)

14             THE COURT:  What is the item being referred to?

15             MR. LYNCH:  Dr. Clark somewhat surprised us by

16     saying there is only five providers in Danville during her

17     direct examination.  We investigated it further.  We went on

18     the SAMHSA website.  We did a search for a 10-mile radius

19     from Danville and a 25-mile radius from Danville.

20         And if you look at the 25-mile radius, the number of

21     providers is much higher.  I believe it -- what is it --

22     about -- I think about 20 to 25 providers, due to a 25-mile

23     radius.

24         And we want to make a point that it was misleading on

25     direct examination to do just the limited search that Dr.

1   Clark appears to have done.

2           THE COURT:  The basis for your question is what?

3           MR. LYNCH:  To rebut a point that --

4           THE COURT:  Excuse me.  That on which you rely is

5   what?

6           MR. LYNCH:  Is this -- I can put it up.  It's a

7   printout from the website from SAMHSA, which is a department

8   of -- within the Department of Health and Human Services

9   that manages opioid addiction services.

10          THE COURT:  So it's a public document?

11          MR. LYNCH:  It's a public document on a publicly

12  available website.

13          THE COURT:  And has the defense seen it?

14          MR. LYNCH:  Well, they saw it during the course of

15  the testimony, but we can produce a clean -- we were trying

16  to do it on the fly.  We can produce a cleaned up copy

17  overnight, Your Honor.

18          THE COURT:  Mr. Harper, do you have a copy of that

19  to which Mr. Lynch is referring?

20          MR. HARPER:  No, I do not.

21          THE COURT:  And what further response do you have

22  to Mr. Lynch's request?

23          MR. HARPER:  So, Your Honor, I think I can

24  actually clarify this for the Court.  And I would hope -- I

25  think we -- with all due respect, we've wasted far too much

1    of everyone's time and, particularly, the jury's time.

2        The issue when Dr. Chambers testified, he said that in

3    the vicinity of Dr. Kesari's clinic in the 25053 ZIP code,

4    there with 30 Suboxone doctors.

5        The implication that he was, obviously, trying to make,

6    there were lots of other Suboxone doctors that people in

7    Danville could have gone to.

8        The testimony that Dr. Clark provided was if you get in

9    this SAMHSA search engine and you type in the ZIP code,

10   25053, it turns out -- I think we can actually probably all

11   agree, there is one Suboxone doctor that comes up in

12   Danville.

13       That's what Dr. Clark said.  And Dr. Chambers was

14   saying something slightly different.

15       Part of the confusion here, because I have run this

16   search multiple times, if you type in the ZIP code and you

17   filter, and you, say, you apply a 10-mile, 25-mile filter,

18   it doesn't matter.  If you apply a filter, the results that

19   come up are not strictly limited by that filter.

20       So, for example -- this is going back a year and a half

21   ago, but the government made the exact same argument in

22   court pleadings and they said, oh, here's all the Suboxone

23   providers that are in a certain ZIP code.  But that included

24   Suboxone providers that are, quite literally, in another

25   state, in Ohio, in Portsmouth, Ohio.  You know.

1      So I think we could actually agree, and I think at this

2    point the parties are just arguing whatever they want to

3    argue, but I don't think they can factually contest there is

4    one Suboxone doctor in Danville that comes up on that

5    search.

6      And if you look more broadly and look at further

7    distances away from Danville, you get increasingly more and

8    more doctors, Suboxone doctors, of course.  But our point

9    still stands, and the nature of Dr. Clark's testimony -- all

10   she said was that there is one Suboxone doctor in Danville.

11   Their paper showed the same thing.

12         THE COURT:  Mr. Lynch, if you would, then, in

13   light of that, tell me what you understood the basis for

14   your proposition reflects, and then see what the difference

15   is between you and what Mr. Harper is saying.

16         MR. LYNCH:  Mr. Harper is saying something that is

17   actually in some ways irrelevant here.

18         THE COURT:  You're going to have to speak up into

19   the microphone.

20         MR. LYNCH:  Mr. Harper is saying something that is

21   irrelevant to the facts of this case.  Here, we have three

22   of the six patients we know are coming from Elkview, West

23   Virginia, which is a substantial distance from Danville.

24   They are driving, like, 40 miles.  And the same is true for

25   one patient from Logan, West Virginia.

1    The radius that we're talking about here should be more

2    like if you just go to the 25-mile radius, you get a ton

3    more providers.

