UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


UNITED STATES OF AMERICA

v.                                    CRIMINAL ACTION NO. 2:19-00241

SRIRAMLOO KESARI, M.D.


MEMORANDUM OPINION

        Defendant Sriramloo Kesari, M.D. was convicted of one

count of unlawful distribution of a controlled substance,

Suboxone, in violation of 21 U.S.C. § 841(a)(1) during a jury

trial on May 27, 2021.  See ECF No. 246.  Kesari had previously

filed a November 12, 2019 motion in limine to exclude evidence

related to the illegal search of his office.  ECF No. 31.  This

opinion explains the reasons for denying this motion.


                              I.


        The November 13, 2019 second superseding indictment in

this action charged Kesari in Count One with conspiracy to

distribute a controlled substance (buprenorphine and Suboxone)

from in or about October 2018, through in or about May 2019, in

violation of 21 U.S.C. § 846; and in Counts Two through Thirteen

with distribution of controlled substances (buprenorphine and

Suboxone) spanning from October 26, 2018, to March 1, 2019 in

violation of 21 U.S.C. § 841(a)(1).  ECF No. 33.  Co-defendant Kristina Truxhall was also charged with the crime alleged in Count One.[1]  Id.

On January 9, 2019, the United States filed before the Magistrate Judge an ex parte "application for order authorizing disclosure of substance abuse treatment records and for authorization to solicit protected information."  ECF No. 31-1. "[P]ursuant to 42 U.S.C. § 290dd-2(a) and 42 C.F.R. §§ 2.64, 2.66, and 2.67," the United States sought through such application "an order authorizing the government to access substance abuse records pursuant to legal process[] and solicit information employing various techniques that may disclose the identities of, and information relating to, substance abuse patients."  Id. at 1.

The subject of the investigation was to be Kesari, "a practitioner who practices in Danville, Boone County, within the Southern District of West Virginia."  Id. at 2.  The application detailed prior "allegations that Dr. Kesari illegally dispensed controlled substances not for legitimate medical purposes in the

---

[1]    Truxhall was acquitted during the jury trial in this matter and is only referenced insofar as her interactions with the undercover agent are pertinent to this opinion.  See ECF No. 247.

usual course of a professional medical practice."[2]  <u>Id.</u>  On December 26, 2018, DEA Diversion Investigator DeAndra Lee spoke with a confidential informant, who alleged that: Kesari had been in California since an unspecified date in November 2018, and that an associate, whose name is redacted but who is presumably Truxhall, had been conducting appointments with patients in his absence and had been writing prescriptions using a pad that had been pre-signed by the doctor.  <u>Id.</u>  In a January 3, 2019 follow-up interview, the informant elaborated on these points and indicated that apart from this associate, no other medical personnel had been present in Kesari's office during the informant's visits there since the doctor's departure for California and that no drug tests were conducted during such appointments.  <u>Id.</u> at 3.

Lee thereafter made an inquiry with the West Virginia Board of Pharmacy's Controlled Substance Monitoring Program seeking information regarding Kesari's prescription history.  <u>Id.</u> at 4.  This inquiry revealed "separate prescriptions issued to [redacted individuals] . . . within the timeframe that Dr.

---

[2]    The factual portion of the copy of the application offered by Kesari contains considerable redactions.  Thus, the court generally describes allegations as discernible from the document and the context of this case.

Kesari allegedly has been in California and not in West Virginia" as well as 217 total prescriptions for controlled substances issued between November 1, 2018, and December 28, 2018. Id. These allegations formed the factual basis for the order sought in the application.

The United States' application stated that since the meaning of "record" is broad under the relevant defining regulation, 42 C.F.R. § 2.11, it sought "a court order which applies not only to disclosure of patient records pursuant to legal process, but also to the employment of investigative techniques that will solicit and disclose, among other things, substance abuse patients' identities, addresses, and phone numbers." Id. at 1 n. 1. Such techniques would include "grand jury subpoenas, surveillance, search warrants, or other legal process." Id. at 4. The application clarified, albeit in a footnote as follows:

> In addition to the use of grand jury subpoenas and obtaining search warrants, the investigative techniques used may include, but are not limited to, the following: surveillance of Dr. Kesari's office; conducting recorded visits to Dr. Kesari's office using either an undercover officer or a confidential informant; surveillance and interviews of former and current employees and/or patients of Dr. Kesari's; obtaining telephone records, including subscriber information, through subpoenas and pen registers of phones believed to be used by employees and patients

4

of Dr. Kesari; the issuance of subpoenas for testimony
by the persons described above; and, review and
analysis of claims data submitted by Dr. Kesari,
pharmacies, or labs seeking payment for Dr. Kesari's
treatment and/or prescriptions.

Id. at 5 n. 2.


The application explained the regulatory requirements

for obtaining an order "authorizing disclosure and use of

records to investigate or prosecute a part 2 program or the

person holding the records" as contemplated by 42 C.F.R. § 2.66

(2017),[3] entitled "Procedures and criteria for orders authorizing

disclosure and use of records to investigate or prosecute a part

2 program or the person holding the records."[4]  Id. at 7.  As the

application recognized, that provision, in turn, directs that

"[a]n order under this section must be entered in accordance

with, and comply with the requirements of, paragraph (d) and (e)

of § 2.64."  Id. (quoting 42 C.F.R. § 2.66(c) (2017)).

