UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

UNITED STATES OF AMERICA

v.                                    CRIMINAL ACTION NO. 2:19-00241

SRIRAMLOO KESARI, M.D.,

MEMORANDUM OPINION AND ORDER

Pending is the "Memorandum in Support of Defendant Sriramloo Kesari, M.D.'s Oral Motion for Judgment of Acquittal or New Trial," filed June 10, 2021.  ECF No. 260.  The government filed a response on July 10, 2021, ECF No. 285, and Kesari filed a reply on July 21, 2021.  ECF No. 286.  The court construes Kesari's memorandum (ECF No. 260) as a timely filed renewed motion for judgment of acquittal or, in the alternative, motion for a new trial.

I.  General Background

Kesari, a medical doctor, treated patients for opioid use disorder at his medical practice, Ram Diagnostics Center, in Danville, Boone, County, West Virginia.  See, e.g., ECF No. 257-10.  Through this medical practice, Kesari prescribed the trade-name drugs Suboxone and (occasionally) Subutex, both of which contain the Schedule III controlled substance

buprenorphine, ECF No. 265, at 46:16-47:7; ECF No. 266, at
91:1-14, for his patients.  <u>See</u>, <u>e.g.</u>, ECF No. 254-7; 255-17;
ECF No. 266, at 205:21-23.

Kesari employed co-defendant Kristina Truxhall as an
office manager.  <u>See</u> ECF No. 268, at 11:8-10.  Truxhall was
registered by the state as a nurse aide from January 7, 2011
through February 28, 2015, at which time her registration
lapsed.  <u>See</u> ECF No. 257-32.  Prior to the lapse of this
registration, Truxhall's last reported nurse aide employment was
with Boone Nursing from May 1, 2011, through June 1, 2011.  <u>See</u>
<u>id.</u>

The Drug Enforcement Administration ("DEA") began to
investigate Kesari's practice in December of 2018.  <u>See</u>, <u>e.g.</u>,
ECF No. 31-1, at 2.  Using the alias "Jason Price," DEA Special
Agent Joshua Tripp visited the practice and obtained Suboxone
prescriptions on four occasions, January 14, 2019, January 23,
2019, February 21, 2019, and March 21, 2019, posing as an opioid
addict and recording each appointment with audio and/or video
recording devices.  <u>See</u> <u>generally</u> ECF No. 256-2; ECF No. 256-2;
ECF No. 256-3; ECF No. 256-4; ECF No. 256-5; ECF No. 272.  DEA
investigators, including DeAndra Lee and Sandra McMillion,
subsequently executed a search warrant at Kesari's office on

2

June 18, 2019.  <u>See</u> ECF No. 280, at 7-19-24; ECF No. 281, at 13:6-14:1.  During the execution of the search warrant, Kesari signed a FORM DEA-104 (07/18), titled "SURRENDER FOR CAUSE OF DEA CERTIFICATE OF REGISTRATION" (hereinafter referred to as the "DEA-104"), and voluntarily surrendered his DEA Certificate of Registration.  <u>See</u> ECF No. 256-26.

Kesari and Truxhall were subsequently charged with criminal counts relating to Kesari's prescribing.  The operative indictment, the Second Superseding Indictment, charged Truxhall and Kesari in Count One with conspiracy to unlawfully distribute buprenorphine and Suboxone in violation of 21 U.S.C. § 846 "[f]rom in or about October 2018, through in or about May 2019." ECF No. 3.  Kesari was charged in Counts Two through Thirteen with individual instances of unlawful distribution of buprenorphine and Suboxone in violation of 21 U.S.C. § 841(a)(1) spanning from October 26, 2018, through March 1, 2019.  <u>Id.</u>  Of particular relevance here are the last three counts.  Counts Eleven through Thirteen concerned Suboxone prescriptions issued to Tripp during his January 14, 2019 (Count Eleven), January 23, 2019 (Count Twelve), and February 21, 2019 (Count Thirteen) appointments with Kesari.  <u>Id.</u>

3

Trial on all charges commenced on May 18, 2021.  <u>See</u>
ECF No. 225.  After the government rested its case, the court
denied the motions of Kesari and Truxhall for judgments of
acquittal on May 25, 2021.  ECF No. 238.  The jury returned its
verdict on May 27, 2021, acquitting the defendants on all
charges with the exception of Count Thirteen, on which Kesari
was found guilty.  ECF No. 246; ECF No. 247.

## II.  The Pending Motions

Kesari filed the pending memorandum on June 10, 2021.
ECF No. 260.  Inasmuch as his earlier oral motion for judgment
of acquittal was denied when made at the close of the
government's case on May 25, 2021, and it does not appear that
he has heretofore made a motion for a new trial, the court
construes the memorandum as a timely renewed motion for judgment
of acquittal or, in the alternative, motion for a new trial
pursuant to Federal Rules of Criminal Procedure 29(c) and 33(b).
The court addresses these issues in turn.

### A.  Renewed Rule 29 Motion for Judgment of Acquittal

Kesari first argues that the evidence was not
sufficient to sustain a conviction on Count Thirteen.  ECF No.
260, at 3-12.

**4**

Under Rule 29(c)(1), a defendant may renew a motion for judgment of acquittal based on the insufficiency of the evidence after a guilty verdict is rendered by the jury. "A judgment of acquittal based on the insufficiency of evidence is a ruling by the court that as a matter of law the government's evidence is insufficient 'to establish factual guilt' on the charges in the indictment." United States v. Alvarez, 351 F.3d 126, 129 (4th Cir. 2003) (quoting Smalis v. Pennsylvania, 476 U.S. 140, 144 (1986)).

However, "a jury verdict 'must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it.'" United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc) (emphasis omitted) (quoting Glasser v. United States, 315 U.S. 60, 80 (1942)). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." Id. (United States v. Smith, 29 F.3d 914, 917 (4th Cir.), cert. denied, 513 U.S. 976 (1994)). The defendant bears a heavy burden, and "reversal for insufficiency must 'be confined to cases where the prosecution's failure is clear[.]'" United States v. Edlind, 887 F.3d 166, 172 (4th Cir. 2018), cert.

5

denied, 139 S. Ct. 203 (2018) (quoting Burks v. United States, 437 U.S. 1, 17 (1978)).  The court does not "weigh the evidence or assess the credibility of witnesses, but assume[s] that the jury resolved any discrepancies in favor of the government." United States v. Kelly, 510 F.3d 433, 440 (4th Cir. 2007) (citing United States v. Romer, 148 F.3d 359, 364 (4th Cir. 1998)).

When prosecuting a doctor under 21 U.S.C. § 841(a)(1), the government must prove: "(1) that the defendant distributed or dispensed a controlled substance; (2) that the defendant acted knowingly and intentionally; and (3) that the defendant's actions were not for legitimate medical purposes in the usual course of his professional medical practice or were beyond the bounds of medical practice."[1]  United States v. Hurwitz, 459 F.3d 463, 475 (4th Cir. 2006) (internal quotation marks and citations omitted).  The third element is distinct from a civil medical malpractice negligence standard in that it requires proof that a doctor prescribed a controlled substance "outside the bounds of . . . professional medical practice."  United States v. McIver, 470 F.3d 550, 558-59 (4th Cir. 2006) (quoting United States v.

---

[1]    The court refers at times to this last element as the "third element" of a 21 U.S.C. § 841(a)(1) charge against a doctor.