4    So it's -- it's misleading to the jury to be able to

5    say, listen, the relevant search here should be just the

6    City of Danville.

7    THE COURT:  I understand that point.  What I'm

8    trying to get -- and you ought to be able to agree on it --

9    it's a public document.  It says what it says.  And what I'm

10    trying to get from you is, what is the coverage area?  And I

11    think you said you have one that is a 10-mile radius,

12    another one that is a 25-mile radius?

13    MR. LYNCH:  Yes.

14    THE COURT:  Of Danville?

15    MR. LYNCH:  Yes, ZIP code, associated with

16    Danville.

17    THE COURT:  And I would think that the two you

18    could get together and examine the public health website,

19    and if that's where this is located, and agree on a figure.

20    What Dr. Chambers was talking about was Danville.  If

21    you, of course, are dealing with someone from Elkview going

22    to Danville, you could include Charleston, which is closer

23    to Danville and add all of those as well.  But that's not --

24    that isn't the point.  The point had to do with Danville.

25    And that's what you have to focus on.

1     So I don't see any reason why overnight you can't show

2  each other what you're relying on and figure it out.

3          MR. LYNCH:  Okay.  We can do that overnight, Your

4  Honor.

5          THE COURT:  Good.

6      Mr. Harper, are you prepared to do that?

7          MR. HARPER:  Yes, Your Honor.

8          THE COURT:  Very good.  Suppose you do that then.

9          MR. LYNCH:  Okay.

10         THE COURT:  And how much longer are you likely to

11  be with the witness?

12         MR. LYNCH:  May I consult real quick?  May I

13  consult?

14         THE COURT:  Oh, yes.

15     (Government attorneys conferring off the record.)

16         MR. LYNCH:  I think no more than 15 minutes, Your

17  Honor.

18         THE COURT:  All right.

19     And let me ask if you have any idea how much longer the

20  defendant Kesari case is likely to be?

21         MR. FERRARA:  Your Honor, Dr. Kesari intends to

22  rest after this witness.  We do request, obviously, that we

23  put the colloquy with the Court on the record regarding Dr.

24  Kesari's Fifth Amendment rights.  But with just that

25  inclusion, Dr. Kesari does, in fact, intend to rest.

 1          THE COURT:  Well, insofar as the colloquy is

 2     concerned, I'll let you do that.  The Court may add to it,

 3     but you can inquire of him on the record, and the Court then

 4     will evaluate that.

 5          MR. FERRARA:  Yes, Your Honor.  Would you like us

 6     to do that now or tomorrow before we rest?

 7          THE COURT:  It seems to me you can do it now if

 8     you want.

 9          MR. FERRARA:  We're fine with that, Judge.

10          THE COURT:  And then let me ask about defendant

11     Truxhall.

12          MR. HISSAM:  Yes, Your Honor.  Our only witness,

13     if she were to choose to testify, would be the defendant,

14     Kristina Truxhall.

15       I would ask the Court's indulgence, however, Your

16     Honor, given that it is a very important decision, for her

17     to sleep on it, conduct that colloquy before the jury comes

18     in tomorrow morning.

19       But based on the timing, Your Honor, just to go ahead

20     and jump to the next point, if Mr. Lynch has another 15

21     minutes of cross, and I assume Mr. Harper may have some

22     redirect, and then they rest, we would be prepared to

23     immediately call Ms. Truxhall, if she chooses to testify.

24     And I would anticipate that that direct examination takes

25     about 40 minutes, maybe less.

1    And then, of course, I can't predict -- I can't predict

2  the government's length of cross-examination, and I can't

3  predict whether the United States has a rebuttal case, but

4  assuming there's not that long of cross, and no rebuttal

5  case, I think it could be possible, Your Honor, that we are

6  prepared to close in the morning or at least around

7  lunchtime.

8    And so I just wanted to inquire of the Court as to when

9  the Court would like to go over the charge to the jury with

10 us?

11   THE COURT:  Well, we could think in those terms

12 this evening.  It's now 5:15.  And we might break for 10

13 minutes and come back and go over the instructions that have

14 been submitted.

15   I would ask counsel if you're prepared to do that?

16   MR. HISSAM:  Yes, Your Honor.

17   MR. FERRARA:  Yes, Judge.

18   MR. LYNCH:  Yes, Your Honor.

19   THE COURT:  Let's be back then in 10 minutes and

20 we'll start with the government's instructions.

21   MR. LYNCH:  Okay.  I'm just going to collect one

22 of the exhibits.

23   THE COURT:  Go ahead.  And so, we'll see you back

24 shortly.

25   THE CLERK:  All rise.

1    (Proceedings concluded at 5:14 p.m.)