---

[3]    It should be noted that insofar as this opinion concerns
whether the Magistrate Judge's order on the application complied
with the relevant regulatory authority, substantive references
to the applicable regulatory provisions pertain to the
provisions in force at the time order was issued.

[4]    A "part 2 program" is a "program" as defined by 42 C.F.R. §
2.11 that receives federal assistance.  42 C.F.R. § 2.11 (2017).
A "program," as relevant here, "is an individual or entity
(other than a general medical facility) who holds itself out as
providing, and provides, substance use disorder diagnosis,
treatment, or referral for treatment."  Id.

Those subsections provide as follows:

(d) Criteria for entry of order. An order under this section may be entered only if the court determines that good cause exists. To make this determination the court must find that:

(1) Other ways of obtaining the information are not available or would not be effective; and

(2) The public interest and need for the disclosure outweigh the potential injury to the patient, the physician-patient relationship and the treatment services.

(e) Content of order. An order authorizing a disclosure must:

(1) Limit disclosure to those parts of the patient's record which are essential to fulfill the objective of the order;

(2) Limit disclosure to those persons whose need for information is the basis for the order; and

(3) Include such other measures as are necessary to limit disclosure for the protection of the patient, the physician-patient relationship and the treatment services; for example, sealing from public scrutiny the record of any proceeding for which disclosure of a patient's record has been ordered.

42 C.F.R. § 2.64(d)-(e) (2017).[5]

---

[5]    The court notes that the scanned copy of the application omits page 9 of the application.  Page 8 ends with a direct quotation to § 2.64(d), "Criteria for entry of order," but that page does not discuss subsections (d)(1)-(e)(3) cited above. ECF No. 31-1, at 8-9.  The court does not view this omission as material inasmuch as the remainder of the application and the Magistrate Judge's subsequent order sufficiently demonstrate compliance with 42 C.F.R. § 2.67.

The United States' application offered the following
to argue that the requirements of 42 C.F.R. §§ 2.64(d)-(e) and
2.66 had been met:

(C) Requirements for Orders

(1) Criteria for Entry of Orders

(a) The records at issue are believed to be
housed at Dr. Kesari's office in Hurricane,
Putnam County, within the Southern District
of West Virginia.  To the government's
knowledge, these records are not currently
available from any other source.

(b) As set forth above, review of patient
files and identification of patients is
necessary to determine whether controlled
substances were illegally dispensed; whether
controlled substances were obtained by fraud
or forgery; and whether medical insurers
were defrauded by having to pay for
uncovered or unnecessary treatments,
counseling sessions, or prescriptions.  The
information contained within the patient
files is necessary to determine if the
offenses under investigation were or were
not committed.  Similarly, surveillance,
phone records, interviews of patients and
former employees, and other investigative
methods, all of which may involve the
acquiring of protected substance abuse
records, including patient identities, are
the only means by which law enforcement can
further this investigation.

(c) The public interest and need for
disclosure outweigh the potential injury to
the patient, the physician-patient
relationship and the treatment services.  In
particular, the conduct under investigation
potentially endangers the health of patients
being treated by Dr. Kesari, in that

7

patients are receiving dangerous drugs
without necessary physician oversight;
physician-patient relationships were
allegedly corrupted or non-existent, and/or
based on incomplete information and/or
fundamentally undermined by interference
from illegal prescription writing.  The
government is not seeking to prosecute the
patients and will treat the information
acquired with due care.  Accordingly, the
public interest and need for disclosure
substantially outweigh any possible injury
to the patient or to any physician-patient
relationship. Indeed, the investigation
seeks to avert further possible harm to Dr.
Kesari's patients and to the public.

(D)  Content of Order

(1) The proposed order limits disclosure of the
records of Dr. Kesari's patients.

(2) The proposed order limits access to the
confidential material to the United States and
federal law enforcement personnel involved in the
investigation and to such experts as the United
States may need to consult to analyze, interpret,
or organize the information contained in the
records.

(3) The United States will comply with a
comprehensive set of procedures to limit
disclosure and maintain control of the records,
as described more fully in Exhibit 1.

(E)  Limitation on Disclosure and Use of Patient
Identifying Information

(1) Procedures to prevent disclosure are
addressed in Exhibit 1. Patient identifying
information will be deleted prior to public
disclosure at trial or in any publicly filed
pleadings, absent further order of this Court.

(2) The United States will not use the
information disclosed as a basis for

8

investigating or prosecuting individual patients
absent further order of this Court allowing such
investigation or prosecution.

ECF No. 31-1, at 9-11.


Exhibit 1 referenced therein stated as follows:


CONFIDENTIALITY OF DISCLOSED RECORDS

This exhibit sets forth the procedures that those with
access to the disclosed substance abuse treatment
records will follow to protect the confidentiality of
the information contained in them and to safeguard
against unauthorized disclosure:

(1) Maintenance: The records and any copies thereof
will be placed in files or folders marked "SENSITIVE."
When not being used, these files or folders will be
stored in a secure room, safe, file drawer, or
cabinet.

(2) Access: Access to the records will be restricted
to those authorized by the order to view them.  Before
a disclosure of any of the records is made to a person
not authorized by the order to view them, all patient
identifying information, including names, will be
redacted from the records intended to be disclosed.