6

<u>Alerre</u>, 430 F.3d at 691 n. 9 (4th Cir. 2005)).  Evidence relating to compliance with professional norms is pertinent to the third element inasmuch as "the extent and severity of departures from [] professional norms [] underpin a jury's finding of criminal violations" of 21 U.S.C. § 841(a)(1) by a physician.  <u>Id.</u> at 561.  In reviewing the sufficiency of the evidence, "[t]here are no specific guidelines concerning what is required to support a conclusion that an accused acted outside the usual course of professional practice.  Rather, the court[] must engage in a case-by-case analysis of evidence to determine whether a reasonable inference of guilt may be drawn from specific facts."  <u>United States v. Singh</u>, 54 F.3d 1182, 1187 (4th Cir. 1995) (quoting <u>United States v. August</u>, 984 F.2d 705, 713 (6th Cir. 1992)).

A doctor's good faith "is relevant to a jury's determination of whether the doctor acted outside the bounds of medical practice or with a legitimate medical purpose when prescribing narcotics."  <u>Hurwitz</u>, 459 F.3d at 476.  However, the good faith standard is an objective one, requiring "not merely a doctor's sincere intention towards the people who come to see him, but, rather, . . . his sincerity in attempting to conduct himself in accordance with a standard of medical practice

generally recognized and accepted in the country." Id. at 478
(quoting United States v. Hayes, 794 F.2d 1348, 1351 (9th Cir.
1986)); accord United States v. Boccone, 556 F. App'x 215, 228
(4th Cir. 2014).

        The court instructed the jury that the government must
prove beyond a reasonable doubt that Kesari distributed or
dispensed a controlled substance without a legitimate medical
purpose or outside the usual course of medical practice. See
ECF No. 285-4, at 42-44. In doing so, the court distinguished
the relevant inquiry from that of a civil medical malpractice
negligence standard, emphasizing that the criminal inquiry
involves consideration of prescribing "outside the bounds of
professional medical practice." See id. at 44. The court
instructed the jury that it should consider "the extent and
severity of any violations of professional norms" by Kesari when
determining whether the government had proved this element. Id.
at 42-43. The court noted that the relevant inquiry was whether
Kesari's "authority to prescribe controlled substances was not
being used for treatment of a patient, but for something other
than a legitimate medical purpose, such as assisting another in
the maintenance of a drug habit or the personal profit of the
physician." Id. at 44. In addition, the court explained the

objective good faith standard and explicitly instructed the jury that Kesari need not prove good faith, putting the burden on the government.  See id. at 34-35.

At the outset of this analysis, the court notes that Kesari compares the acquittals on other charges alleged against him, namely, Counts One, Eleven, and Twelve, to the sufficiency of the evidence regarding his conviction on Count Thirteen.  See ECF No. 260, at 7-8, 11.  As the government argues, ECF No. 285, at 6, this approach is not appropriate for the present inquiry. "When the district court reviews the sufficiency of the evidence on a charge, it should compare the government's evidence against the elements of the charged offense, but it should not consider the jury's verdict that the evidence was insufficient on another charge." United States v. Mackins, 32 F.3d 134, 138 (4th Cir. 1994) (citing United States v. Powell, 469 U.S. 57, 67 (1984)); see also, e.g., United States v. Green, 599 F.3d 360, 368-69 (4th Cir. 2010) ("Although we doubt that the jury's acquittal of Green on the telephone count is in any meaningful sense 'inconsistent' with its guilty verdict on the drug conspiracy count, it has long been settled that inconsistent jury verdicts do not call into question the validity or legitimacy of the resulting guilty verdicts.") (citations omitted).

9

The question before the court is a narrow one: whether there was sufficient evidence to support a conviction for Kesari's conduct charged in Count Thirteen.  While evidence relating to some of the other charges, particularly Counts Eleven and Twelve concerning the January 14, 2019, and January 23, 2019, visits by Tripp to Kesari's practice, may be relevant to this inquiry, the jury's decision that the doctor was not guilty of unlawfully prescribing Suboxone to Tripp on these prior occasions is of no consequence.  To the extent Kesari's arguments are premised on the acquittals for any counts alleged against him, they are without merit.

Apart from the allusions to the acquittals on other counts, Kesari generally argues that the evidence concerning the third element of 21 U.S.C. § 841(a)(1) was insufficient to support a conviction on Count Thirteen.  ECF No. 260, at 4-12. In addressing this argument, the court recounts the evidence at trial.

Tripp first attended Kesari's Danville office on January 14, 2019.  During this visit, he signed a form in his intake paperwork acknowledging certain rules of the practice, including a requirement that he return Suboxone "packets," i.e., the wrappers in which Suboxone strips are packaged, when he

10

returned for subsequent visits.  ECF No. 255-20, at 11.  The
form required Tripp to account for full and empty packets, which
was ostensibly a method of ensuring that patients were actually
taking the Suboxone prescribed.  Id.  The same form also stated
that Tripp was required to go to counselling for his opioid use
once a week and that one such counselling appointment should be
an individual appointment with a counselor rather than a group
counselling session.  See id.  The form emphasized this rule,
advising that there were no exceptions to it and that an
inability to take off work was not an excuse to miss
counselling.  Id.  The form stated, "**NO COUNSELLING = NO
MEDICATION!!!**."  Id.  (emphasis in original).  The same form
advised that random in-house urine drug screens would be
conducted and that a failed urine drug screen would result in
the urine sample being sent out for secondary confirmation by a
lab, with the patient to bear the costs, as well as a probation
period for the patient.  Id.

     The practice also had signs posted reinforcing
wrapper, counselling, and urine drug screen requirements.  See
ECF No. 256-8 (sign stating "NO COUNSELLING . . . NO
MEDICATION!!" and requiring patients to attend at least two
counselling sessions per month, with one being an individual

session and another being a group session) (emphasis in original); ECF No. 256-14 (sign stating "No Wrappers, No Prescription, No Exceptions!" and "Every Patient Must Go to Counselling!!  At least (2) sessions, Every Month!  Must provide proof of counselling to be put in file!  Failure to Attend Counselling, can and will result in termination!") (emphasis in original); ECF No. 256-17 (sign stating that patients were required to provide a drug screen and used and unused packets "BEFORE [THEY] WILL BE GIVEN ANY MEDICATION OR SEEN ANY FURTHER.") (emphasis in original).

Another sign posted in Kesari's office set forth appointment pricing, including $90 charges for "1 week," $150 charges for "2 weeks," and $270 charges for "4 weeks."  ECF No. 256-15.  Tripp explained during his testimony at trial that "new patients typically [would] go one week at a time for about a month before going to a one-month prescription."  ECF No. 272, at 87:16-18.  According to Tripp, the monthly visits would save patients money inasmuch as they would only pay Kesari $270 per month rather than $90 per week.  See id. at 88:4-18.

These charges by Kesari were separate from the costs of filling the prescription at a pharmacy.  For example, Tripp paid $419.49 to fill the February 21, 2019 prescription at issue

in Count Thirteen, see ECF No. 255-17, after paying $270 for his appointment with Kesari that same date.  See ECF No. 272, at 122:9-14.

Tripp received a one-week prescription from Kesari on January 14, 2019, the date of his initial visit to the doctor's office, and a one-month prescription during his January 23, 2019 appointment.  See ECF No. 255-16; ECF No. 257-11.  On both occasions, he saw Kesari, who was in California at the time for his wife's cancer treatment, by Skype videoconference call on Truxhall's cell phone.  See ECF No. 256-2; ECF No. 256-3; ECF No. 257-6; ECF No. 272, at 209:1-20.  The agent paid $90 for the January 14, 2019 visit and $270 for the January 23, 2019 visit. ECF No. 272, at 71:19-21, 102:1-5.  The January 14, 2019, and January 23, 2019, visits were logged in the practice's electronic medical records.  See ECF No. 257-8.