2    (Proceedings resumed on, May 26, 2021.)

3    (Proceedings preceded on May 26, 2021, but were not

4    transcribed.)

5    **(Jury in at 10:26 a.m.)**

6         THE COURT:  Ladies and gentlemen, first of all, I

7    apologize to you for the delay this morning.  The Court had

8    matters simply to take up with counsel before we could

9    proceed and for us to proceed in a much more efficient

10   manner.

11        In the meantime, logistics didn't work out well.  The

12   courtroom across the way was not available, and you had to

13   go from the second floor and back to the second floor, and

14   back again.

15        And I apologize for all of that, but it is one of the

16   attributes of COVID-19, and there's not much we can do about

17   it.

18        We are just pleased that somehow you remain cheerful

19   through it all.

20        With that, we're ready to proceed.

21        MR. LYNCH:  Yes, Your Honor.

22        THE COURT:  Almost ready to proceed.

23   **KELLY CLARK, M.D., DEFENSE WITNESS, PREVIOUSLY SWORN**

24        THE COURT:  Good morning.

25        THE WITNESS:  Good morning.

1          **CROSS-EXAMINATION RESUMED**

2     **BY MR. LYNCH:**

3     **Q.**   Good morning, Dr. Clark.

4     **A.**   Good morning.

5     **Q.**   I'm going to put up for you on the screen and publish

6     to the jury -- it's already been admitted -- Exhibit 351.

7          Dr. Clark, you recognize this exhibit as a prescription

8     issued by Dr. Kesari, correct?

9     **A.**   Yes.

10    **Q.**   And the ZIP code listed for the clinic at the top of

11    this exhibit is 25053?

12    **A.**   25053, yes.

13    **Q.**   All right.  We can pull down the exhibit.

14         I'm now going to show you outside the presence of the

15    jury what has been marked as Government's Exhibit 508.  This

16    is a two-page document.  I'll quickly go through both pages.

17    Here's the first page -- excuse me -- three-page document.

18    Here's the second page.  And here's the third page.

19    **A.**   Okay.

20    **Q.**   Dr. Clark, did you have enough time to look at that or

21    would you like to see a copy of this exhibit?

22    **A.**   I'd like to see a copy of it if you're going to ask me

23    about it.

24    **Q.**   Okay.  I am going to hand you two exhibits.  We are

25    going to start with 508, and then we'll go into 509, okay.

1          MR. LYNCH:  May I approach, Your Honor?

2          THE COURT:  You may.

3     BY MR. LYNCH:

4     **Q.**   Dr. Clark, why don't you go ahead and review both 508

5     and 509?

6     **A.**   Okay.

7     **Q.**   You recognize these as -- 508, 509 as printouts from

8     the SAMHSA website, right?

9     **A.**   Yes.

10    **Q.**   And SAMHSA is part of the federal Department of Health

11    and Human Services, a government agency, right?

12    **A.**   Yes.

13    **Q.**   And you talked about on direct examination, you can use

14    the SAMHSA website to look up Buprenorphine prescribers in a

15    particular area of the country, correct?

16    **A.**   That's correct.

17    **Q.**   And not every single Buprenorphine prescriber may be

18    listed on the SAMHSA website; is that correct?

19    **A.**   That's correct.

20    **Q.**   And we discussed briefly yesterday as to the search

21    function on the SAMHSA website; isn't that right?

22    **A.**   Yes.

23    **Q.**   And you can search by ZIP code, right?

24    **A.**   Yes.

25    **Q.**   And you can search within a certain radius, correct?

1    **A.**    That's correct.

2    **Q.**    So you can search within a 5-mile or, for example,

3    25-mile radius, right?

4    **A.**    Or zero mile.  You can search for a ZIP code.

5    **Q.**    Okay.  Exhibit 508 is one of these -- you recognize

6    Exhibit 508 as a search for within a five-mile radius of

7    25053; is that correct?

8    **A.**    That's what it is.

9    **Q.**    And Exhibit 509 is a search for the same 25053 within a

10   25-mile radius?

11   **A.**    That's correct.

12          MR. LYNCH:  Your Honor, the government moves to

13   admit Exhibits 508 and 509.

14          MR. FORMAN:  No objection.

15          MR. FERRARA:  No objection.

16          THE COURT:  Admitted.

17          MR. LYNCH:  And permission to publish to the jury?

18          THE COURT:  You may.

19       **(Government's Exhibits 508 and 509 admitted.)**

20   BY MR. LYNCH:

21   **Q.**    So here we are looking at Exhibit 508 first.  This is

22   within five miles of 25053?