(3) Closed files: When the case is closed, all
substance abuse treatment records obtained pursuant to
the order will either be: 1) placed in a locked
storage facility, in a folder marked "SENSITIVE, DO
NOT DISCLOSE OR DISSEMINATE WITHOUT CONSULTING
COUNSEL," 2) returned to the original record
custodian, or 3) destroyed.

(4) Designation of person to be responsible for the
records: DEA Diversion Investigator DeAndra Lee will
be designated to have primary responsibility for
maintaining the security procedures set forth above.

Id. at 13.

On January 9, 2019, the same day the application was offered by the United States, United States Magistrate Judge Dwane L. Tinsley issued an "order authorizing disclosure of substance abuse treatment records and authorization to solicit protected information." ECF No. 31-2. As pertinent here, the Magistrate Judge acknowledged that the ex parte application sought "an order authorizing the United States to access substance abuse records regarding patients of Sriramloo Kesari, M.D., pursuant to legal process, and to solicit information employing various investigative techniques that may disclose the identities of, and information relating to, substance abuse patients," while recognizing that such application was made, "pursuant to 42 U.S.C. § 290dd-2(a) and 42 C.F.R. §§ 2.64, 2.66, and 2.67." Id. at 1.

The Magistrate Judge specifically found that, "[t]here is reason to believe that the records and information sought are relevant to a legitimate law enforcement inquiry" and that the application has been "filed under seal to avoid alerting the target of the investigation," i.e., Kesari. Id. at 1. The Magistrate Judge further stated that good cause for the order existed inasmuch as:

10

(a) There are no other effective ways of obtaining the information sought, as provided in 42 C.F.R. § 2.64(d)(l); and

(b) The public interest and the need for disclosure of the records outweigh the potential injury to the patients, to the physician-patient relationships, and to the treatment services, as provided in 42 C.F.R. § 2.64(d)(2).

Id. at 1-2.

After making such findings, the Magistrate Judge ordered as follows:

1. The United States may obtain pursuant to legal process, solicit by use of lawful investigative techniques, and use all substance abuse and healthcare patient records relating to the investigation described in the Application and any prosecutions flowing therefrom.

2. As provided in 42 C.F.R. § 2.64(e)(l), disclosure shall be limited to those parts of the patients' records which are essential to the investigation and prosecution of the offenses under investigation, which offenses involve dispensing of controlled substances not for legitimate medical purposes in the usual course of a professional medical practice, manipulating medical records with false statements, and obtaining or assisting others in obtaining controlled substances by fraud.

3. As provided in 42 C.F.R. § 2.64(e)(2), access to the records shall be limited to the United States, federal law enforcement personnel, and state law enforcement personnel involved in the investigation and any subsequent related prosecutions, and to such experts as the United States may need to consult to analyze, interpret, or organize the information contained in the records.

11

4. As provided in 42 C.F.R. § 2.64(e)(3), the United States shall follow the procedures outlined in Exhibit 1 appended to the Application, which are necessary to limit disclosure for the protection of the patients, the physician-patient relationships, and the treatment services.

5. As provided in 42 C.F.R. § 2.66(d)(l), the United States shall delete patient identifying information from any documents made available to the public.

Id. at 2-3.  Kesari did not challenge the January 9, 2019 order's compliance with 42 C.F.R. § 2.66.

The United States thereafter used an undercover agent to visit Kesari's office on four occasions: January 14, 2019, January 23, 2019, February 21, 2019, and March 21, 2019.  ECF No. 31-3; ECF No. 31-4; ECF No. 31-5; and ECF No. 31-6.  The agent's reports from each of these occasions indicate that he "was equipped with a covert audio recording device," which was activated prior to his arrival at Kesari's office.  ECF No. 31-3, at 1; ECF No. 31-4, at 1; ECF No. 31-5, at 2; and ECF No. 31-6, at 3.  Although the undercover agent's reports, as they appear in the record, do not otherwise detail the means of recording used, the recordings produced by the United States indicate that the agent obtained only an audio recording during the January 14, 2019 visit while he obtained video recordings with sound during the January 23, 2019, February 21, 2019, and March 21, 2019 visits.

With the exception of the final March 21, 2019 visit, Kesari was not physically present in his office during these visits.  See ECF No. 31-3; ECF No. 31-4; ECF No. 31-5; ECF No. 31-6.  During the three prior visits, Kesari was in California and conducted appointments by video conference on Truxhall's cell phone.  See ECF No. 31-3; ECF No. 31-4; ECF No. 31-5.

The following exchanges were observed by the undercover agent during the visits: (1) in-person exchanges between the undercover agent and Truxhall; (2) in-person exchanges between Truxhall and third-party patients; (3) exchanges between Kesari and third-party patients or Truxhall regarding the treatment of third-party patients by video conference; (4) in-person exchanges between the undercover agent and third-party patients; (5) in-person and video conference exchanges between the undercover agent and Kesari; (6) in-person and video conference exchanges between Truxhall and Kesari regarding the undercover agent's treatment, which occurred in the presence of the undercover agent and which involved input from the undercover agent;[6] and (7) Truxhall's January 23, 2019

---

[6]     The United States has described such exchanges as "three-way conversations."  ECF No. 44, at 30. This characterization aptly describes the exchanges as presented through the undercover agent's video recordings.

statements over the phone to Mountaineer Drug Company, a
pharmacy at which the undercover agent filled Suboxone
prescriptions obtained from Kesari.  See, e.g., ECF No. 31-3, at
3, 6, 8-9; ECF No. 31-4, at 3; ECF No. 31-5, at 5; ECF No. 31-6,
at 4.  Kesari has not contended, and the recordings do not
indicate, that the undercover agent was ever in areas of the
office where a patient would not otherwise be authorized to be
during these visits.  See ECF No. 31.  In other words, any
observed communications to which the undercover agent was not a
party were, at least, within earshot of the undercover agent
while he was situated in areas of the office which a patient
would be permitted to occupy.