Tripp returned to Kesari's office on February 21, 2019, the date of the Count Thirteen charge.  He testified that he did not think he brought empty Suboxone wrappers to the appointment on that date.  ECF No. 272, at 118:19-119:2.  The video recording of this visit demonstrates that upon his arrival at the office, Truxhall asked Tripp whether he was "still doing a month," to which Tripp responded "if you would, $270?"  ECF

13

No. 256-4, at 4:13-4:15.  Tripp proceeded to pay the $270 in cash to Truxhall.  Id. at 4:22; see also ECF No. 272, at 117:12-14.

Tripp performed a urine drug screen, pouring a methamphetamine metabolite into the urine sample so that the sample would test positive for methamphetamine.  ECF No. 272, at 115:18-21.  Tripp testified that he expected the sample to test "positive for meth and negative for all other[ drugs]," including Suboxone.  ECF No. 272, at 115:24-25.  When Truxhall examined the results of the urine drug screen, she noted that Tripp had tested negative for Suboxone and had none of the prescription drug in his system.  ECF No. 256-4, at 15:46-15:56.  Truxhall also noted that Tripp tested positive for methamphetamine.  See id. at 15:09-18:17.  Truxhall instructed Tripp to dump the sample in the toilet and throw the urine drug screen container in a biohazard trash can, which he did.  Id. at 18:34-19:02.

Truxhall then dialed Kesari, who was not yet back from California, for a videoconference call with Tripp.  Id. at 19:31-19:38.  The conversation between Tripp and Kesari occurred as follows:

Truxhall: I got this guy, you remember him?

Tripp: Hey Doc.

Kesari: Hey, yeah, yeah.  How are you doing?

Tripp: Good, how are you?

Kesari: Good, good.  Everything okay?

Tripp: It's going good.

Kesari: Okay.  Any problems or any issues?

Tripp: Not for me.

Kesari: Okay, okay.  She will take care of you, okay?

Tripp: Thank you.

Id. at 19:59-20:21.  This exchange lasted 22 seconds.  See id.
Truxhall immediately proceeded to hand Tripp a receipt and a
prescription script, Tripp thanked her, and she and Kesari, who
was still on the videoconference call, responded "You're
welcome."  Id. at 20:21-20:33.  Kesari and Truxhall proceeded to
discuss gasoline prices on the videoconference call as Tripp
left the office.  Id. at 20:33-20:55.

It is not entirely clear from the video evidence when
the prescription was filled out.[2]  At any rate, Tripp testified,
and the relevant prescription script shows, that the substantive

---

[2]      The court notes, however, that Truxhall may have filled out
the prescription script while Tripp was providing his urine drug
screen sample or while he was in the waiting room prior to the
conversation with Truxhall regarding his urine drug screen
results.

Suboxone dosage information, providing a one-month supply, was computer-printed.  See ECF No. 255-17; ECF No. 272, at 120:20-121:10.  The computer-typed date is January 23, 2019, i.e., the date of Tripp's second appointment, but Tripp testified that it was issued on February 21, 2019, and the pharmacy sticker attached to the script indicates that it was filled on February 21, 2019.  See ECF No. 255-17; ECF No. 272, at 120:21-22.

This prescription was also signed in writing by Kesari.  See ECF No. 255-17.  During her testimony, DEA Diversion Investigator DeAndra Lee stated that blank prescription scripts had been mailed to Kesari in California, who signed them and mailed them back to his practice in Danville.  ECF No. 281, at 8:9-11.

The evidence accordingly strongly suggested that the prescription script obtained by Tripp on February 21, 2019, had been pre-signed by Kesari and mailed back to his practice in Danville, whereupon Truxhall accepted Tripp's $270, filled the substantive dosage information out by computer, and printed the script by or immediately after the 22-second exchange between Tripp and Kesari.  Truxhall promptly gave the script and a receipt to Tripp while Kesari was still on the videoconference

16

call, effectively ending the appointment.  Notably, no electronic medical record or paper records documenting this appointment were introduced into evidence.  <u>See</u> ECF No. 255-19; ECF No. 255-20; ECF No. 257-8; ECF No. 257-10; ECF No. 258-2.

Tripp returned to the office on March 21, 2019, whereupon he was provided with a final one-month Suboxone prescription and discharged from the doctor's practice after stating that he had sold Suboxone to a coworker.  <u>See</u>, <u>e.g.</u>, ECF No. 257-10.  This March 21, 2019 prescription was not the subject of an individual 21 U.S.C. § 841(a)(1) count alleged in the second superseding indictment.  <u>See</u> ECF No. 33.

Government expert Robert Andrew Chambers, M.D., an addiction psychiatrist and associate professor of psychiatry at Indiana University School of Medicine, gave testimony regarding the February 21, 2019 appointment.  ECF No. 265, at 6:17-7:4; ECF No. 266, at 138:12-143:23.  Dr. Chambers generally testified that it is outside the usual course of medical practice "for patient records to not accurately reflect what occurs in each patient" visit inasmuch as "[i]naccuracies in the record can produce mistakes in care that can hurt people."  ECF No. 266, at 105:10-24.  He specifically testified that he was unable to

17

locate any records documenting Tripp's February 21, 2019
appointment.  Id. at 142:9-13.

Dr. Chambers also offered the following testimony
regarding the February 21, 2019, urine drug screen:

> Q. At any point during the interaction, did Dr. Kesari
> inquire as to the results of any drug screen that had
> been done?
>
> A. I don't believe so, on that particular session.
>
> Q. Assuming, hypothetically, that a patient that
> received a prescription for a 28-day supply of
> Suboxone on January 23rd, 2019, came in on February
> 21st, 2019, gave a urine sample as part of a urine
> drug screen, and that sample indicated that the
> patient tested negative for Suboxone and positive for
> methamphetamine; per that hypothetical, do those
> results concern you?
>
> A. Absolutely.
>
> Q. Why is that?
>
> A. It shows a couple things. One is that they are not
> compliant — A [sic], they are not compliant on the
> treatment for opiate addiction that you're
> prescribing.  Two, there is no opiate addiction.  And
> three, there may be methamphetamine addiction.
>
> Q. Why do you say there is no opioid addiction?
>
> A. Well, there is no opiate in the urine.
>
> Q. What about methamphetamine then?
>
> A. Yeah, there is.  So there is meth in the urine,
> which indicates a person's using meth, which implies a
> strong signal that it would be a methamphetamine
> addiction.

18

Q. And so what does the usual course of medical practice dictate as to those results from the urine drug screen?

A. Well, that requires an extended conversation between the physician and the patient to understand what the patient is actually doing.  What is their pattern of drug use around methamphetamine[?]  Why is there no Suboxone in the urine?  When have you been using it?  Did you use it at all?  You know, did you sell it to get methamphetamine?  All those questions.

ECF No. 266, at 140:19-142:1.

Dr. Chambers acknowledged on cross-examination that individuals other than addiction psychiatrists, including non-addiction psychiatrist physicians, nurse practitioners, clinical nurse specialists, certified nurse anesthetists, physician assistants, and certified nurse midwives, may be able to prescribe buprenorphine.  Id. at 314:18-317:6.  He qualified this testimony by stating that such individuals "need training in the diagnostic and evaluative procedures that would inform Suboxone delivery."  Id. at 317:21-23.