23   **A.**    That's right.  That's not what I searched.  I searched

24   what Doctor -- the other doctor.

25          MR. LYNCH:  Your Honor, move to strike as

1    unresponsive.

2            THE COURT:  It doesn't matter.  Go ahead.

3    BY MR. LYNCH:

4    **Q.**   Okay.  And there are providers on the second page of

5    this document, correct?

6    **A.**   Yes.

7    **Q.**   Okay.  On Exhibit 509, this is the 25-mile radius

8    document?

9    **A.**   That's correct.

10   **Q.**   And on the subsequent pages, it lists the providers

11   that are within a 25-mile radius; is that correct?  Yes or

12   no?

13   **A.**   That's correct.

14           MR. LYNCH:  We can pull down the -- we can turn

15   off the monitors.

16   BY MR. LYNCH:

17   **Q.**   Okay.  Dr. Clark, I want to make this clear for the

18   record.  You bill invoices or you send billing statements to

19   Dr. Kesari, right, for your work in this case?

20   **A.**   No.  Actually, I send them to the lawyers.  I work for

21   the lawyers; I don't work for the doctor.

22   **Q.**   But you did send billing statements to the lawyers?

23   **A.**   Yes.

24   **Q.**   And you've been doing that throughout the course of

25   this case?

1  **A.**   I will do it until I leave the stand today, when I go

2  off the clock.

3  **Q.**   Okay.  And those statements clock your hours and your

4  billing rate; is that right?

5  **A.**   Yes.

6  **Q.**   And you've been keeping those since you began your

7  involvement in this case, around November 2019, correct?

8  **A.**   Yes.  I have a spreadsheet for all of the hours I bill

9  for every case or every, you know, legal team that I'm

10  working for.

11  **Q.**   You have a spreadsheet with all your hours?

12  **A.**   Yes.

13  **Q.**   Have you reviewed that since last night?

14  **A.**   No.

15  **Q.**   Are you aware that I asked, because we couldn't figure

16  out the total amount you billed last night --

17          MR. HARPER:  Objection, Your Honor.  This is a

18  discovery matter.  I don't believe this is appropriate

19  before the jury.

20          MR. LYNCH:  Your Honor, I'm asking if -- I made a

21  request for the total number of hours that Ms. Clark had

22  billed in this case to the defendant's lawyers.  And I want

23  to know if she's aware of that communication and --

24          THE WITNESS:  Of course, not.  I didn't talk with

25  the legal team.

1            THE COURT:  Just one moment, please.  You're not

2     to speak.

3            Go ahead.

4            MR. LYNCH:  I asked -- I e-mailed Mr. Ferrara and

5     Mr. Harper last night.

6            MR. HARPER:  Objection.

7        Can we go to the headsets?

8            THE COURT:  You may.

9        **(Sidebar via headsets.)**

10            MR. LYNCH:  Your Honor, can you hear me?

11            MR. HARPER:  I can hear you.

12            THE COURT:  Yes.  You're making an objection?

13            MR. HARPER:  Sure.  Yes.  So, Your Honor -- Mr.

14     Harper -- I believe this is wildly improper to put this

15     before the jury.  Yesterday evening at, I believe, 8:10

16     p.m., Mr. Lynch sent an e-mail requesting all of Dr. Clark's

17     invoices that had been paid over the course of this case,

18     which dates back to, I believe, October of 2019, and he

19     requested that pursuant to Rule 26.2, which governs witness

20     statements.

21        First and foremost, Dr. Clark's invoices are not

22     witness statements under Rule 26.2(f).  That defines the

23     witness statement as a written statement that the witness

24     makes, signs, or otherwise adopts or approves.  They do not

25     fall under the rule whatsoever.

1       Second of all, we don't know the answer to this

2  question she had for all invoices paid to date by Dr.

3  Kesari.  We send the invoices to Dr. Kesari for payment.  We

4  have no means of tracking whether they've been paid or not.

5  The only person who might know that answer, who is

6  testifying in this case, is Dr. Clark.  She's on the stand.

7  She's already testified that she doesn't know the precise

8  amount that's been paid.

9       Next point, Your Honor.  This request is untimely.  We

10 disclosed Dr. Clark as a witness on October 31st, 2019.  We

11 said at the last pretrial hearing on May 13th, that she

12 would testify.  They have waited until the evening before

13 closing argument to ask for invoices.