On June 17, 2017, the United States sought and
received a search warrant for Kesari's office, which was
premised, in part, on information obtained by the undercover
agent.  See ECF No. 31-7; see also ECF No. 1, ECF No. 3, ECF No.
4, In the Matter of the Search of The Premises known as S.
Kesari, MD, Inc., located at 81 Prichard Road, Danville, Boone
County, West Virginia, No. 2:19-mj-00062 (S.D. W. Va. 2019).
The search warrant was executed on June 18, 2019.  See ECF No.
5, In the Matter of the Search of The Premises known as S.
Kesari, MD, Inc., No. 2:19-mj-00062.

14

Kesari filed the motion in limine to exclude evidence related to what is described as the illegal search of his office on November 12, 2019.  ECF No. 31.  In the motion, Kesari has advanced several interrelated arguments: (1) the January 9, 2019 order issued by the Magistrate Judge did not comply with the requirements of 42 C.F.R. § 2.67, which prescribes the requirements for orders "authorizing the use of undercover agents and informants to investigate employees or agents of a part 2 program in connection with a criminal matter"; (2) such noncompliance with 42 C.F.R. § 2.67 compels exclusion of evidence obtained by the undercover agent under the relevant regulatory regime; (3) noncompliance with 42 C.F.R. § 2.67 violates Kesari's reasonable expectation of privacy under the Fourth Amendment and compels exclusion of evidence obtained by the undercover agent; (4) the United States' "blatant disregard of the applicable restrictions on the use of undercover agents in substance abuse treatment programs establishes bad faith," which appears to be another Fourth Amendment argument; and (5) the United States violated the surveillance provisions found in Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("the Wiretap Act"), 18 U.S.C. § 2510 et seq., which, in turn, requires exclusion of the evidence recorded by the undercover agent.  See id.

15

During an April 21, 2021 hearing, the court ruled that the Magistrate Judge's January 9, 2019 order of the Magistrate Judge was sufficient to authorize the United States to place an undercover agent in Kesari's office for the purpose of the investigation.  ECF No. 191, at 17:13-18:2.  The court inquired whether, assuming the accuracy of this ruling, counsel for Kesari objected to the admissibility of the evidence, and in particular, the recordings obtained by the undercover agent. Id. at 17:19-18:3.  After considerable exchange and input from the United States, counsel for Kesari indicated that "the trigger for all of this," including admissibility of recorded evidence under the Wiretap Act, "is [] whether the undercover [agent] could lawfully be where he was and lawfully pose as a patient."  Id. at 27:2-4.  Counsel stated, "once that is decided, as I understand the Court has ruled, then I think the rest of this does become admissible, because he's then there and in a lawful manner and can record those interactions pursuant to the order that was entered by the Magistrate Judge."  Id. at 27:8-12.

Notwithstanding this concession, the court noted that it would give the Wiretap Act issue further thought.  See id. at 76:3-4.  The case proceeded to trial, and the January 14,

16

January 23, February 21, and March 21 recordings were admitted into evidence, effectively denying what, if anything, was left of Kesari's motion.  <u>See</u> ECF No. 256, at 4; ECF No. 256-2; ECF No. 256-3; ECF No. 256-4; ECF No. 256-5.

This opinion serves to explain the court's reasons for the denial of the motion, with a particular focus on the January 9, 2019 order's compliance with the applicable regulatory regime as well as the compliance of the recordings at issue with the Wiretap Act.

II.

The court first explains the reasons for its determination that the January 9, 2019 order of the Magistrate Judge was sufficient to authorize placement of the undercover agent in Kesari's office.

Such determination turns on an inquiry into whether that order complied with the requirements of 42 C.F.R. § 2.67. That regulation provides, in full:

> (a) Application.  A court order authorizing the placement of an undercover agent or informant in a part 2 program as an employee or patient may be applied for by any law enforcement or prosecutorial agency which has reason to believe that employees or agents of the part 2 program are engaged in criminal misconduct.

17

(b) Notice.  The part 2 program director must be given adequate notice of the application and an opportunity to appear and be heard (for the limited purpose of providing evidence on the statutory and regulatory criteria for the issuance of the court order in accordance with § 2.67(c)), unless the application asserts that:

(1) The part 2 program director is involved in the suspected criminal activities to be investigated by the undercover agent or informant; or

(2) The part 2 program director will intentionally or unintentionally disclose the proposed placement of an undercover agent or informant to the employees or agents of the program who are suspected of criminal activities.

(c) Criteria. An order under this section may be entered only if the court determines that good cause exists. To make this determination the court must find all of the following:

(1) There is reason to believe that an employee or agent of the part 2 program is engaged in criminal activity;

(2) Other ways of obtaining evidence of the suspected criminal activity are not available or would not be effective; and

(3) The public interest and need for the placement of an undercover agent or informant in the part 2 program outweigh the potential injury to patients of the part 2 program, physician-patient relationships and the treatment services.