When Chambers was asked whether Kesari's treatment of Tripp during the February 21, 2019 appointment was outside the usual course of medical practice and without a legitimate medical purpose, he responded that it was inasmuch as there was "a whole collection of problems," including "a total lack of any professional medical expertise or involvement . . . no exam, no

19

evaluation, no use of testing." Id. at 142:14-22.  Chambers similarly opined that "there was no medical practice" during the February 21, 2019 encounter between Kesari and Tripp since it was "devoid of a normal evaluation[,] examination and testing[,] and a treatment plan."  Id. at 139:17-25.

Dr. Chambers opined that the February 21, 2019 prescription was issued outside the usual course of medical practice since there was "[n]o exam, no evaluation, apparently fraudulent medical record-keeping, overlapping scripts with other scripts, improperly dated scripts," as well as issued without a legitimate medical purpose and beyond the bounds of medical practice for similar reasons.  Id. at 158:9-160-9.  Dr. Chambers was also asked whether his opinion about the February 21, 2019 prescription was "contingent upon whether or not Dr. Kesari saw Mr. Price [Tripp] in person or over Skype on his cell":

> A. It's the same opinion, regardless of Skype or in person.
>
> Q. Is that true in terms of your opinion regarding it being outside the usual course of medical practice?
>
> A. Yes.
>
> Q. Without a legitimate medical purpose, and beyond the bounds of medical practice?
>
> A. Yes.

20

<u>Id.</u> at 160:10-19.

Kesari's expert Kelly Clark, M.D., a Board-certified physician in psychiatry and addiction medicine with an extensive background consulting in addiction medicine, also testified as to the legitimacy of the February 21, 2019 appointment.  <u>See</u> ECF No. 273, at 6:13-8:13, 84:20-85:10.  The testimony proceeded:

> Q. And are you aware that the government alleges that . . . the January 14th, 2019, the January 23, 2019, and February 21, 2019 prescriptions [for Tripp] . . . are drug deals?
>
> A. Yes.
>
> Q. Do you have an opinion regarding the medical legitimacy of those prescriptions?
>
> A. Yes.
>
> Q. Were they issued within the usual course of professional practice?
>
> A. Yes.
>
> Q. Were they written for a legitimate medical purpose?
>
> A. Yes.
>
> Q. And were they written in good faith?
>
> A. Yes.

<u>Id.</u> at 84:20-85:10.  Dr. Clark did not specifically opine as to why the February 21, 2019 prescription was within the usual course of professional practice, written for a legitimate

21

medical purpose, and provided in good faith.   See id. at

84:5-92:3.

Dr. Clark also opined about the propriety of Kesari's

practice with respect to addiction treatment:

> Q.  Dr. Chambers testified at length about the
> requirements - or his perception of the requirements
> relating to an opioid use disorder treatment clinic.
> Are those requirements applicable to Dr. Kesari; why
> or why not?
>
> A. Absolutely not.  Absolutely not.  There are
> treatment clinics, there are treatment programs, there
> are programs and clinics that have multiple clinicians
> there, usually, that are licensed by the state for
> whatever levels of care they're providing.
>
> . . .
>
> Dr. Kesari did not run a treatment program.  He did
> not run an addiction clinic.  He was doing
> office-based opioid treatment.  He was doing OBOT in a
> doctor's office.  And all it is is office-based opioid
> treatment.  He was not treating methamphetamine
> addiction.  He was not treating - he was not, you
> know, assessing and treating all of the other things
> that Dr. Chambers was talking about.  He was doing a
> specific thing in a doctor's office, because we
> have - he is doing what the federal government on the
> treatment side are saying we need more of, prescribing
> Buprenorphine for opioid addiction.  That's what he
> was doing, in a doctor's office.  Not an addiction
> treatment clinic.

Id. at 39:17-40:25.  On cross-examination, Dr. Clark conceded

that it is "counter-therapeutic" to allow a patient to "falsely

claim [he is] not using drugs of abuse, but [is] only taking the

prescribed substances," and further testified that allowing a

patient to lie about a drug test can amount to colluding with the patient, in which case "[the doctor is] not working as a doctor; [he is] harming the patient."  Id. at 115:3-25.

When asked of her opinion regarding Kesari's adherence to the office's signs and paperwork policies, Dr. Clark responded:

> A.  . . . [I]t's always a good idea to follow your policies and procedures. I see lots of notes saying, "Payment due in 30 days. No exception."  Okay. That is an internal policy.  Okay. It is not the same thing as telling the state or billing insurance - which is another issue around this - that you are going to be providing all of this stuff in order to get your license to be a treatment center.  These were his internal things that he set himself up as a bar, and while it might be good to do that, it's not needed, required, must, illegal not to.

Id. at 41:6-16.

In addition, Dr. Clark testified on direct examination that Kesari, "as a general practitioner prescribing Buprenorphine, could [] have [prescribed] within the usual course of professional practice and not even used the medical record . . . ."  Id. at 65:7-11.  On cross-examination, Dr. Clark acknowledged that medical notes should, "[t]o the best of [the] ability of the person writing them," be "truthful and honest and factual."  Id. at 110:20-24.  Dr. Clark stated that it "is possible" that she had "said in the past that [medical]

23

records that make[] no sense because of inconsistencies can suggest that a physician is either incompetent or does not care."  Id. at 111:7-11.  The government also questioned Dr. Clark about her testimony as an expert for the Department of Justice from a prior case:

> Q. In the Abovine case, . . . I'm going to read [your testimony] aloud, and you can follow along silently . . . . "I can tell you it is the responsibility of a doctor to be writing down why you are prescribing a controlled substance, like an amphetamine, risks, benefits, and alternatives, getting an informed consent.  And I had not seen anything in the record that showed that amphetamine" - in [the Abovine] case, that was the controlled substance – "was going to be prescribed to this particular patient."  . . . .  Did I read that correctly?
>
> A. That's correct.

Id. at 110:4-18.  Dr. Clark also acknowledged that she had testified as an expert for the Department of Justice in a different prior case that "[t]he medical record should read like a book," although she qualified this prior statement as pertaining to clinics unlike Kesari's office.  ECF No. 273, at 108:20-109:10.

Dr. Clark testified regarding the propriety of pre-signed prescription scripts on direct examination:

> Q. Is it ever appropriate for a physician to pre-sign a prescription?

24

A. . . . "[A]ppropriate" is not really a good word in court.  [It w]ouldn't be my primary choice here.  So pre-signing a prescription, it is like pre-signing a check in your checkbook or checks in your checkbook. Is it illegal to pre-sign checks in your checkbook? No. Is it a good idea?  No, it's not a good idea. Because you are responsible for whatever goes on top of that, right.  Those blank checks are going to be paid because it's got your name on it.  And the same way for a pre-signed prescription, that prescriber is responsible for what actually goes out.  And in this case, Dr. Kesari instructed Ms. Truxhall to not be sending out prescriptions that he didn't approve.

Id. at 60:4-19.  During cross-examination, Dr. Clark was questioned about prior testimony on this issue while serving as an expert witness for the Department of Justice:

Q.  . . . Now, you were asked in the Abovine case . . . : "Can a nurse practitioner write prescriptions on a prescription pad that the doctor has already signed, and let's limit that to controlled substances?"  "Answer: Appropriately, no, no, no, no, no."  Five "Noes."  Did I read that correctly?

. . .

A.  That's correct.

Id. at 104:17-105:10.  Like Dr. Chambers, Dr. Clark testified that non-doctors, including physician assistants, nurse practitioners, and certified nurse midwives, may prescribe buprenorphine.  Id. at 32:22-33:6.