14      Furthermore, we object not only to this discovery

15 request that they made and they just improperly raised

16 before the jury, but to any further inquiry whatsoever of

17 Dr. Clark's compensation in this case.  And here's why.

18      It is incredibly prejudicial.  This case had eight

19 trial dates and it's nearly two years old.  Everyone in --

20 the attorneys in this courtroom know what a significant part

21 of this case was until the April 21st pretrial hearing.

22      The government had two experts opine on this issue.

23 Dr. Clark identified the issue and issued a 17-page report,

24 with substantial work done on that issue in anticipation of

25 trial.

1    If they were to get the invoices or to do further

2    inquiry, which they have now been doing for a period of

3    about half an hour, ad nauseam, on this issue, it would --

4    any information -- additional information they could get

5    about the total amount that Dr. Clark has billed on this

6    case is completely taken out of context, because a good

7    chunk of that work related to the cognitive decline issue

8    that all the parties have agreed is off the table, that the

9    government itself has objected vehemently to when we even

10    touched on it by, for example, testimony that, that Dr.

11    Kesari appeared confused.

12    We believe it is completely inappropriate.  And I

13    object not only to the discovery request that they made last

14    night and to the improper raising of the issue in front of

15    the jury -- like Mr. Lynch -- but we respectfully request

16    the Court admonish Mr. Lynch not to ask any further

17    questions about Dr. Clark's invoices that have been paid,

18    because there is no fair way to present that without

19    introducing on redirect the facts that a substantial portion

20    of those invoices related to her were on the cognitive

21    decline issue.

22    MR. LYNCH:  Rule 26.2(a), misquoted just now by

23    Mr. Harper, it says at the end that the defendant must

24    produce, quote, "any statement of the witness that is in

25    their possession and that relates to the subject matter of

1    the witness' testimony."  Directly quoting from the rule.

2        I learned yesterday that Dr. Clark had billing

3    statements.  I didn't actually know how she billed before my

4    cross-examination.  Those are statements by the witness that

5    are in the possession of the defendant that we've now

6    clarified today on cross-examination.  And it relates to the

7    subject matter of her testimony.

8        We should have those records.  We should have had those

9    records.  I promptly e-mailed the defendants about that last

10   night.  They ignored my request.

11       They told me this morning they weren't going to comply

12   with the request.  This is a violation of their reverse

13   *Jencks* obligations.  And we should be allowed -- I'm not

14   clear, but if Mr. Harper has the -- if Mr. Harper has the

15   invoices here with him today, I'd be happy to take a quick

16   look at them and ask several questions about the invoices of

17   Dr. Clark.  I don't need to probe into the cognitive

18   impairment issue.

19       But this seems to be a -- Mr. Harper's own creation in

20   that he's not complying with the discovery requests.

21       MR. HARPER:  Your Honor, Mr. Lynch is blatantly

22   misguiding and mischaracterizing Rule 26.2.  It says, "Any

23   statement of the witness that is in their possession that

24   relates to the subject matter of the witness' testimony."

25   That is not a billing statement.  That's not an invoice.

1    It did define witness statements later in the rule, as

2    I correctly quoted, a written statement of the witness,

3    dates and time, otherwise amounts approved.  It simply does

4    not apply to a billing invoice.

5    Moreover, Mr. Lynch did not address and, therefore, I

6    assume concede my point about the extreme prejudice of

7    introducing further evidence -- further testimony on Dr.

8    Clark's invoices when we cannot, by agreement of the

9    parties, delve into the nature of a substantial portion of

10   that work which relates to cognitive decline, which is not

11   at issue in this case.

12   This is the exact same issue as the redacted orders

13   suspending Dr. Kesari's medical license, which the Court

14   excluded, because we couldn't fully consider that record

15   without delving into the cognitive decline issue.

16   That's the same issue.

17   And we, therefore, again renew our request that further

18   inquiry on this be shut down.

19        THE COURT:  I believe that covers it.  Are the

20   parties in agreement?

21        MR. LYNCH:  Your Honor, are you -- am I allowed to

22   further inquire of this issue, Your Honor?

23        THE COURT:  No.  I believe that covers the

24   argument, does it?

25        MR. LYNCH:  Yes, Your Honor.

1          MR. HARPER:  Yes, Your Honor.

2          THE COURT:  The Court directs that the invoices be

3    produced if they are available.

4          I think that covers the point.

5       Are they available?

6          MR. HARPER:  We don't have them in court, Your

7    Honor.

8          MR. LYNCH:  Your Honor, they can -- they have them

9    on that computer right there.  They can get them for me in

10   five minutes.

11         THE COURT:  Are they available, as Mr. Lynch has

12   just stated?