(d) Content of order. An order authorizing the placement of an undercover agent or informant in a part 2 program must:

(1) Specifically authorize the placement of an undercover agent or an informant;

18

(2) Limit the total period of the placement to six months;

(3) Prohibit the undercover agent or informant from disclosing any patient identifying information obtained from the placement except as necessary to investigate or prosecute employees or agents of the part 2 program in connection with the suspected criminal activity; and

(4) Include any other measures which are appropriate to limit any potential disruption of the part 2 program by the placement and any potential for a real or apparent breach of patient confidentiality; for example, sealing from public scrutiny the record of any proceeding for which disclosure of a patient's record has been ordered.

(e) Limitation on use of information. No information obtained by an undercover agent or informant placed in a part 2 program under this section may be used to investigate or prosecute any patient in connection with a criminal matter or as the basis for an application for an order under § 2.65.

42 C.F.R. § 2.67 (2017).

Kesari has generally argued that "[a]lthough the government sought and obtained the required court order to obtain Dr. Kesari's patient records," a procedure governed by 42 C.F.R. §§ 2.64 and 2.66, "it did not request authorization to use an undercover agent, and the Court did not authorize the use of an undercover agent."  ECF No. 31, at 2.  But as indicated above, the application stated that the investigative techniques used by the government pursuant to the order sought may include: "surveillance of Dr. Kesari's office; conducting recorded visits

19

to Dr. Kesari's office using either an undercover officer or a confidential informant; [and] surveillance and interviews of former and current employees and/or patients of Dr. Kesari's . . . ."  ECF No. 31-1, at 5 n. 5.

Moreover, the Magistrate Judge's order referenced the United States' request "to solicit information employing various investigative techniques" and directly authorized the United States to "solicit by use of lawful investigative techniques[] and use all substance abuse and healthcare patient records relating to the investigation described in the Application and any prosecutions flowing therefrom."  ECF No. 31-2, at 1-2. Such language does not exist in a vacuum but must instead be considered in light of the application's footnote describing potential surveillance techniques.  The language must also be considered alongside the citations to 42 C.F.R. § 2.67 contained in the application and the order itself.  That regulation, as set forth above, __only__ describes the procedure for the issuance of orders authorizing the placement of undercover agents and informants in part 2 programs to investigate employees or agents thereof in connection with criminal matters.  It serves no other ostensible purpose.  For these reasons, it is apparent that the order's references to the use of various and lawful

20

investigative techniques generally contemplated and authorized the placement of an undercover agent in Kesari's office.

Kesari has also asserted that the order did not comply with the specific requirements of 42 C.F.R. § 2.67(c)-(d).  ECF No. 31, at 6.  Subsection (c)(1) requires a finding that "[t]here is reason to believe that an employee or agent of the part 2 program is engaged in criminal activity."  42 C.F.R. § 2.67(c)(1) (2017).  The January 9, 2019 order referenced the "criminal investigation" described in the application and determined that "[t]here is reason to believe that the records and information sought are relevant to a legitimate law enforcement inquiry," which necessitated that the application be filed under seal "to avoid alerting the target of the investigation."  ECF No. 31-3, at 1.  The application completely concerned the alleged criminal activities of Kesari and an investigation relating thereto.  Thus, the court finds that the order complied with 42 C.F.R. § 2.67(c)(1).

Subsection (c)(2) requires a finding that "[o]ther ways of obtaining evidence of the suspected criminal activity are not available or would not be effective."  42 C.F.R. § 2.67(c)(2) (2017).  The Magistrate Judge found that "There are

no other effective ways of obtaining the information sought, as provided in 42 C.F.R. § 2.64(d)(1)." ECF No. 31-2, at 2. In the context of patient record disclosure authorization orders, 42 C.F.R. § 2.64(d)(1) mandates the same finding as 42 C.F.R. § 2.67(c)(2) does in the context undercover agent placement authorization orders. And as the United States has argued, ECF No. 44, at 17, "[t]here is no reason to believe that 'information' as used in the order does not incorporate everything that was stated in the Government's application, including the potential need to use an undercover agent." This is particularly true in light of the order's citation to 42 C.F.R. § 2.67 and reference to investigative techniques set forth in the application, which contemplated the use of an undercover agent to investigate Kesari.

Subsection (c)(3) requires a finding that "[t]he public interest and need for the placement of an undercover agent or informant in the part 2 program outweigh the potential injury to patients of the part 2 program, physician-patient relationships and the treatment services." 42 C.F.R. § 2.67(c)(3) (2017). The Magistrate Judge found that "[t]he public interest and the need for disclosure of the records outweigh the potential injury to the patients, to the

physician-patient relationships, and to the treatment services, as provided in 42 C.F.R. § 2.64(d)(2)." ECF No. 31-2, at 2. As one might surmise, the finding mandated by 42 C.F.R. § 2.64(d)(2) in context of records disclosure authorization orders resembles the finding prescribed by 42 C.F.R. § 2.67(c)(3). Inasmuch as the order contemplated the use of an undercover agent, this finding of the Magistrate Judge satisfied 42 C.F.R. § 2.67(c)(3).

Subsection (d)(1) requires that an order "[s]pecifically authorize the placement of an undercover agent or an informant." Since the order authorized the use of the investigative techniques described in the application and cites to 42 C.F.R. § 2.67, this requirement was met.