Several points demonstrate that the evidence was sufficient to support a conviction on Count Thirteen.  First, a superficial or inadequate physical examination is indicative of

25

prescribing without a legitimate medical purpose in the usual course of professional medical practice or outside the bounds of professional medical practice.  See, e.g., United States v. Moore, 423 U.S. 122, 142-143 (1975); United States v. McIver, 470 F.3d 550, 558, 564 (4th Cir. 2006); United States v. Tran Trong Cuong, 18 F.3d 1132, 1137-38 (4th Cir. 1994).  The jury could reasonably infer that Kesari's physical examination of Tripp on February 21, 2019, was non-existent.  His conversation with the patient lasted 22 seconds, most of which was an exchange of amenities, and it lacked any substantive inquiry into Tripp's condition with only one question and answer: "Q: Any problems or any issues?"; A: "Not for me."  ECF No. 256-4, at 19:59-20:21.  And Dr. Chambers' testimony regarding the February 21, 2019 appointment emphasized the lack of an examination of the patient as a ground for concluding that the prescription was issued outside the usual course of professional medical practice and without a legitimate medical purpose.

Second, the Fourth Circuit has found evidence sufficient to sustain convictions in cases where the government presented expert testimony concerning prescriptions issued despite "red flag" drug screens, including negative tests for the prescribed controlled substance and positive tests for other

controlled substances.  See Boccone, 556 F. App'x at 226,

231-32; McIver, 470 F.3d at 556, 564.  Dr. Chambers opined as to

the red flag associated with a urine drug screen that is

positive for methamphetamine and negative for opioids.  Dr.

Clark, Kesari's own expert, conceded on cross-examination that

it is counter-therapeutic to allow a patient to lie about drug

test results.  Kesari contends that he cannot be held

accountable for the February 21, 2019 urine drug screen since he

was not informed of the negative Suboxone and positive

methamphetamine results.  ECF No. 260, 7-8; ECF No. 286, at 5.

But the video demonstrates that he did not inquire as to the

urine drug screen's results during the 22-second encounter with

Tripp.[3]  Similarly, he made no inquiry regarding the Suboxone

wrappers from the January 23, 2019 prescription, the absence of

which, like the negative test for Suboxone in the urine drug

screen, would have indicated no Suboxone usage and no opioid

addiction.  Given the expert testimony on the issue, the jury

could reasonably infer that Kesari's failure to inquire about

---

[3]     This stands in contrast to the January 14 and January 23
appointments during which Kesari did, in fact, inquire as to
Tripp's urine drug screen results.  See ECF No. 256-2, at
1:30:09; ECF No. 256-3, at 6:52.

the urine drug screen results was consistent with illegal prescribing.

Third, a lack of appropriate documentation is also a red flag connoting illegal prescribing.  See Boccone, 556 F. App'x at 225-26; Alerre, 430 F.3d at 686.  There appears to have been no medical record kept by Kesari documenting the February 21, 2019 appointment.  Dr. Chambers opined that it was outside the usual course of medical practice "for patient records to not accurately reflect what occurs in each patient" since "[i]naccuracies in the record can produce mistakes in care that can hurt people."  ECF No. 266, at 105:10-24.  Dr. Clark's statements on direct examination may have indicated the contrary, but Dr. Clark also acknowledged prior testimony (on behalf of the Department of Justice) regarding the importance of accurate medical records on cross-examination.  The jury could reasonably infer that the lack of any medical record for the February 21, 2019 visit was consistent with unlawful prescribing.

Fourth, the Fourth Circuit has upheld convictions where defendant physicians allowed an unauthorized individual to prescribe controlled substances.  See United States v. Naum, 832 F. App'x 137, 139, 143-44 (4th Cir. 2020); Boccone, 556 F. App'x

28

at 230-31.  Kesari posits that <u>Naum</u> is inapposite since
"[b]ecause it is beyond dispute that Dr. Kesari saw all of his
patients either in person or via telemedicine before Dr. Kesari
authorized a prescription to be issued" and "did not provide
prescribing authority to Ms. Truxhall or anyone else."  ECF No.
286, at 9.

        But the jury could reasonably reach the opposite
conclusion.  Truxhall had limited medical experience, and her
nurse aide registration lapsed four years prior to the February
21, 2019 appointment.  More significantly, she did not fit
within the categories of professionals who, according to Drs.
Chambers and Clark, may prescribe buprenorphine.  The video
footage demonstrates that Truxhall asked Tripp whether he was
"still doing a month" and accepted $270 in payment prior to the
videoconference call with Kesari.  At some point prior to the
videoconference call, Truxhall filled out by computer the
substantive dosage information on the pre-signed prescription
script and printed the script.  Kesari made no inquiry and gave
no instruction regarding the appropriate dosage for Tripp during
the videoconference call.  At the end of the 22-second encounter
with Tripp, Kesari stated that Truxhall would "take care of"
Tripp.  Truxhall then immediately handed the script and

corresponding receipt to Tripp while Kesari was still on the videoconference call. Given this sequence of events, the jury could reasonably conclude that Kesari had, in effect, delegated his prescribing authority to the unqualified Truxhall.

Fifth, the jury could reasonably infer that the $270 cost of Tripp's February 21, 2019 appointment was tied directly to the amount of Suboxone prescribed (a four-week supply) rather than the care provided. In Moore, the defendant doctor "used a 'sliding-fee scale' pegged solely to the quantity prescribed, rather than to the medical services performed. The fees ranged from $15 for a 50-pill prescription to $50 for 150 pills.". Moore, 423 U.S. at 126. The Supreme Court considered the fact that the doctor "did not charge for medical services rendered, but graduated his fee according to the number of tablets desired" to be evidence of conduct "exceeding the bounds of 'professional practice.'" Id. at 142-43. In this case, the jury could reasonably determine that the $270 cost of Tripp's February 21, 2019 appointment was attributable to a fee scale graduated by the number of Suboxone doses prescribed, e.g., $90 for a one-week supply or $270 for a four-week supply, rather than the medical services rendered.

30

These points, in the aggregate, indicate that there was sufficient evidence to satisfy the third element of 21 U.S.C. § 841(a)(1) and sustain a conviction on Count Thirteen of the Second Superseding Indictment.  The jury could reasonably conclude that Kesari issued the February 21, 2019 prescription to Tripp without a legitimate medical purpose, outside the usual course of professional medical practice, outside the bounds of medical practice, and without an objective good faith attempt to comport with the generally recognized standard of medical practice in this country.

The court next briefly addresses Kesari's other arguments regarding the sufficiency of the evidence.  Kesari posits that "[w]ithout evidence that Dr. Kesari intended to violate the bounds of the usual course of professional practice, the government's case fails."  ECF No. 260, at 10; see also ECF No. 286, at 10 (arguing that the government "need[ed] to prove that Dr. Kesari possessed the specific intent to issue a controlled substance outside the contours of the law and . . . that Dr. Kesari acted other than in objective good faith.").

This court recently considered a similar argument in United States v. Houdersheldt, No. 3:19-00239, 2020 WL 7646808, at *5 (S.D. W. Va. Dec. 23, 2020).  In Houdersheldt, the

defendant argued that "that the jury should have been required to find not only that he intentionally dispensed a controlled substance, but that he also intentionally acted without a legitimate medical purpose or beyond the bounds of medical practice."  Id.  Noting that the "Fourth Circuit has not expressly addressed this issue," Judge Chambers remarked that:

> [n]evertheless, [Hurwitz's] analysis of the good faith instruction can be instructive. In Hurwitz, the [Fourth Circuit] held that the district court erred by refusing to include a good faith instruction but determined that the defendant was not entitled to the subjective good faith standard he requested. Id. at 478.  The court reasoned that "allowing criminal liability to turn on whether the defendant-doctor complied with his own idiosyncratic view of proper medical practices is inconsistent with the Supreme Court's decision in Moore."  Hurwitz, 459 F.3d at 478. This interpretation of Moore indicates that a jury need not find that the defendant intentionally acted outside the bounds of medical practice, but simply that the defendant acted without objective good faith.