13         MR. HARPER:  We don't have them in any organized

14   fashion.  We could --

15         THE COURT:  Well, do you have them in a

16   disorganized fashion?

17         MR. HARPER:  Your Honor, I don't know where those

18   invoices reside.  I don't want to represent to you that I

19   do.

20         MR. LYNCH:  Your Honor, this is -- they should

21   have known that you weren't going to be able -- that you

22   might rule that we should get the invoices, as we're allowed

23   to, under Rule 26.2.  This is going to delay the proceedings

24   and I think that if you are to ask Krysta right now how long

25   it would take her to get all of the invoices, it would take

1    her around five minutes.

2              THE COURT:  Can those invoices be made available

3    in the next 10 minutes?

4              MR. HARPER:  Again, I don't know, Your Honor.  I

5    simply don't know.

6              THE COURT:  Well, we'll set the time to find out.

7    So if you want the jury excused until that can be done, we

8    will do that?

9              MR. HARPER:  Could Mr. Lynch proceed with a

10   different inquiry while we search for the invoices to see if

11   they are available?

12             THE COURT:  You may do it.

13             MR. LYNCH:  Your Honor, I don't have anything

14   further to ask about other than the money.  You know, I can

15   -- yeah, that's my primary next question.

16             MR. HARPER:  Your Honor, just to clarify, what

17   did -- assuming we are able to identify these invoices and

18   find them and locate them and provide them to Mr. Lynch,

19   would there be -- we would need an opportunity to screen

20   those invoices for information relating to cognitive

21   decline.  Otherwise, we would necessarily have to ask about

22   those billings for cause and cognitive decline on redirect,

23   which violates the parties' agreement at the eleventh hour

24   at trial.

25             THE COURT:  I assume what Mr. Lynch wants are the

1   figures?

2          MR. HARPER:  Yes.  But, Your Honor, my point is

3   that the figures necessarily include substantial work

4   related to cognitive decline.

5          THE COURT:  Does it matter?  That always happens

6   in cases.  It's quite common for issues not to survive the

7   trial.  The question is what is the total amount, and if you

8   have those available, they are to be furnished.

9          MR. HARPER:  Okay.  Again, just to reiterate, I do

10  not have the information Mr. Lynch requested.  He asked for

11  all invoices paid to date by Dr. Kesari.  That information

12  is simply not available.

13         THE COURT:  How long of a recess will it require?

14  Do we need to -- do we need to recess until tomorrow while

15  you figure this out?

16         MR. HARPER:  Your Honor, if the information is not

17  available, I don't know what invoices have been paid.  We

18  can gather invoices, which is a different request than Mr.

19  Lynch made.  But I don't have -- I simply don't have access

20  to all invoices that have been paid to date.

21         THE COURT:   The Court expects a search to be made

22  to find the invoices and provide the information.  And we

23  will recess the trial for such time as is required in order

24  to accomplish that.

25         MR. LYNCH:  Your Honor, I would ask that it be put

1    on the record that it is not a delay that is being caused by

2    the government.  I would ask that we make it explicit why we

3    are delaying the jury's time at this point, and it's because

4    we made a very reasonable request last night within the

5    rules, and they decided not to comply with it.

6             MR. HARPER:  I object to that instruction, Your

7    Honor.  Again, I will reiterate for the record, this request

8    is clearly outside of the rules.  And we --

9             THE COURT:  The Court has ruled on the matter, Mr.

10   Harper.

11        Anything further?

12             MR. LYNCH:  No.  I would just -- if we can get the

13   instruction that we are not causing this delay.  I think

14   that that's important, and especially given the

15   circumstances and how this has developed, Your Honor.

16             THE COURT:  And so when do the parties suggest we

17   resume?

18             MR. HARPER:  If you could give us 15 minutes, Your

19   Honor?

20             THE COURT:  Very good.

21        Let me ask you, does the government have further

22   evidence?

23             MR. LYNCH:  Inquiry of Dr. Clark, other than the

24   invoices issue?  No, Your Honor.

25             THE COURT:  Let me ask whether or not the next

1    phase of the case can continue with this matter hanging?

2            MR. LYNCH:  May I confer briefly on that?

3            MR. HARPER:  No objection from Dr. Kesari.

4        (Government attorneys conferring off the record.)

5            MR. HISSAM:  Mike Hissam.  No objection from us,

6    Your Honor.

7            MR. LYNCH:  Your Honor, to streamline, we can just

8    have -- why don't we just cover the invoice issue after -- I

9    think we can move forward with Ms. Truxhall, and then we can

10   just recall Dr. Clark to deal with the invoice issue.