Subsection (d)(2) requires that an order "[l]imit the total period of the placement [of an undercover agent or informant] to six months." 42 C.F.R. § 2.67(d)(2) (2017). The United States has recognized that the order did not explicitly place temporal limits on the investigative methods authorized but insists that Kesari suffered no prejudice inasmuch as the undercover agent operation "did not last longer than around three months." ECF No. 44, at 18. In United States v. Schinderman, 515 F.3d 5, 12-13 (1st Cir. 2008), the First

23

Circuit determined, albeit in the context of analyzing whether 42 C.F.R. § 2.66(b)'s notice provision was violated, that the absence of prejudice weighed against finding a violation of that part 2 regulation as it pertained to the doctor's rights in that case.

The same is true here.  The undercover agent visited Kesari's office on four occasions spanning approximately nine weeks.  Thus, it cannot be said that the failure of the January 9, 2019 order to place a six-month limit on the undercover agent operation substantively affected any rights that the doctor may have under 42 C.F.R. § 2.67 such that a violation could be found.

Subsection (d)(3) requires that an order "[p]rohibit the undercover agent or informant from disclosing any patient identifying information obtained from the placement except as necessary to investigate or prosecute employees or agents of the part 2 program in connection with the suspected criminal activity."  42 C.F.R. § 2.67(d)(3) (2017).  The January 9, 2019 order explicitly limited disclosure of records "to those parts of the patients' records which are essential to the investigation and prosecution of the offenses under investigation . . . ."  ECF No. 31-2, at 2.  The order also

24

provided that "the United States shall delete patient
identifying information from any documents made available to the
public." Id. at 3.  Thus, the order satisfied 42 C.F.R. §
2.67(d)(3).

        Finally, subsection (d)(4) requires an order to
"[i]nclude any other measures which are appropriate to limit any
potential disruption of the part 2 program by the placement and
any potential for a real or apparent breach of patient
confidentiality; for example, sealing from public scrutiny the
record of any proceeding for which disclosure of a patient's
record has been ordered."  42 C.F.R. § 2.67(d)(4).  In addition
to the points discussed in the prior paragraph, which also bear,
to some extent, on subsection (d)(4)'s requirements, the
Magistrate Judge's order limited access to patient records "to
the United States, federal law enforcement personnel, and state
law enforcement personnel involved in the investigation and any
subsequent related prosecutions, and to such experts as the
United States may need to consult to analyze, interpret, or
organize the information contained in the records."  ECF No.
31-2, at 2.  The order also incorporated by reference Exhibit 1
to the application, which provided a mechanism "those with
access to the disclosed substance abuse treatment records will

follow to protect the confidentiality of the information contained in them and to safeguard against unauthorized disclosure." ECF No. 31-1, at 13.  The order accordingly complied with subsection (d)(4).

The United States has conceded that "[a]t base, more detail could obviously have been included in the Court's order and the Government's application . . . ." ECF No. 44, at 19. This is certainly true.  But considering the January 9, 2019 order within the context of the requests made in the application, it cannot be said that the order did not comply with 42 C.F.R. § 2.67 such that the court may find a violation of the regulation as it pertains to Kesari.

### III.

The court notes that the regulatory and Fourth Amendment exclusion arguments advanced by Kesari in his brief on the matter involve the January 9, 2019 order's alleged noncompliance with 42 C.F.R. § 2.67.  ECF No. 31, at 8-14.  This is consistent with counsel for Kesari's position during the April 21, 2021 hearing.  Inasmuch as the court has determined that no violation of 42 C.F.R. § 2.67 occurred and counsel has indicated that exclusion or suppression is not warranted on these grounds if the Magistrate Judge's order complied with 42

26

C.F.R. § 2.67, the regulatory exclusion and Fourth Amendment arguments have no merit.[7]

IV.

That leaves the Wiretap Act arguments.  Congress has provided a statutory mechanism for the suppression of evidence obtained in violation of the Wiretap Act.  See 18 U.S.C. § 2515 ("Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial . . . if the disclosure of that information would be in violation of this chapter."); see also 18 U.S.C. § 2518(10)(a); United States v. Clenney, 631 F.3d 658, 667 (4th Cir. 2011). "The Wiretap Act sets forth in detail procedures for the issuance of orders to allow the interception of wire, oral, or electronic communications" in 18 U.S.C. §§ 2516 and 2518.[8] United States v. Brunson, 968 F.3d 325, 330 (4th Cir. 2020).  It has not been asserted that such procedures were complied with

---

[7]    At any rate, Fourth Amendment considerations inform the analysis on some of the Wiretap Act issues discussed herein. See, infra, at 32-37.

[8]    For the purposes of the Wiretap Act, "'intercept' means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device.'"  18 U.S.C. § 2510(4).

here, and the January 9, 2019 application and order did not reference any provisions of the Wiretap Act.

The Wiretap Act "generally prohibits the unauthorized interception of 'any wire, oral, or electronic communication.'" United States v. Frink, 328 F. App'x 183, 189 (4th Cir. 2009) (quoting 18 U.S.C. § 2511(1)(a)).  But 18 U.S.C. § 2511(2)(c) provides an exception "for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception."