Id. at *7.  Ultimately, the court did not decide the issue but instead found that the instructions given satisfied the standard advocated by the defendant.  Id. at *7-8.

In this case, elements of the offense charged in Count Thirteen were given to the jury as follows:

> FIRST:   That Defendant SRIRAMLOO KESARI, M.D. knowingly and intentionally distributed a quantity of a Schedule III controlled substance as more specifically identified and described in Counts Two

through Thirteen of the Second
Superseding Indictment;

SECOND:   That at the time of such distributions,
Defendant SRIRAMLOO KESARI, M.D. knew
that the substances distributed were
controlled substances under the law;
and

THIRD:   That Defendant SRIRAMLOO KESARI, M.D.'s
actions were not for a legitimate
medical purpose or were outside the
usual course of professional medical
practice and were not in good faith.

See ECF No. 285-4, at 40.  Kesari made no objection at trial to

the elements instruction or any other instruction given to the

jury.  And as noted earlier, the court instructed the jury as to

the objective good faith standard in accordance with the law on

the matter.

Kesari also posits that "there is no evidence that any

deviations from the standard of care were systemic or drastic,"

likening the conviction equivalent to a finding of civil

liability.  ECF No. 260, at 11-12.  He cites McIver, 470 F.3d at

559, and Alerre, 430 F.3d at 691, in support of this

proposition.  The McIver court stated "we [have] recognized that

evidence that a physician 'deviated drastically from accepted

medical standards' is probative of criminal liability."  470

F.3d at 559 (quoting Alerre, 430 F.3d at 691).  Alerre noted

"evidence that a physician's performance has consistently

33

departed from accepted professional standards supports the
proposition that the physician was not practicing medicine, but
was instead cloaking drug deals under the guise of a
professional medical practice."   430 F.3d at 691.

    As the government argues, see ECF No. 285, at 12-13,
however, neither case provides that systemic, drastic, or
consistent violations of the applicable standard of care are
necessary conditions for satisfaction of the third element.
Indeed, as above noted, "[t]here are no specific guidelines
concerning what is required to support a conclusion that an
accused acted outside the usual course of professional
practice," and courts are to evaluate the evidence on a
case-by-case basis.   Singh, 54 F.3d at 1187 (citation omitted).
And the evidence in this case bears multiple hallmarks of
illegal prescribing under 21 U.S.C. § 841(a)(1).
Notwithstanding these points, Dr. Chambers' testimony that
"there was no medical practice" during the February 21, 2019
encounter between Kesari and Tripp would appear to comport with
a "drastic" deviation from the standard of care.   ECF No. 266,
at 139:17-25.

34

Finally, Kesari briefly makes a related argument that the February 21, 2019 "encounter was entirely unnecessary" inasmuch as "Suboxone is a Schedule III controlled substance, [and] Dr. Kesari could have written [Tripp] an initial prescription with up to five refills or orally called in up to five refills" under 21 C.F.R. § 1306.22.  ECF No. 260, at 12. "In other words," Kesari contends, "the fact that [Tripp] continued to receive Suboxone approximately one month after his initial visit was not a departure from the standard of care, let alone a drastic one, and a judgment of acquittal is necessary." Id.  The government asserts, in an equally brief argument, that 21 C.F.R. § 1306.22 "does not displace the standard of care required here, which is that a prescription must be issued in the usual course of professional practice and in good faith." ECF No. 285, at 14 n. 7.

Again, the evidence, including expert testimony, was sufficient to demonstrate the third element of 21 U.S.C. § 841(a)(1) for physician prosecutions inasmuch as it could support a finding of prescribing without a legitimate medical purpose, outside the usual course of professional medical practice, beyond the bounds of medical practice, and other than in good faith.  And perhaps more significantly, Kesari's

suggestion of legal behavior under 21 C.F.R. § 1306.22's refill provisions is totally detached from the facts of the case. Kesari did not authorize refills for Tripp nor did he offer to gratuitously call-in a refill on February 21, 2019.  Instead, the doctor was paid $270 for the visit on that date and Tripp received in return a prescription for a one-month supply of Suboxone.

For these reasons, the court finds that the evidence was sufficient and the instructions to the jury adequate to sustain a conviction on Count Thirteen.  Kesari's renewed Rule 29 motion is denied.

### B.  Rule 33 Motion for a New Trial

Kesari offers two groups of arguments with respect to his alternative Rule 33 motion for a new trial: (1) those concerning the weight of the evidence; and (2) those concerning remarks made by the government during closing arguments.  <u>See</u> ECF No. 260, at 12-22.

### i.  Weight of the Evidence Arguments

Kesari argues that the court should grant a new trial under Rule 33 inasmuch as Dr. Chambers was not credible for two reasons: (1) he testified to the necessity of psychiatric

36

evaluations prior to the issuance of Suboxone prescriptions despite acknowledging that certain non-psychiatrists and non-doctors may issue such prescriptions; and (2) he ignored evidence favorable to Kesari, namely, a November 9, 2018 note from Kesari documenting a normal drug screen for patient Shawn Shaffer, while relying instead on misleading evidence unfavorable to Kesari, namely, a prepopulated electronic medical record that mistakenly indicated that Shaffer had tested positive for methamphetamine, morphine, and MDMA on November 9, 2018.  See ECF No. 260, at 13-14.  Kesari also argues that any deviations from the applicable standard of care were "attributable in part to Dr. Kesari being distracted by his wife's terminal cancer — which the jury heard was the sole and undisputed reason why Dr. Kesari was [in California,] away from West Virginia[,] and serves to inform a rational factfinder's determination of his good faith."  Id. at 14.

The court maintains the discretion to grant a new trial pursuant to Rule 33(a) "if the interest of justice so requires."  Fed. R. Crim. P. 33(a); United States v. Millender, 970 F.3d 523, 531 (4th Cir. 2020).  "In deciding a motion for a new trial, the district court is not constrained by the requirement that it view the evidence in the light most

37

favorable to the government.  Thus, it may evaluate the credibility of the witnesses." United States v. Arrington, 757 F.2d 1484, 1485 (4th Cir. 1985)).  "But a court should exercise its discretion to grant a new trial sparingly." Millender, 970 F.3d at 531 (internal quotation marks omitted) (citing United States v. Palin, 874 F.3d 418, 423 (4th Cir. 2017)). Accordingly, "[a] new trial is warranted only '[w]hen the evidence weighs so heavily against the verdict that it would be unjust to enter judgment.'" Id. (second alteration in original) (quoting Arrington, 757 F.2d at 1485).

The court does not find Kesari's weight of the evidence arguments to merit a new trial.  There was nothing incredible regarding Dr. Chambers' testimony insofar as Count Thirteen is concerned.  As the preceding discussion suggests, Dr. Chambers' testimony was what one who has reviewed the February 21, 2019 video footage might expect from an expert opining about the appointment and the prescription of that date, i.e., the Suboxone prescription, authorized after a perfunctory 22-second encounter with a supposed opioid addict that lacked any substantive medical treatment or inquiry, was issued outside the usual course of professional medical practice, without a legitimate medical purpose, and beyond the bounds of medical

38

practice.  Notwithstanding any emphasis on psychiatric evaluations, Dr. Chambers offered credible testimony regarding the impropriety of the February 21, 2019 visit and the prescription issued that date.  Moreover, any isolated inconsistency regarding Dr. Chambers' consideration of the records concerning Shawn Shaffer is not persuasive evidence that the expert offered incredible testimony regarding Kesari's "treatment" of Tripp on February 21, 2019.