11           THE COURT:  That's what I'm asking the parties to

12   do.  What I want to see is if you can agree to it?

13           MR. HISSAM:  Yes, Your Honor.

14           MR. HARPER:  Yes, Your Honor.

15           MR. LYNCH:  Yes, Your Honor.

16           THE COURT:  We'll proceed accordingly.

17       **(Sidebar ends.)**

18       **(Open Court.)**

19           MR. LYNCH:  Your Honor, as a result of our

20   conference, I have no further questions at this time subject

21   to recall of Dr. Clark to address that issue.

22           THE COURT:  Thank you.

23       Let me ask if there are any other questions of Dr.

24   Clark at this time?

25           MR. FORMAN:  No, Your Honor.

1          MR. FERRARA:  No, Your Honor.

2          THE COURT:  Dr. Clark, we are going to excuse you

3    for the moment.  But we need you to remain close by because

4    I'm anticipating that you'll be recalled to the stand.  And

5    so you need to keep in mind the same instruction that you

6    are not to discuss the case with anyone, treating yourself

7    as though you're on the witness stand until we return.

8       Can you find a place to rest for what I hope will be no

9    more than 15 or 20 minutes?  It might be as long as an hour.

10          THE WITNESS:  Absolutely.

11          THE COURT:  It could be even longer than that.

12    But if you can be nearby, because we are going to need you

13    on the spur of the moment.

14          THE WITNESS:  Yes, sir.

15          THE COURT:  Thank you.

16          THE WITNESS:  Thank you.

17          MR. LYNCH:  Thank you, Your Honor.

18       May I approach, Your Honor?  Thank you.

19       (A recess was taken at 10:50 a.m.)

20       (Trial proceedings conducted but not transcribed.)

21       (Proceedings resumed at 12:57 p.m. resuming the

22    testimony of Dr. Clark.)

23       **(Jury in.)**

24          THE COURT:  Is she handy?

25          MR. FERRARA:  I can immediately find out, Judge.

1          THE COURT:  Thank you.

2          **KELLY CLARK, M.D., DEFENSE WITNESS, RECALLED**

3          **CROSS-EXAMINATION RESUMED**

4    **BY MR. LYNCH:**

5    **Q.**   Dr. Clark, I'm going to approach and mark Exhibit 510.

6    Go ahead and take a look through this multi-page exhibit.

7    **A.**   (Witness complies.)  Okay.

8    **Q.**   Have you had a moment to look through the exhibit?

9    **A.**   Yes.  They are invoices for my time.

10   **Q.**   You recognize these as eight pages of invoices of your

11   time?

12   **A.**   Yes.

13          MR. LYNCH:  Okay.  Your Honor, move to admit the

14   government's composite Exhibit 510.

15          MR. FERRARA:  Preserving the matter that we took

16   up, Your Honor, but understanding the Court's ruling.

17          MR. FORMAN:  No objection.

18          THE COURT:  I want to see the exhibit before the

19   Court rules.

20          MR. LYNCH:  Yes, Your Honor.  May I approach?

21          THE COURT:  You may.  Is this a copy or is this

22   the exhibit?

23          MR. LYNCH:  The exhibit is actually with Dr.

24   Clark.

25          THE COURT:  And it's marked?

1            MR. LYNCH:  The version with Dr. Clark is marked.

2            THE COURT:  What is it, what's the number?

3            MR. LYNCH:  510.

4            THE COURT:  Thank you.  And do you need this back?

5            MR. LYNCH:  Yes, Your Honor.

6            THE COURT:  Did I hear from you on the exhibit?

7            MR. FORMAN:  I have no objection.

8            THE COURT:  510 is admitted.

9        **(Government's Exhibit 510 admitted.)**

10           MR. LYNCH:  Permission to publish to the jury?

11           THE COURT:  You may do so.

12   BY MR. LYNCH:

13   **Q.**   Dr. Clark, we're just briefly going to go through each

14   of these pages.  First page of this exhibit is a first

15   invoice; is that correct?

16   **A.**   Yes.  October 31, 2019.

17   **Q.**   And we'll go through this quickly, but is it fair to

18   say that each of these exhibits you list the time range for

19   your work, the number of hours you billed, the amount you

20   billed, and your rate?

21   **A.**   That's correct.  That's what I do.  I bill for my time

22   at the $750 rate.

23   **Q.**   Okay.  So this first page is for a bill for $9,900; is

24   that right?