As the United States has argued, ECF No. 44, at 30, the undercover agent, who was indisputably acting under color of law, was a party to the vast majority of the exchanges that were intercepted by recording device.  These include: (1) in-person exchanges between the undercover agent and Truxhall; (2) in-person exchanges between the undercover agent and third-party patients; (3) in-person and video conference exchanges between the undercover agent and Kesari; and (4) in-person and video conference exchanges between Truxhall and Kesari regarding the undercover agent's treatment, which occurred in the presence of the undercover agent and which involved input from the undercover agent.  The undercover agent was a party to such

28

exchanges inasmuch as he was a participant in the conversations. See, e.g., Clemons v. Waller, 82 F. App'x 436, 442 (6th Cir. 2003); United States v. Campagnuolo, 592 F.2d 852, 862-63 (5th Cir. 1979).  Assuming these exchanges constituted wire, oral, or electronic communications, which are the only types of communications protected by the Wiretap Act, e.g., Huff v. Spaw, 794 F.3d 543, 548 (6th Cir. 2015), 18 U.S.C. § 2511(2)(c) precludes their suppression.

The three remaining exchanges are as follows: (1) in-person exchanges between Truxhall and third-party patients; (2) exchanges between Kesari and third-party patients or Truxhall regarding the treatment of third-party patients by video conference; and (3) Truxhall's January 23, 2019 statements over the phone to Mountaineer Drug Company.

The United States cites United States v. Amen, 831 F.2d 373, 378 (2d Cir. 1987), for the proposition that the consent prong of 18 U.S.C. § 2511(2)(c) is met for the exchanges to which the undercover agent was not a party.  ECF No. 44, at 31.  Under 18 U.S.C. § 2511(2)(c), consent to an interception may be express or implied.  E.g., Amen, 831 F.2d at 378.  But "implied consent is not constructive consent.  Rather, implied consent is 'consent in fact' which is inferred 'from surrounding

29

circumstances indicating that the [party] knowingly agreed to the surveillance.'" <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 116-17 (1st Cir. 1990) (alteration in original) (quoting <u>Amen</u>, 831 F.2d at 378); <u>see also</u> <u>Berry v. Funk</u>, 146 F.3d 1003, 1011 (D.C. Cir. 1998) ("Without actual notice, consent can only be implied when [t]he surrounding circumstances [] <u>convincingly</u> show that the party knew about and consented to the interception.") (alterations and emphasis in original) (citation and internal quotation marks omitted).

Thus, the question is not whether there was consent for the undercover agent to hear conversations to which he was not a party, but rather whether there was consent to the interceptions, <u>i.e.</u>, the recordings, themselves. Consent to interceptions by individuals acting under color of law is not as rare as it might seem, and it often arises in the context of prisons monitoring phone calls by inmates. <u>See</u>, <u>e.g.</u>, <u>United States v. Hammond</u>, 286 F.3d 189, 192 (4th Cir. 2002); <u>United States v. Footman</u>, 215 F.3d 145, 154-56 (1st Cir. 2000); <u>United States v. Van Poyck</u>, 77 F.3d 285, 292 (9th Cir. 1996); <u>United States v. Horr</u>, 963 F.2d 1124, 1126 (8th Cir. 1992); <u>Amen</u>, 831 F.2d at 378.

Here, there is no suggestion that Kesari, Truxhall, or anyone present in Kesari's office had any reason to believe that the undercover agent was surreptitiously recording exchanges during his visits thereto.  Accordingly, there was no implied consent to the interceptions, and 18 U.S.C. § 2511(2)(c) does not operate to bar suppression of the remaining three types of exchanges.

With respect to these exchanges, the United States has also posited that to "be an oral communication that is protected by Title III, the speaker must have had a subjective expectation that the communication was not subject to interception, and this expectation must have been objectively reasonable . . . ."  ECF No. 44, at 31 (quoting United States v. Willoughby, 860 F.2d 15, 22 (2d Cir. 1988)).  This assertion derives from the definition of "oral communication" in 18 U.S.C. § 2510(2): "'oral communication' means any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation, but such term does not include any electronic communication."  Kesari has agreed with the United States that the communications at issue in the recordings are oral in nature and does not contend that the statutory definitions of "wire communication"

or "electronic communication," to which Title III Wiretap Act protections also adhere, apply in this case.  ECF No. 31, at 15 (arguing that "[t]o determine whether a [Wiretap Act] violation occurred, the Court must determine whether the undercover agent's recording device (1) 'intercept[ed]' (2) 'oral communications.'") (third alteration in original) (citation omitted).

"The statute's definition of protected oral communications . . . is intended to parallel the 'reasonable expectation of privacy' test created by the Supreme Court in Katz v. United States, . . . and courts therefore apply the same legal framework to suppression motions under either source of authority."  United States v. Paxton, 848 F.3d 803, 808 (7th Cir. 2017) (internal citations and quotation marks omitted) (citing United States v. Larios, 593 F.3d 82, 92 (1st Cir. 2010); United States v. Clark, 22 F.3d 799, 801 (8th Cir. 1994); United States v. McKinnon, 985 F.2d 525, 527 (11th Cir. 1993); In re John Doe Trader No. One, 894 F.2d 240, 242 (7th Cir. 1990)).  Thus, whether oral communications are protected under the Wiretap Act turns on the existence of subjective expectations of privacy that society would consider objectively reasonable.  See Larios, 593 F.3d at 92.