In addition, the deviations from the standard of care described above were significant enough to justify the conviction on Count Thirteen regardless of the reason for Kesari's absence from his office.  Dr. Chambers stated that his opinions regarding the propriety of the February 21, 2019 prescription were not contingent on whether the appointment was conducted in-person or by Skype videoconference call.  And it is difficult to discern why a determination of guilt subject to an objective good faith standard would depend, in part, on a doctor's reasons for being "distracted."  Such a consideration would seem more appropriate under a subjective good faith standard, which is not the law.

At base, the evidence supports a conviction on Count Thirteen for the reasons stated in the preceding section

39

discussing the renewed Rule 29 motion.  And as described herein, Kesari's weight-of-the-evidence arguments in the Rule 33 context do not persuasively suggest that a new trial, a remedy to be ordered "sparingly," is appropriate.  See, e.g., Millender, 970 F.3d at 531.

ii.  Remarks by the Government During Closing Argument

Kesari also contends that two remarks made by the Government during closing statements were improper and warrant a new trial under Rule 33.  ECF No. 260, at 15-23.  "A prosecutor's improper closing argument may 'so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process.'"  United States v. Lighty, 616 F.3d 321, 359 (4th Cir. 2010) (alteration in original) (quoting United States v. Wilson, 135 F.3d 291, 297 (4th Cir. 1998)).  "In determining whether a defendant's due process rights were violated by a prosecutor's closing argument, [courts] consider (1) whether the remarks were, in fact, improper, and, (2) if so, whether the improper remarks so prejudiced the defendant's substantial rights that the defendant was denied a fair trial." Id. (citing Wilson, 135 F.3d at 297).  The prejudice prong of this analysis involves consideration of six factors:

40

> (1) the degree to which the prosecutor's remarks have
> a tendency to mislead the jury and to prejudice the
> accused; (2) whether the remarks were isolated or
> extensive; (3) absent the remarks, the strength of
> competent proof introduced to establish the guilt of
> the accused; [] (4) whether the comments were
> deliberately placed before the jury to divert
> attention to extraneous matters[;] . . . (5) whether
> the prosecutor's remarks were invited by improper
> conduct of defense counsel[;] . . . and (6) whether
> curative instructions were given to the jury.

Wilson, 135 F.3d at 299 (citations omitted).  "These factors are

examined in the context of the entire trial, and no one factor

is dispositive."  Id.

        The statements at issue were made by Maryam Adeyola,

counsel for the government, during her rebuttal closing

argument.  The first concerned a characterization of Truxhall's

testimony relating to Kesari's use of medical records as a

"lie."  DEA Diversion Investigator Sandra McMillion testified at

trial that she had interviewed Truxhall and that Truxhall

"indicated that she fills out the chart[s, i.e., the medical

records] and that the doctor does not review them."  ECF No.

280, at 17:24-18:3.  Truxhall later testified on direct

examination that Kesari "didn't fool much with the [electronic

medical record.  He did all paper," and when asked whether she

"knew Dr. Kesari never reviewed the charts," on

cross-examination, stated: "He would review the charts, the

paper charts.  He never - I said he didn't get into the

electronic records."  ECF No. 268, at 34:18-19, 75:16-19.

During Adeyola's rebuttal closing argument, the

following exchange occurred:

[MS. ADEYOLA]: And there is no evidence that is more
clear that this was a conspiracy between the two of
them to distribute illegal prescriptions than the
January 14th video of Agent Tripp's visit to the
practice. Look at it. I'm not going to repeat how long
or whatever else -I just know he didn't ask him any
questions. He didn't know him from Adam. He had no
information about his history.

Counsel got up here and put all the paperwork on the
slides, showing you this is everything that he
told - that Agent Tripp told Kristie.  Kristie didn't
send those documents to Dr. Kesari in California.  He
didn't have it.  She didn't send it.  He didn't have
it.

You know why?

Because the medical records don't matter.  He doesn't
review them.  She knows that he doesn't review them.
And she lied to you about that.  She got on that stand
yesterday and said, "Oh, no. He reviews the records."

MR. HISSAM [Counsel for Truxhall]: Objection, Your
Honor.  May we go to the headset?

THE COURT: The witness may continue - excuse me - the
argument may continue. I'm sorry.

MS. ADEYOLA: "He reviewed the records."

They want you to believe that, oh, no, of course, she
told the truth, because we didn't differentiate
between the paper records and the electronic medical
records.  But the Diversion Investigator Sandra
McMillian got on the stand yesterday and told you what

42

she told her back in June of 2019, "I filled out the
charts, but he doesn't review them."

"I fill out the charts."

If she is to be believed, the only chart she fills out
are those paper records. So either - either she's
misrepresenting about whether or not she fills out
those electronic medical records, the ones that
everybody keeps saying they're wrong, or
auto-populating.  Someone else is saying that they are
lying and putting in incorrect information.

So either she has misrepresented about her filling out
the electronic medical records or she's
misrepresenting to you about whether or not he is
reviewing the paper records.

ECF No. 269, at 6:9-7:22 (emphasis added).


The second statement at issue concerns Adeyola's

characterization of the DEA-104 signed by Kesari on June 18,

2019, when the Drug Enforcement Administration executed a search

warrant at his office.  See ECF No. 256-26; see also ECF No.

281, at 6:1-12:22.  The substantive portion of the Kesari

DEA-104 reads:


In view of my alleged failure to comply with the
Federal requirements pertaining to controlled
substances or list I chemicals, and as an indication
of my good faith in desiring to remedy any incorrect
or unlawful practices on my part, I hereby surrender
for cause my Drug Enforcement Administration (DEA)
Certificate of Registration.

I understand that submission of this document to DEA,
including any employee of DEA, shall result in the
immediate termination of my registration.

43

I understand that I am not entitled to a refund of any
payments made by me in connection with my
registration.  I understand that, beginning on the
date that I sign below, I am not authorized to order,
manufacture, distribute, possess, dispense,
administer, prescribe, or engage in any other
activities with controlled substances or list I
chemicals.

With the understanding that I am not required to
surrender my DEA Certificate of Registration, I freely
and under no duress, implied or expressed, execute
this document and choose to take the action described
herein.

ECF No. 256-26.  During her rebuttal, Adeyola discussed the

DEA-104 in relation to the conspiracy alleged in Count One:

[Ms. Adeyola]:  Was there an agreement to work
together for a criminal purpose?

That is the decision.

Counsel also talked about the fact that there was no
direct evidence of a conspiracy.

You have the videos. That's direct evidence.

You have his - you have his signed confession, the
DEA-104.

ECF. No. 269, at 10:22-11:4 (emphasis added).


     At this juncture, Michael Ferrara, counsel for Kesari,

objected, and the court held a sidebar conference outside the

earshot of the jury.  Id. at 11:5-7.  Ferrara stated:

Dr. Kesari agreed to surrender his license to the DEA
due to regulatory allegations.  The allegations are
not specified; they are a regulatory issue, Judge.

**44**

> Counsel just intentionally prejudicially claimed the
> confession to be a crime.
>
> I ask that the jury be instructed that form is not a
> confession to a crime, and that counsel immediately
> cease this line of argument.