25   **A.**   This is from October 2019, a year and a half ago, yes,

1      thirteen and a quarter hours.

2      **Q.**   Okay.  $9,900?  This is your second invoice.

3      **A.**   It's number 2.  December 2019.  22.75 hours,

4      $17,062.50.

5              THE COURT:  Before this wanders off-point.

6          Can't you simply ask a leading question about the rest

7      of this?

8              MR. LYNCH:  Sure.

9      BY MR. LYNCH:

10     **Q.**   Is it fair to say, flipping through each of these

11     invoices, that it will say the same -- let me just ask you.

12         Is it accurate that this third invoice is for $9,375;

13     is that correct?

14     **A.**   Yes.

15     **Q.**   The fourth invoice is for $8,070.50?

16     **A.**   Yes.

17     **Q.**   And the fifth invoice is for $20,812.50?

18     **A.**   Yes.

19     **Q.**   And the sixth invoice is for $23,625?

20     **A.**   Yes.

21     **Q.**   The seventh invoice is for $18,782?

22     **A.**   Yes.

23     **Q.**   The eighth invoice is for $17,625?

24     **A.**   Yes.

25     **Q.**   And this last invoice is through May 2nd, 2021?

1   **A.**   Correct.

2   **Q.**   So it doesn't include from May 2nd until today; is that

3   correct?

4   **A.**   That's correct.

5   **Q.**   We were able to sum up the amounts of all these

6   invoices, would it be -- and this was a calculation also

7   given to me by counsel for Dr. Kesari -- does $125,000 sound

8   like about right for the amount of money that you have

9   billed in invoices on these eight invoices?

10  **A.**   $750 an hour times a lot of hours on this case?  Yes.

11  That could be right.

12  **Q.**   And that doesn't include, again, the period from May

13  2nd, through the present; is that right?

14  **A.**   Until the time I leave this witness box, when my time

15  becomes my own, correct.

16  **Q.**   So that -- that doesn't include the, approximately,

17  $60,000 we talked about yesterday?

18  **A.**   I don't remember that -- those numbers.  But it doesn't

19  include what I've done in my time since then, correct.

20          MR. LYNCH:  No further questions, Your Honor.

21          MR. HARPER:  No questions, Your Honor.

22          MR. FORMAN:  I have no questions, Your Honor.

23          THE COURT:  Thank you.

24      May Dr. Clark be excused from the trial?

25          MR. LYNCH:  Yes, Your Honor.

1           MR. FERRARA:  Yes, Judge.

2           MR. FORMAN:  Yes, Your Honor.

3           THE COURT:  Doctor, thank you.  You're excused.

4    And although we are getting near the end, please don't

5    discuss your testimony with any other witness in this case

6    until the trial is over.

7           THE WITNESS:  Yes, sir.

8           THE COURT:  Thank you.

9           THE WITNESS:  Thank you.

10           MR. LYNCH:  Your Honor, we have a very brief

11    rebuttal witness.  I don't think it will take more than five

12    minutes.

13           THE COURT:  And Mr. Ferrara, is ready to speak.

14    Let me hear them.

15           MR. FERRARA:  Before the government introduces the

16    rebuttal case, I think it's appropriate Dr. Kesari first

17    rest his.

18        At this time, Your Honor, Dr. Kesari rests his case.

19        **(Defendant Kesari rests.)**

20           THE COURT:  Thank you.

21        And I understand you have a rebuttal witness?

22           MR. LYNCH:  Yes, Your Honor.  We can do it now or

23    take a break.

24           THE COURT:  And I understand that Ms. Truxhall has

25    already rested?

1         MR. HISSAM:  Yes, Your Honor.

2     **(Defendant Truxhall rested.)**

3         THE COURT:  And so you may recall that witness.

4     (End of Dr. Clark testimony at 1:07 p.m.)

5     (Trial Proceedings followed but were not transcribed.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25              CERTIFICATE OF OFFICIAL REPORTER

1         I, Catherine Schutte-Stant, Federal Official Realtime

2    Court Reporter, in and for the United States District Court

3    for the Southern District of West Virginia, do hereby

4    certify that, pursuant to Section 753, Title 28, United

5    States Code, the foregoing is a true and correct EXCERPTED

6    transcript of the stenographically reported proceedings held

7    in the above-entitled matter and that the transcript page

8    format is in conformance with the regulations of the

9    Judicial Conference of the United States.

10

11         s/Catherine Schutte-Stant, RDR, CRR

12    _____  June 18, 2021

13         Catherine Schutte-Stant, RDR, CRR
          Federal Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25