A case offered by Kesari, <u>United States v. Johnson</u>, No. CR09-5703RBL, 2011 WL 13142510, at *1 (W.D. Wash. June 21, 2011), clarifies this issue in the context of physicians' office interceptions. In <u>Johnson</u>, "two undercover agents visited various clinics [operated by the defendant doctor] and used video and/or audio surveillance to record their visits" in furtherance of a health care fraud and illegal distribution of controlled substances investigation. <u>Id.</u> at *1. The doctor filed a motion to suppress pursuant to the Wiretap Act and the Fourth Amendment. <u>Id.</u> at 4. The court first denied the motion insofar as it sought to suppress audio and video recordings of the agents' "communications with Dr. Johnson and others at Dr. Johnson's clinics" inasmuch as such communications were clearly permitted under the 18 U.S.C. § 2511(2)(c) exception for agents acting under color of law. <u>Id.</u> at *4.

The court then turned to the recordings of conversations to which the agents were not parties. Such conversations fell into two categories: those that were overheard in the waiting room area and those that were overheard in the treatment area past the reception desk, which included a nurse's station and private examination rooms. <u>Id.</u> at *6. The court reasoned that there was no reasonable expectation of

privacy for statements recorded while the agents were situated
in the waiting room and could hear the recorded statements with
the unaided ear.  Id. (citing United States v. White, 401 U.S.
745, 751 (1971); United States v. Ortega, 471 F.2d 1350, 1361
(2d Cir. 1972)).

The Johnson court noted that it was "difficult to
ascertain from the recordings whether conversations between
medical providers, including Dr. Johnson, and patients, or
between medical providers about a patient were recorded" while
the agents were in the treatment area.  Id. at *7.  But to the
extent such conversations were recorded while the agents were in
the treatment area, the court concluded that the defendant
doctor would have a subjective expectation of privacy that was
objectively reasonable since, inter alia, the law affords a high
expectation of privacy for medical services provided in private
physicians' offices and "restrict[s] the disclosure of protected
health care information."  Id. at *6 (citing Health Insurance
Portability and Accountability Act of 1996 ("HIPAA"), Pub. L.
104-191, 110 Stat. 1936 (1996); Tucson Woman's Clinic v. Eden,
371 F.3d 1173, 1192 (9th Cir. 2004)).

In this case, the video recordings establish that Truxhall communicated with third-party patients at the reception desk while the undercover agent was seated mere feet away in the waiting room.  There is no indication of any subjective expectation of privacy by any party to such conversations, and even if there were, such expectations would not be reasonable.  Those communications accordingly fall outside the protection of the Wiretap Act as provided by 18 U.S.C. § 2510(2).

Truxhall's statements made to Mountaineer Drug Company over the phone on January 23, 2019 are another matter.  The agent's report indicates that the phone call was placed to determine whether the pharmacy could access the undercover agent's prior Maryland prescription records and whether the pharmacy would fill a monthly, rather than weekly, Suboxone prescription for the agent.  See ECF No. 31-4, at 4.  The video footage reveals Truxhall leaving the reception desk and entering a side room to place the call.  She did not close the door to the side room.  After the call was completed, she returned to the reception desk (mere feet from the undercover agent seated in the waiting room), described the result of the call to the agent, and again described the result of the call to Kesari in a three-way videoconference that included input from the agent.

35

The court notes that the undercover agent's report on the January 23, 2019 visit indicates that the agent observed a few details of what Truxhall said over the phone to Mountaineer Drug Company, but it does not discuss whether such details were perceptible on the recording or merely overheard by the agent himself.  ECF No. 31-4, at 4.  Indeed, Truxhall's statements to the pharmacy are very difficult to hear on the recording.

However, insofar as Truxhall's phone statements are audible on the video recording and the United States seeks to offer the recording into evidence, suppression is not an appropriate remedy.  While Truxhall made the phone call in another room, the undercover agent and his video recording device were situated in the waiting room.  Moreover, the communication to the pharmacy concerned the undercover agent's treatment rather than information concerning the treatment of another patient.  In addition, Truxhall described the result of the phone call to the agent individually and during the three-way conversation with Kesari.  Accordingly, the court finds no reasonable expectation of privacy in the phone communications to the pharmacy such that they may be protected under 18 U.S.C. § 2510(2).

36

As for the video conference exchanges between Kesari and third-party patients or Truxhall regarding the treatment of third-party patients, such communications occurred on at least one occasion during the January 14, 2019 visit.  ECF No. 31-3, at 3-4.  The exact circumstances of the agent's perception of these communications are difficult to discern from the audio recording and redacted report.  Indeed, the audio recording of such exchanges is faint.  But the report appears to indicate that the agent was in the waiting room while he overheard and recorded them.  Id.  Since these exchanges appear to have been audible to the undercover agent while he was present in the waiting room, the court finds that there was, at least, no objectively reasonable expectation of privacy such that 18 U.S.C. § 2510(2) would protect such communications.

Accordingly, the court finds that no violation of the Wiretap Act occurred such that suppression of intercepted exchanges pursuant thereto would be warranted.

V.

For these reasons, suppression of the evidence obtained by the undercover agent was unwarranted.

The Clerk is directed to forward copies of this memorandum opinion and order to the defendants, all counsel of record, the United States Probation Department, and the United States Marshal.

ENTER:  August 25, 2021

John T. Copenhaver, Jr.
Senior United States District Judge