Id. at 11:14-22.  Michael Hissam, counsel for Truxhall,
requested during the sidebar conference a curative instruction
that the jury "disregard Ms. Adeyola's comment that Kristie
Truxhall lied . . ." on the basis that the Fourth Circuit has
found the use of the word "lie" to be improper under similar
circumstances.  Id. at 12:7-13; 13:7-12.  Ferrara then
"request[ed] a similar instruction[] that the jury be told to
disregard signing of this DEA-104 as a confession" and asked
that the court instruct the jury "in plain English, clearly and
plainly, that it was not a confession to a crime."  Id. at
13:14-15.

     The government undertook to explain the comments
during the sidebar conference.  As relevant here, Adeyola
asserted that the "lied" remark was justified inasmuch as
"that's what the evidence showed, that she misrepresented what
she said."  Id. at 12:25-13:2.  Kilby Macfadden, counsel for the
government, offered the following explanation for the
"confession" comment:

> Your Honor, the issue is that Mr. Ferrara cut off Ms.
> Adeyola.  Her - her next line was going to say, signed
> confession as to his ability to be able to prescribe,
> which is exactly what it is.  That is what the
> document says.  He cut her off as qualifying and
> explaining it.  That evidence was not allowed to come
> in, and she was finishing the thought.
>
> So we have rehearsed this.  This is exactly what she
> was going to say, Your Honor.

Id. at 14:15-22.

At the conclusion of the sidebar conference, the court

immediately issued the following curative instructions:

> Ladies and gentlemen of the jury, two things: The
> statement just made by counsel for the government
> treating the DEA surrender as a confession is
> stricken.  You'll see what it is.  The statement that
> it is a confession is stricken.  And you'll disregard
> it completely.
>
> In addition, the statement that Ms. Truxhall lied is
> also stricken.  You will completely disregard it.

Id. at 15:18-25.

For the purposes of the present analysis, the court

will assume that the two comments concerning Truxhall's "lie"

and the DEA-104 "confession" were improper.  Even so, the six

factors pertaining to the prejudice prong of the inquiry counsel

against granting a new trial.

The first factor involves the tendency of the remarks

to mislead the jury and prejudice the defendant.  On the one

46

hand, the "lied" remark regarding Kesari's review of the records may not have been particularly misleading inasmuch as there was seemingly inconsistent testimony from Truxhall and McMillion, who had interviewed Truxhall, regarding Kesari's review of medical records.  Still, the "confession" remark was certainly misleading.  The substantive text of the DEA-104 contains no explicit confession to anything, let alone a violation of the criminal law, but rather involves a good faith surrender of a DEA Certificate of Registration amidst non-descript alleged failures to comply with federal law.  As for the tendency of the statements to prejudice the defendant, it is difficult to discern any actual prejudice.  Although both remarks were ostensibly made during Adeyola's discussion of the conspiracy charge, they seem to potentially concern all counts charged inasmuch as Kesari's review of medical records was pertinent to them and the DEA-104 was a generic form not tailored to any specific offense or conduct.  Nevertheless, Kesari was acquitted on twelve of the thirteen counts charged against him, including the conspiracy charge.  The indication is that the remarks had little or no effect on the verdict.

As for the second factor, the remarks were isolated and not extensive.  Individually, the "lied" remark comprises

two lines of the roughly 13-page rebuttal closing argument transcript, with related statements concerning the alleged misrepresentation occupying approximately one page.  See id. at 5-17. The "confession" remark comprises two lines in the transcript.  See id.  Both remarks were made during the same discreet session of the trial and occurred within minutes of each other.  This factor weighs against a new trial.

The court has already, in effect, addressed the third factor involving the strength of the government's proof absent the remarks.  As described herein, the evidence concerning the commission of Count Thirteen was quite significant and involved various hallmarks of physician convictions for violations of 21 U.S.C. § 841(a)(1).

The fourth factor weighs in Kesari's favor.  Based on the remarks of Adeyola and Macfadden during the sidebar conference, it is clear that the government deliberately used the term "lied" to describe Truxhall's testimony and intentionally characterized the DEA-104 as a "signed confession."  The "lied" remark was arguably not intended to divert attention to extraneous matters inasmuch as it was presented to call attention to inconsistent testimony, but the "confession" remark appears to have contemplated a diversion of

48

the jury's attention to an idea that is not reasonably inferred from the text of the DEA-104.

The fifth factor, whether the government's remarks were invited by improper defense counsel conduct, also weighs in Kesari's favor.  Counsel for Kesari and Truxhall did nothing to invite the remarks at issue.

The court finds the sixth and final factor to be the most significant under the circumstances.  The court issued clear, unambiguous curative instructions advising the jury that the government's statements treating the DEA-104 as a confession and indicating that Truxhall lied were stricken and were to be "completely" disregarded.  These curative instructions were given during the government's rebuttal closing argument, within minutes of the time both statements at issue were made and while the statements were undoubtedly fresh in the jurors' minds.  See Bagheri v. Bailey, 713 F. App'x 141, 149 (4th Cir. 2017) (finding "no inherent prejudice . . . in the fact that the district court" issued a curative instruction after a weekend recess and noting "the delay in providing the curative instruction does not in itself indicate abuse of discretion"); see also United States v. Harrison, 716 F.3d 1050, 1053 (4th

Cir. 1983) (prosecutorial comments not unduly prejudicial where, inter alia, the trial court "later offer[ed] curative instructions before the case went to the jury") (emphasis added). Moreover, the court's general instructions before the jury retired to consider the case provided that "statements and argument of counsel are not evidence," "[the jury was] to consider only the evidence in the case," and "[a]ny evidence as to which an objection was sustained by the court, and any evidence ordered stricken by the court, must be entirely disregarded." ECF No. 285-4, at 9-10.

Of course, "juries are presumed to follow their instructions." United States v. Chong Lam, 677 F.3d 190, 204 (4th Cir. 2012) (quoting Richardson v. Marsh, 481 U.S. 200, 211 (1987)). The Fourth Circuit has upheld the denial of a Rule 33 motion premised on improper prosecutorial remarks where:

> the district court found that, although the government's comments were misleading and extensive, and Appellants did not invite the comments, the government did not make the comments with the purpose of deliberately misleading the jury. It also found that the government presented enough evidence to support Appellants' convictions in the absence of the misleading remarks. Finally, the district court considered its curative instructions, finding that they removed any prejudice the government's comments created.

50

Id. at 197, 204-06.  Thus, even where some factors weigh in favor of a new trial, curative instructions may mitigate resulting prejudice.

Here, there is little to no evidence of any prejudice resulting from the isolated statements made by Adeyola during her rebuttal closing argument.  Any prejudice that may have resulted would have been mitigated by the clear and direct curative instructions given by the court soon after the statements were made, as well as the general jury instructions subsequently given.  Moreover, the evidence of Kesari's guilt of the offense charged in Count Thirteen, absent Adeyola's remarks, was particularly significant and on par with that in similar cases resulting in conviction.  The court finds that the interest of justice does not warrant a new trial under Rule 33.

III.  Conclusion

Accordingly, it is ORDERED that Kesari's memorandum (ECF No. 260), construed as a renewed motion for judgment of acquittal or, in the alternative, motion for a new trial, be, and it hereby is, DENIED.

The Clerk is directed to forward copies of this memorandum opinion and order to the defendant, all counsel of record, the United States Probation Department, and the United States Marshal.

ENTER:    August 25, 2021


John T. Copenhaver, Jr.
Senior United States District Judge